# EXHIBIT A

00906802.1

of communication; and (iii) the general subject matter of

the communication.

Unless otherwise specified, 45 John Lofts LLC requests the production of documents

authored in, or concerning, the time period from August 1, 2014 through October 1, 2014 (the

"Relevant Period").

These are continuing requests for responsive documents. You are under a duty to

supplement your production of documents if you obtain information on the basis of which you

learn or have reason to believe (a) that the production was incomplete when made, or (b) that you

have in your possession, custody, or control, documents responsive to these requests that have

not been produced.

In the event that any document called for has been destroyed, discarded, or otherwise

disposed of, identify the document by stating its: (a) author or preparer; (b) recipients (whether

indicated or blind copies); (c) date; (d) subject matter; (e) number of pages; (f) attachments or

appendices; (g) all persons to whom distributed or shown (h) date of destruction or other

disposition; (i) manner of destruction or other disposition; (j) reason for destruction or other

disposition; (k) person authorizing destruction or other disposition; (l) person destroying or

disposing of the document; and (m) the document request or requests to which the document is

responsive.

### DOCUMENTS REQUESTED

1.     All Documents and Communications concerning all transfers or payments made
by Riverside in accordance with or concerning the Direction Letter, including but not limited to,
(i) all documents and instruments, including checks (front and back), wire instructions and
documents concerning wire transfer, which concern payment, assignment or transfer of the
Down Payment, (ii) the deposit of all or any portion of the Down Payment, and (iii) the

5

transmission or delivery of all or any portion of the Down Payment to you or to any other person or entity.

2.    All Documents and Communications concerning all transfers or payments made by Riverside in accordance with or concerning the Disbursement Schedule, including but not limited to, (i) all documents and instruments, including checks (front and back), wire instructions and documents concerning wire transfer, which concern payment, assignment or transfer of the Disbursement Schedule Funds, (ii) the deposit of all or any portion of any of the Disbursement Schedule Funds, and (iii) the transmission or delivery of all or any portion of any of the Disbursement Schedule Funds to you or to any other person or entity.

3.    All Documents and Communications concerning any transfer of any monies or other property by 45 John Lofts, HS 45 John, Miller, or Sprei to you, not otherwise requested in Request No. 1 and 2 during the Relevant Period.

6

# EXHIBIT B

00906802.1

SHAUL C. GREENWALD

Page 1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -x
In re:                                    :
                                          :
HS 45 JOHN LLC,                           :Chapter 11
                                          :
        Debtor.                           :Case No.
_____   :15-10368(SHL)
HS 45 JOHN LLC,                           :
                                          :
        Plaintiff,                        :
                                          :
v.                                        :
                                           Adv. Pro.
45 JOHN LOFTS LLC, CHAIM MILLER,          :No. 15-01066
SAM SPREI, CHUN PETER DONG, QUICK         :(SHL)
TITLE SEARCH LLC, ABRAHAM
TEITELBAUM, LI LAN WU, aka, LI LAN        :
LIAO, aka, LIAO LI LAN, AIYUN CHEN,       :
WING FUNG CHAU, TU KANG YANG, and         :
RELIABLE ABSTRACT CO., LLC,               :
                                          :
        Defendants.                       :
                                          :
- - - - - - - - - - - - - - - - - - - -x


        DEPOSITION of SHAUL C. GREENWALD, taken by

Respective Parties at the offices of Loeb & Loeb, 345

Park Avenue, New York, New York, on Thursday,

July 2, 2015, commencing at 8:20 a.m., before Leah

Allbee, a Registered Professional Reporter and Notary

Public within and for the State of New York.

SHAUL C. GREENWALD

| Page 2 | Page 4 |
|---|---|

**Page 2**

1
2 A P P E A R A N C E S :
3
4    LOEB & LOEB, LLP
        Attorneys for Debtor-Plaintiff HS 45
5    John LLC
        345 Park Avenue
6    New York, New York 10154
7    BY:  SARA J. CRISAFULLI, Esq.
        VADIM J. RUBINSTEIN, ESQ.
8
9
10   GOLDBERG WEPRIN FINKEL GOLDSTEIN, LLP
        Attorneys for Debtor-Plaintiff HS 45
     John LLC
11   1501 Broadway
        New York, New York 10036
12
     BY:  KEVIN J. NASH, ESQ.
13
14
15   SILVERMAN SHIN & BYRNE, PLLC
        Attorneys for Defendants/
        Cross-claimants Chun Peter Dong and 45
16   John Lofts LLC
        381 Park Avenue South, 16th Floor
17   New York, New York 10016
18   BY:  DONALD SCHNEIDER, ESQ.
19
20   WILK AUSLANDER
        Attorneys for Defendants Wing Fung
21   Chau and Tu Kang Yang
        1515 Broadway
22   New York, New York 10036
23   BY:  ALAN ZUCKERBROD, ESQ.
24
25

**Page 3**

1
2 A P P E A R A N C E S :
3
4    ZELMANOVITZ & ASSOCIATES, PLLC
        Attorneys for Shaul C. Greenwald
5    1211 Avenue of the Americas
        New York, New York 10036
6
     BY:  MENACHEM O. ZELMANOVITZ, ESQ.
7
8
9 ALSO PRESENT:  Maria Filippelli, Esq.
        Old Republic National Title Insurance
10   Company
        400 Post Avenue, Suite 310
11   Westbury, New York 11590
12   Chun Peter Dong
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1            S. Greenwald
2    S H A U L   C H A I M   G R E E N W A L D,
3    called as a witness, having been first
4    duly affirmed by Leah Allbee, a Notary
5    Public within and for the State of New
6    York, was examined and testified as
7    follows:
8    EXAMINATION
9 BY MR. ZUCKERBROD:
10       Q.   Good morning, Mr. Greenwald.
11       A.   Good morning.
12       Q.   My name is Alan Zuckerbrod.  I
13   represent what have been referred to as some of the
14   Asian investors in this lawsuit.  I am going to ask
15   you some questions.  And if my questions are not
16   clear, please say so.  I will try to clarify.
17           If you need to speak with your
18   counsel, you may.  Just not while a question is
19   pending.  Okay?
20       A.   Sure.
21       Q.   Just speak up so the reporter can hear
22   you.
23       A.   Sure.
24       Q.   I understand that you are an attorney?
25       A.   Yes, I am.

**Page 5**

1            S. Greenwald
2    Q.   Can you tell me about your background?
3    A.   My name is Shaul Greenwald, and I am
4 an attorney.  I was admitted to practice law in New
5 York, in the beginning of 2008.  I passed the bar in
6 2007; admitted to practice in 2008.  I opened a
7 title company in August of 2006.  And then
8 subsequently joined my current firm, my current
9 title insurance agency, in 2009, February 2009,
10 called Riverside Abstract.
11   Q.   Did you form that firm?  Were you the
12 founder of that firm, Riverside Abstract?
13   A.   I was not the founder of the firm.
14   Q.   How long has Riverside Abstract been
15 in business?
16   A.   January or February of 2007, I
17 believe.
18   Q.   You joined in 2009?
19   A.   February of 2009.
20   Q.   What was your title when you joined?
21   A.   I don't recall exactly, but I think
22 CEO and corporate counsel.
23   Q.   I am sorry?
24   A.   Corporate counsel and CEO.
25   Q.   Okay.  So when you say that you were

SHAUL C. GREENWALD

| Page 6 | Page 8 |
|---|---|

**Page 6**

1          S. Greenwald
2    the CEO, it sounds like you were the boss?  You were
3    in charge?
4        A.    I have a partner.
5        Q.    Okay.  Who is your partner?
6        A.    Yoel Zagelbaum.
7        Q.    I am sorry?
8        A.    Yoel Zagelbaum.  I will spell it.
9        Q.    Is he still your partner?
10      A.    Yes.
11      Q.    So since 2009 you guys have been
12    partners?
13      A.    Yes.
14      Q.    Are there any other principals of the
15    company?
16      A.    No.
17          MR. ZUCKERBROD:  By the way,
18    before we continue, Mr. Zelmanovitz, we
19    had talked, before we got started, about
20    some additional documents that were the
21    subject of the discussion with the Court
22    yesterday.  And you said you had some
23    documents, but you wanted to put a
24    stipulation on the record.
25          MR. ZELMANOVITZ:  Yes.  These

**Page 7**

1          S. Greenwald
2    are the documents identified by your
3    partner, Mr. Snyder, both on the
4    teleconference with the Court, as well
5    as in an email subsequently to me, where
6    he added an additional document.  He
7    actually added two, but they were the
8    same document so it's really one.  And
9    we have looked at them.  I have copies
10    of them with me.
11          We are prepared to provide them
12    to the parties, provided that all
13    parties agree that this does not waive
14    any privilege applicable to anything
15    else, any other document, any other
16    testimony, whatsoever.
17          MR. ZUCKERBROD:  That's fine.
18          MR. NASH:  We agree.
19          MR. ZELMANOVITZ:  Anyone
20    opposed?  Anyone not agree?
21          MR. NASH:  No.
22          MR. ZELMANOVITZ:  Okay.  Since I
23    was not in the office, I have,
24    unfortunately, only one copy.
25          MR. ZUCKERBROD:  Well, I am not

**Page 8**

1          S. Greenwald
2    going to deal with them now.  We will
3    take a look at them and make copies.
4          MR. ZELMANOVITZ:  Let me
5    identify something for you so that you
6    understand.
7          MR. ZUCKERBROD:  Okay.
8          MR. ZELMANOVITZ:  They are --
9    the four redacted copies I have
10    handwritten on the bottom the
11    corresponding identifying number that
12    relates to them in the redaction log.
13    The other email exchange that's been
14    stapled together, that's the document
15    from the privilege log.
16          MR. ZUCKERBROD:  Okay.  Thanks.
17          MR. ZELMANOVITZ:  And when you
18    make copies, I would appreciate getting
19    a copy back.
20          MR. ZUCKERBROD:  Yes.  Of
21    course.  I will take a look at them at
22    the break, and we will go from there.
23      Q.    So, Mr. Greenwald, where did you go to
24    law school?
25      A.    Benjamin N. Cardozo School of Law.

**Page 9**

1          S. Greenwald
2        Q.    You graduated in '07?
3        A.    I graduated in May of 2007.
4        Q.    Where did you do your undergraduate
5    work?
6        A.    Beth Medrash Govoha in Lakewood, New
7    Jersey.
8        Q.    Prior to joining Riverside in 2009,
9    did you work elsewhere?
10      A.    Yes.  From August of 2006 through
11    February of 2009 I was at a company called Saxony
12    Title.  Saxony, S-A-X-O-N-Y.
13      Q.    Right.
14      A.    Title, LLC.  And that was from that
15    moment, from August of 2006 through February of
16    2009.
17      Q.    What did you do at Saxony Title?
18      A.    I believe my title was vice president
19    of operations or something like that.
20      Q.    Okay.
21      A.    And I really founded the company over
22    there together with, quote, unquote, "my partner,"
23    however you want to define it.
24      Q.    Same partner as at Riverside?
25      A.    No.

SHAUL C. GREENWALD

| Page 10 |
| --- |

1           S. Greenwald
2     Q.   Different partner?
3     A.   Yes. In 2006. And it was my job to
4  actually start -- it was a startup.
5     Q.   Okay.
6     A.   So find clients.
7     Q.   You did everything?
8     A.   Build the company. Whatever it took.
9     Q.   Now, for today's deposition, can you
10 tell me what you did to prepare for it?
11    A.   I reviewed some of the documents, I
12 met with counsel yesterday, I reviewed a few of the
13 depositions, but just really cursory, like read it
14 through. I think I was in bed at the time. So it
15 was one of those late night readings. And that's
16 pretty much all.
17    Q.   And you said that you reviewed some
18 documents. What documents did you review?
19         MR. ZELMANOVITZ: I am going to
20    instruct the witness not to answer that,
21    because those are documents I provided
22    to him. If you would like to show him a
23    document, he will tell you if he saw it
24    or not.
25         I will not allow you to

| Page 11 |
| --- |

1           S. Greenwald
2  invade --
3         MR. ZUCKERBROD: Mr.
4    Zelmanovitz, that's not really a proper
5    instruction.
6         MR. ZELMANOVITZ: Too bad.
7         MR. NASH: Come on. Let's just
8    start fresh here. Okay? We have been
9    doing this for two weeks.
10        Let me finish.
11        There is a cordiality to the
12   depositions and there is a protocol to
13   the depositions. And I know this is
14   your first time here, but we have been
15   going through a lot of people, in fairly
16   good order, because of the cordiality.
17        The judge has made it clear the
18   objections are only as to privilege, but
19   they have to be real privileges. No
20   objections to relevance, materiality,
21   and so forth.
22        Now, it's standard what
23   documents you reviewed. To define the
24   documents is not an invasion of
25   privilege.

| Page 12 |
| --- |

1           S. Greenwald
2         So I don't want to get off to a
3    bad start. We have ground to cover, and
4    we want to get this thing done. But in
5    all seriousness, that's not a proper
6    objection. He is entitled to ask that.
7    Everybody that has testified has
8    indicated what documents they looked at.
9         MR. ZELMANOVITZ: Finished?
10        MR. NASH: Yes.
11        MR. ZELMANOVITZ: I thought I
12   was being cordial until now. I stand
13   corrected if I wasn't. I intend to be
14   cordial. But I have been doing this --
15   this is not my first time at a
16   deposition. I have been doing this a
17   lot longer than you have, Kevin.
18        MR. NASH: I don't know.
19        MR. ZELMANOVITZ: I am going to
20   instruct the witness not to answer that
21   question. It is part of the attorney
22   preparation with him.
23        If you want to show him a
24   document or if it's a document that I
25   did not show him, then you can ask the

| Page 13 |
| --- |

1           S. Greenwald
2  question. If you show him a document,
3  he will tell you if he saw it before,
4  whether I showed it to him or not.
5         MR. ZUCKERBROD: I don't want to
6    get into long speeches or lectures.
7    Okay? It's a proper question. If you
8    instruct him not to answer, that's an
9    improper direction and we will go back
10   to the judge. We're not hesitant to do
11   that.
12        MR. ZELMANOVITZ: Then go back
13   to the judge.
14        MR. ZUCKERBROD: Okay. And your
15   witness is going to have to come back.
16        MR. ZELMANOVITZ: Go back to the
17   judge.
18        MR. ZUCKERBROD: That's fine.
19    Q.   Did you speak with Mr. Miller?
20    A.   Yes.
21    Q.   Prior to the deposition?
22    A.   Yes.
23    Q.   About his deposition and about your
24 testimony?
25    A.   No.

SHAUL C. GREENWALD

| Page 14 | Page 16 |
|---|---|

Page 14

1           S. Greenwald
2      Q.   When did you speak with Mr. Miller?
3      A.   Last?  When --
4      Q.   Yes.
5      A.   I spoke to him a few times over the
6  course of this week.
7      Q.   Did you speak to him -- did you let
8  him know that you were being deposed?
9      A.   Yes, of course.
10     Q.   And did he tell you that he was
11  deposed?
12     A.   Yes.
13     Q.   What more did you discuss with him
14  about the case?
15     A.   That's all we spoke about.
16     Q.   That's it?
17     A.   Yes.  I didn't want to get any --
18     Q.   Did you discuss any specifics?
19     A.   Just for settling purposes.
20     Q.   Okay.  You were talking generally how
21  the case could be possibly settled, and you thought
22  that might be a good idea?
23     A.   Of course.
24     Q.   Did you speak with Mr. Sprei?
25     A.   Same.

Page 15

1           S. Greenwald
2      Q.   Same thing?
3      A.   Same thing.
4      Q.   Did you speak with Mr. Sohn?
5      A.   Not -- what time frame?
6      Q.   Recently, in the last week or two.
7      A.   No.
8      Q.   Have you spoken with any of the other
9  attorneys in this case in preparation or
10  anticipation of your deposition?
11     A.   No.  I spoke to Maria just now when I
12  walked in.
13     Q.   Tell me about just the organizational
14  structure of Riverside.  How many employees?  What
15  are your responsibilities and the responsibilities
16  of some of the other people?  How is it set up?
17     A.   As I mentioned before, I am the chief
18  executive officer and corporate counsel.  We also
19  have approximately 10 to 12 attorneys, including
20  myself, on staff.  Some of them are in-counsel
21  positions.  Some of them are more sales oriented.
22  We have approximately a total of 70 employees,
23  approximately.  I can't give you an exact figure on
24  that.
25           The setup is pretty much that

Page 16

1           S. Greenwald
2  everything runs on a day-to-day basis.  We have
3  different departments.  We start -- we have
4  probably, I would say, six different departments.
5  There may be some more.
6           We have an order entry department, of
7  course.
8           We have a processing department that
9  processes, basically -- would take the -- would take
10  the orders.  And once we get certain things back
11  from our searches, abstracters, municipal searches,
12  other agencies and other search companies,
13  surveyors, they would put together our commitment.
14           The commitment would then be proofed
15  by an attorney, generally by an attorney.  Once that
16  happens, the processors would get it back with
17  corrections.  The corrections would then be
18  implemented.  The -- I don't recall this part, but I
19  think what happens then is that the processor
20  actually sends out the title commitment to our
21  client, or whoever is supposed to get the report.
22  And from there, the responsibilities of the file are
23  transferred over to different groups of
24  coordinators.  Those coordinators' responsibility is
25  to make sure that whatever the clients need or

Page 17

1           S. Greenwald
2  whatever potentially is needed for the file or if
3  the client has requests, it makes their process much
4  easier to have a point person to deal with the file
5  on a day-to-day basis.
6           We have a survey department that deals
7  with ordering surveys.  And once it gets closer to
8  closing, it transfers over to the closing
9  department, where they generally take care of
10  getting closers, printing out documents, changes to
11  policies.  Potentially other things that are going
12  on.
13           There is a -- we have an accounting
14  department, where we have six or seven people right
15  now that deal with financial matters.
16           We also have in that department,
17  sometimes we have to actually get involved with the
18  funding of transactions, so they get involved in
19  that.  Potentially preparing closing statements and
20  other things that may occur during that period of
21  time.
22           And we have a post-closing department.
23  They break out the packages that come back and
24  making sure that the deed comes back properly or at
25  least as close as possible as we can get it.

SHAUL C. GREENWALD

Page 18

1      S. Greenwald
2      And we have a coordinating department.
3  So I think that's all we have. And then within
4  coordinating, we have different departments. We
5  have New York department, New Jersey department, we
6  have a national department.
7      Q.   And what specifically are your
8  responsibilities?
9      A.   My responsibilities, I run the company
10 day-to-day. I am involved in sales. And I am
11 involved in a lot of different meetings, dealing
12 with my underwriters, dealing with clients, dealing
13 internally with hiring and firing decisions.
14 Anything that really needs to be done in order to --
15     Q.   What about legal issues? Do you get
16 involved in those?
17     A.   Sure. As corporate counsel, I do get
18 involved. Sure.
19     Q.   Is there one person -- I think you
20 mentioned you have 10 or 12 attorneys. Is there one
21 attorney in particular who is the lead corporate
22 counsel, or is that you? Or --
23     A.   So generally, we do have -- I said 10,
24 12 attorneys. I would say -- I would have to go
25 through them, but in my mind, probably about five or

Page 19

1      S. Greenwald
2  six attorneys that are involved on a day-to-day
3  basis.
4      And my responsibility, ultimately is,
5  I am the last word. So if there is a question at
6  some point, they would come to me. There is a woman
7  by the name of Karla Miller, who I would say maybe
8  she is chief corporate counsel as far as that. But
9  ultimately, the ultimate decision would be, of
10 course, with the underwriters. We confer with
11 underwriters all of the time. But we would also --
12 I would be involved in that process at some point.
13     Q.   Okay. As I understand it, Riverside
14 is an abstract company?
15     A.   We are a title agency or abstract -- I
16 mean, I don't know how you are defining that.
17     Q.   So again, I am not that clear. Can
18 you explain for me the difference between an
19 abstract company and a title company and the agency,
20 and how that works?
21     A.   Sure. I am not sure -- even though
22 our name is Riverside Abstract, many companies
23 nowadays call their companies title agencies. I
24 would say that's more of a specific -- more
25 defined -- specific definition of what we do.

Page 20

1      S. Greenwald
2      But an agency. We are a company. We
3  are an LLC. We have a staff that handles, like we
4  said, researching title. And ultimately, when we
5  have to -- when we close, there is either an owner's
6  policy or a loan policy or other policies that are
7  issued at the time that we are either closing, or in
8  this case, it was a contract and deed policy, which
9  insures the person going into contract.
10     There would be a policy that we issue
11 as an agent for an underwriter. There are many
12 underwriters in the country. But most notably there
13 are, I would say, four major groups of underwriters.
14 And they are not an agent but a company.
15     So, for example, Old Republic National
16 Title Insurance Company is one. Stewart National
17 Title is another. Fidelity National Title Group has
18 three underwriters, I think. I am not sure. Maybe
19 more. But what I am aware of is Fidelity, Chicago,
20 and Commonwealth, and First American.
21     Those are the major national
22 underwriters, I would say. There are many regional
23 underwriters, and we are -- we have a contract with
24 those -- an agency contract with those companies.
25     The understanding is that we generally

Page 21

1      S. Greenwald
2  do our own work. And we work as diligently as
3  possible to make sure that we do good work; that's
4  our goal. And --
5      Q.   You are authorized as an agent to act
6  for and bind those companies?
7      A.   Yes. Under the terms of the agency
8  contract, whatever the terms are.
9      Q.   Understood. So I would like you to
10 identify the people and employees at Riverside that
11 worked on the 45 John Street transaction.
12     A.   I will tell you the ones I recall.
13     Q.   Okay.
14     A.   Just from really the -- I guess from
15 really -- I wouldn't recall today if not for the
16 fact that I looked at some of the documents
17 yesterday. So I --
18     Q.   Let me ask you. Did the documents
19 that you reviewed before the deposition help refresh
20 your recollection as to the events that happened
21 back in September?
22     A.   On a few things, sure.
23     Q.   You can continue. So who do you
24 recall having worked on this transaction?
25     A.   The attorney, Elliot Schon. There is

SHAUL C. GREENWALD

| Page 22 | Page 24 |
|---|---|

**Page 22**

1          S. Greenwald
2     a woman in my office, Polina Kohan.
3          Q.    Right.
4          A.    There is a woman in my office.  Her
5     name is Rivka, R-I-V-K-A, Cohen, C-O-H-E-N.  Mark
6     Pollak probably -- I think he was involved.  Mark
7     Pollak, P-O-L-L-A-K.
8          Q.    Someone named Azi?
9          A.    Azi Mindick.
10         Q.    He is the CFO?
11         A.    Right now he is, yes.  In his capacity
12    right now he is the CFO.
13         Q.    And yourself; correct?
14         A.    And myself.
15         Q.    Now, in terms of the relative size of
16    transactions, was this 45 John Street deal one of
17    the larger ones that you have done or medium or
18    small ones?  How would you characterize it?
19         A.    I would think that for -- that in
20    general it's considered a large transaction, in
21    general.  And that -- but as a company, we handle
22    transactions of that size quite often.
23         Q.    So it was a large one, but not out of
24    the ordinary?
25         A.    Not completely out of the ordinary,

**Page 23**

1          S. Greenwald
2     sure.
3          Q.    Okay.  Now, prior to this particular
4     transaction, can you tell me what, if any, was your
5     relationship with Chaim Miller?
6          A.    Prior to this transaction?
7          Q.    Yes.
8          A.    Almost none.
9          Q.    Okay.  When did you first meet or come
10    to know Mr. Miller?
11         A.    Right around that time.
12         Q.    When you say "that time," do you mean
13    September of 2014?
14         A.    September of 2014.  Maybe only -- I
15    don't even know if I ever spoke to him.  Maybe a
16    couple of -- I don't recall.
17         Q.    What about the same question with
18    respect to Sam Sprei?
19         A.    Also similar situation.
20         Q.    So you had not known them before or
21    done business with them before?
22         A.    I heard the name Sam Sprei before.  I
23    did not hear the name Chaim Miller before September.
24         Q.    Okay.
25         A.    I probably heard his name for the

**Page 24**

1          S. Greenwald
2     first time either in July or August of that year, of
3     2014.
4          Q.    Other than 45 John Street and what we
5     have seen are four Brooklyn properties --
6          A.    Could I clarify one thing?
7          Q.    Sure.
8          A.    I don't want to be misinterpreted.  I
9     said -- I didn't mean Chaim Miller.  I never met him
10    until September.  I believe in September I met him.
11    Definitely not before.
12              I do recall meeting Mr. Sprei one
13    other time in a social setting in July or August.
14         Q.    Okay.  Thank you for the
15    clarification.
16              So other than the 45 John Street
17    transaction and the four Brooklyn properties, which
18    closed that same day, have you done or has your
19    company done any title work for Mr. Miller and
20    Mr. Sprei on other properties, other deals?
21         A.    I don't recall.  I will qualify that,
22    that I definitely -- it's possible, because we dealt
23    with Mr. Schwartz, and I don't know if they were
24    involved in those other transactions.  And maybe
25    they had other terms that they were involved with.

**Page 25**

1          S. Greenwald
2     But as far as I am concerned, I don't recall any
3     other transactions.
4          Q.    For how long have you known
5     Mr. Schwartz, Yisroel Schwartz, who was the attorney
6     for 45 John Lofts LLC and Mr. Miller?
7          A.    I am not very good with dates, but it
8     must be a couple of years.
9          Q.    A couple of years.  And had he brought
10    you in to do title work on deals that he was working
11    on as a real estate attorney?
12         A.    Yes.
13         Q.    Approximately how many deals have you
14    worked with him on?
15         A.    Where he directly brought us the deal,
16    probably a dozen, maybe less.  I don't know.  But
17    approximately.
18         Q.    Was he the one that brought you into
19    45 John Street?
20         A.    Yes.
21         Q.    Now, Mr. Schwartz was representing the
22    seller of 45 John Street.  Isn't a title company
23    usually retained by the purchaser?
24         A.    Yes.
25         Q.    So how did it come to happen in this

SHAUL C. GREENWALD

Page 26

1           S. Greenwald
2   case that the seller brought the title company in?
3        A.   Now, I don't recall.  But you know a
4   deal is a deal.  So on my side, I don't --
5        Q.   It didn't matter?
6        A.   I don't question.
7        Q.   Right.
8        A.   If an attorney brings me a deal, I say
9   whatever your relationships are --
10           I know at one point -- as you asked
11   the question, I am recalling one thing.  I think
12   there was mention of maybe the buyer -- I am
13   sorry -- maybe the seller was -- had -- was paying
14   somehow for the title insurance in some way, maybe.
15   But at the end result, I don't know if they paid.
16   So I don't know -- I don't recall.
17        Q.   Right.  In fact, I think the evidence
18   shows that the seller did pay the title fees in this
19   case.
20           Is that -- in your experience, is that
21   unusual that the seller would pay for title fees of
22   the purchaser in a transaction?
23        A.   A transaction in New York, as far as
24   at closing, it definitely would be.  This wasn't a
25   closing, so I can't speak to that.

Page 27

1           S. Greenwald
2        Q.   What about at a transaction like this
3   where the contract was being insured?
4        A.   I haven't done many contract vendee
5   policies.  So I could tell you that I wouldn't know
6   what is usual and what's customary.
7        Q.   Okay.  So tell me how Riverside
8   first -- what you recall about Riverside's first
9   involvement and work on the title policy for 45 John
10   Street.  When did that occur?  What did you do?
11   What happened?
12        A.   When you say recall, I just want to
13   clarify.  Are you saying current recollection or --
14        Q.   Yes, current recollection, as you sit
15   here today.
16        A.   From what I read?
17        Q.   Yes.  Either way.
18        A.   Either way.  I just want to --
19        Q.   Whatever is in your head.
20           MR. ZELMANOVITZ:  Let me just --
21        he is asking you to testify as to what
22        you recall now, whether it refreshed
23        your memory by what you read or
24        otherwise.  But not just to repeat what
25        you read.

Page 28

1           S. Greenwald
2           THE WITNESS:  Okay.
3        A.   So I could tell you I don't recall how
4   we got involved in the transaction.
5        Q.   Okay.  Do you recall getting involved
6   initially in connection with possible refinancing of
7   the property?  Or was your firm's role always in
8   connection with a possible purchase and sale and the
9   contract?
10        A.   I don't actually recall.
11        Q.   Okay.  And I take it from what you
12   said before it was Mr. Schwartz that gave you the
13   initial information about the deal?
14        A.   Yes.  Sure.
15        Q.   What did he say?  Do you recall what
16   he said at that time?
17        A.   I don't recall.
18        Q.   Do you recall any discussions with
19   Mister -- strike that.
20           Did you have discussions with
21   Mr. Sohn, the buyer's counsel, during this process?
22        A.   I don't recall.
23        Q.   Do you know who the buyer's counsel
24   was, Mr. Sohn's counsel?
25        A.   I am really bad with names.  If you

Page 29

1           S. Greenwald
2   remind me --
3        Q.   Albstein?
4        A.   Yes, Andy Albstein.
5        Q.   Goldberg Weprin?
6        A.   Goldberg was the firm, but Andy
7   Albstein was, I believe, representing him.
8        Q.   Do you recall any discussions at the
9   outset about insuring a loan from -- as a structure
10   of this transaction -- insuring the transaction as a
11   loan from Mr. Sohn to Mr. Miller and Mr. Sprei as
12   opposed to insuring the contract or insuring the
13   fee?
14        A.   I don't recall.
15        Q.   Tell me what a -- you said it was a
16   little bit unusual -- but could you explain to me
17   what a title policy -- a vendee policy is?
18        A.   I could try.
19        Q.   Okay.
20        A.   I hope I get it right.  A contract
21   vendee policy insures someone that is going into a
22   contract of sale, entering into a contract of sale,
23   potentially putting down a down payment, or even
24   without a down payment, it's really irrelevant.
25           If there was a release down payment or

SHAUL C. GREENWALD

| Page 30 |
|---|
| 1          S. Greenwald |

**Page 30**

1         S. Greenwald
2 not a release down payment, they want to feel secure
3 that whatever the current status and title of
4 anything on the record, on public records, relevant
5 to the property is all that they have.
6       So many times -- this happens quite
7 often -- we will get requests for a title commitment
8 just because someone is in a due diligence period,
9 or even prior to due diligence, before they even
10 enter into a contract, in order to see what the
11 status is of title. Not only for title as far as
12 title issues per se, but even municipal searches in
13 New York which would give you information about any
14 violations that might be out there or the C of Os,
15 the certificate of occupancy status, or other types
16 of searches that are typically run.
17       They want to just get a basic feel of
18 what they are getting into. They don't want to get
19 into a contract without that. They may want to put
20 some description into the contract of what they are
21 accepting on themselves, what they aren't accepting
22 on themselves, what they may be taking subject to,
23 what they may not be taking subject to. And that's
24 pretty standard.
25       We do that -- we do lien searches, we

**Page 31**

1         S. Greenwald
2 probably do hundreds of lien searches a year. I
3 probably do. And many of them are used in
4 anticipation of getting into a contract.
5       Some of them are used when they get
6 into contract. They don't want to maybe run a
7 full-blown title, because they are only in a due
8 diligence period and they have an ability to cancel
9 the contract at any time. So they may not want to
10 run a title search, but they want a lien search.
11 Some people want to get a full title commitment.
12       There are those that -- for example,
13 in this particular case, the client called us and
14 said at some point they wanted a contract vendee
15 policy. And the contract vendee policy really says
16 that this is the status of contract -- of the title,
17 and we give them the commitment. And from that, we
18 give them -- we issue them a policy at some point,
19 once certain conditions are met. And we give them a
20 policy that says this is a condition of title.
21     Q. So at that point, you are certifying
22 the current conditions of title in some respect?
23     A. Yes.
24     Q. And are you also insuring the contract
25 and the authority, for example, of the person

**Page 32**

1         S. Greenwald
2 signing the contract and the seller to enter into
3 that transaction? Are you insuring that that's a
4 valid contract?
5     A. I believe so.
6     Q. In this case, the contract that was
7 eventually entered into between --
8     A. Let me clarify. When I said --
9     Q. Go ahead.
10     A. When I used the word "insuring,"
11 We're not insuring. We are an agent to --
12     Q. I understand that. I am using the
13 word "insuring" --
14     A. I just want to clarify.
15     Q. -- in a broader sense.
16     A. Okay.
17     Q. In this case, the contract that was
18 signed by the purchaser and the seller was recorded.
19 Are you aware of that?
20     A. Yes. Sure.
21     Q. Do you know why? What was the purpose
22 of that contract being recorded?
23     A. Two reasons. First of all, on the
24 contract vendee policy one of the requirements, or
25 at least we try to make sure that it's a contract

**Page 33**

1         S. Greenwald
2 recorded so that the current condition of title is
3 secure. There are times that we won't insure -- we
4 won't need to record a contract, but you would take
5 an exception to that in a policy. Make sure that
6 that's understood, that we're not insuring the
7 contract. We can't guarantee any of the conditions
8 of title.
9       And in this case, and in many cases,
10 even without a contract vendee policy, if someone is
11 either releasing funds, or whatever reason that is
12 between the buyer and seller, they determine that
13 they want to record a contract of sale, they will
14 record either the contract of sale or a memorandum
15 of the contract of sale. That's pretty standard.
16     Q. So again, my question is specifically
17 to this case. Do you know who wanted the contract
18 recorded and why in this case?
19     A. I don't recall.
20     Q. For example, was it because a large
21 deposit was being released and not being held in
22 escrow? Would that be a reason to record the
23 contract, to put the world on notice?
24       MR. ZELMANOVITZ: Are you asking
25       him to speculate?

SHAUL C. GREENWALD

Page 34

1        S. Greenwald
2            MR. ZUCKERBROD: I am asking him
3        if he knows. I am not asking him to
4        speculate.
5        A.   I don't recall.
6        Q.   Who was it at Riverside that
7    handled -- again, at the outset, the day-to-day
8    processing of this title work and the application,
9    who had the responsibility to push the ball forward?
10       A.   I don't recall.
11       Q.   Was it you or somebody else?
12       A.   Definitely not me.
13       Q.   Definitely not you?
14       A.   That I do recall.
15       Q.   I just want to show you -- take a look
16   at some documents. There are a couple of books in
17   front of you which have all of the exhibits from the
18   prior depositions. So instead of handing you new
19   documents, we are going to refer to what has been
20   previously marked.
21           MR. ZELMANOVITZ: These are the
22       same ones?
23           MR. ZUCKERBROD: No. They are
24       different. You will see on the front,
25       there are different witnesses.

Page 35

1        S. Greenwald
2        Q.   So I am going to refer you to a
3    document which has been marked as Miller Exhibit 4.
4    So if you can find the book that has Miller --
5            MR. ZELMANOVITZ: Volume 1 or 2?
6            MR. ZUCKERBROD: I don't know.
7            MR. NASH: It should be the
8        first one.
9        Q.   Kevin will help you out because he is
10   a nice guy.
11       A.   Miller what?
12       Q.   So if you find Miller Exhibit 4, which
13   is the first amendment to the operating agreement.
14   Okay?
15           MR. ZELMANOVITZ: Just give him
16       a chance to take a look.
17           MR. ZUCKERBROD: Of course.
18       A.   (Reviewing documents.) Yes.
19       Q.   Have you seen that document before?
20       A.   Yes.
21       Q.   When do you recall first seeing it?
22       A.   I don't recall.
23       Q.   Again, in the context of this
24   transaction, which the documents seem to show first
25   really got started in a meaningful way around

Page 36

1        S. Greenwald
2    September 10th, and then closed on September 19,
3    2014, can you narrow the time when you believe you
4    first saw that document using those dates?
5            MR. ZELMANOVITZ: You are
6        assuming he saw this in that time
7        period?
8            MR. ZUCKERBROD: No.
9        Q.   I am saying using those dates, does
10   that help you narrow the time when you first may
11   have seen the document? It could have been before
12   September 10th. It could have been after
13   September 19th.
14       A.   I don't recall.
15       Q.   It could have been in the middle?
16       A.   I don't recall.
17       Q.   No recollection?
18       A.   No recollection at all.
19       Q.   Do you recall that document becoming
20   an issue in the closing? And when I say "the
21   closing," I mean the closing of the contract which
22   occurred on September 19th.
23       A.   I recall that there was a question as
24   far as this operating agreement. I don't recall if
25   I ever even saw the document. Potentially, I would

Page 37

1        S. Greenwald
2    be apprised of the information from someone in my
3    office. Even if I would have been involved, that
4    would be my involvement.
5        Q.   Okay. But I thought you said earlier
6    that you do recall seeing the document -- you recall
7    having seen it before, you just don't recall when?
8        A.   Yes, I have seen it, the document.
9        Q.   Okay. And I think you said you recall
10   this document being an issue? An issue or being
11   discussed?
12       A.   Discussed -- a discussion, yes.
13       Q.   Well, was it a problem?
14       A.   I don't recall.
15       Q.   You don't recall?
16       A.   We spoke about it.
17       Q.   Well, was there a bigger issue or a
18   bigger problem in terms of getting this transaction
19   closed other than that document?
20       A.   I don't recall.
21       Q.   Really?
22       A.   I don't.
23       Q.   Do you recall being told about this
24   document by any of the other people at Riverside
25   that worked on this matter?

SHAUL C. GREENWALD

| Page 38 | Page 40 |
|---|---|

**Page 38**

1          S. Greenwald
2    A.   I don't recall.
3    Q.   You don't recall any discussions with
4  Mr. Schon about the document?
5    A.   I don't recall.
6    Q.   Do you recall any discussions with
7  Ms. Miller about the document?  The document being
8  Miller Exhibit 4.
9         MR. ZELMANOVITZ:  With which
10    Miller?
11         MR. ZUCKERBROD:  Karla Miller.
12    A.   Karla Miller.  I don't recall.
13    Q.   Do you recall any discussions with
14  Polina Kohan about this document, the recorded first
15  amendment?
16    A.   No.
17    Q.   Do you recall any discussions with
18  Mr. Albstein, representing the purchaser, about this
19  document?
20    A.   I don't recall.
21    Q.   Do you recall any discussions with
22  Chaim Miller about this document?
23    A.   No.
24    Q.   Do you recall any discussions with Sam
25  Sprei about this document?

**Page 39**

1          S. Greenwald
2    A.   No.
3    Q.   So as you sit here today, can you
4  recall any discussions with this document with
5  anybody else?
6    A.   I do recall that I spoke to
7  Mr. Schwartz about it.
8    Q.   What did you talk to Mr. Schwartz
9  about with regard to this document?
10    A.   If I recall correctly, that this
11  document became some sort of an issue as far as --
12  it was a recorded document, if I am not mistaken.
13    Q.   Can you speak up a little bit?  It's
14  hard to hear you.
15    A.   It's a recorded document.  It was
16  recorded.
17    Q.   Right.
18    A.   And the question was what this
19  document was.  And he felt that there was no issue
20  at all, as he had represented to me, at least in our
21  discussion, that he felt that he -- I believe he
22  presented us with some sort of -- I shouldn't say
23  what he presented to us, because I am not sure if I
24  saw it at that time.  But definitely, what he told
25  me was that the regular operating agreement does not

**Page 40**

1          S. Greenwald
2  allow any further transfer of shares, the original
3  operating agreement.  And there is a restriction on
4  transfer from the lender as well.
5         In addition, the -- I believe this
6  document -- let me just check.
7         Yes.  This document wasn't signed by
8  one of the actual members, which is -- I think it's
9  actually listed on one of the schedules.  On
10  Schedule A of the document that you presented, it
11  names Chun Peter Dong as 32 percent interest, and he
12  wasn't a signatory on this document.
13    Q.   So is there anything else that you can
14  recall in your discussions with Mr. Schwartz about
15  the document?
16    A.   That's all I recall.
17    Q.   And do you know when this
18  discussion -- was this one discussion?  Or did it
19  occur several -- were there several discussions
20  about it?
21    A.   I don't recall.
22    Q.   Now, I just want to go back to your
23  answer.  So you said that Mr. Schwartz told you that
24  there was another document or, I take it, the
25  original LLC operating agreement that said something

**Page 41**

1          S. Greenwald
2  different?
3    A.   Correct.
4    Q.   Okay.  And did he tell you that he
5  believed that the terms of the original operating
6  agreement gave Mr. Miller the authority to sell the
7  property?
8    A.   Correct.
9    Q.   And you understood, I take it, that
10  this document said something different, that
11  Mr. Miller did not have the authority to sell the
12  property without the written consent of the majority
13  interest of the members?
14    A.   No, I didn't say that.
15    Q.   Okay.  Did you read the document?
16    A.   I don't recall.
17         MR. ZELMANOVITZ:  Asked and
18    answered.
19    A.   I don't recall.
20    Q.   So when you had your discussion with
21  Mr. Miller and he told you these things about the
22  document, did you look at the document and try to
23  come to your own conclusion about what it meant,
24  what its effect --
25         MR. ZELMANOVITZ:  Objection.

SHAUL C. GREENWALD

Page 42

1          S. Greenwald
2          Asked and answered.
3     Q.   You can answer.
4          MR. NASH:  You can answer.
5     A.   I don't recall.
6     Q.   So when Mr. Miller told you that there
7  was another agreement that gave Mr. Miller the
8  authority, did you accept his statement or did you
9  question it in any way?  Or did you have your other
10 numerous attorneys at your firm look at the issue?
11    A.   I don't recall.
12    Q.   Let me ask you this, Mr. Greenwald.
13 Eventually -- well, strike that.
14         This document showed up as a -- on the
15 title report; correct?
16    A.   Correct.
17    Q.   The initial title report that your
18 firm did.
19         And the attorneys were scrambling
20 around -- and if my words are incorrect, please
21 correct them -- during the week of September --
22 between September 10th and September 19th to address
23 this issue; correct?
24         MR. ZELMANOVITZ:  Objection.
25 That assumes facts not in evidence.

Page 43

1          S. Greenwald
2          MR. NASH:  Okay.  The minute he
3  used the word "scrambled," he told you
4  can --
5          MR. ZUCKERBROD:  Don't accept my
6  terminology.
7          MR. ZELMANOVITZ:  Look, this is
8  Mr. Zuckerbrod's examination.  Your turn
9  will come.
10         MR. ZUCKERBROD:  Mr.
11 Zelmanovitz --
12         MR. NASH:  There is a
13 cordiality.  You are breaking it.
14         MR. ZUCKERBROD:  Kevin, Kevin,
15 please.
16         Mr. Zelmanovitz, this is not a
17 trial.  Okay?  If you have an objection
18 to the form, say so.
19         MR. ZELMANOVITZ:  1 just did.  I
20 didn't direct the witness not to answer.
21         MR. ZUCKERBROD:  You don't have
22 to give speeches.
23         MR. ZELMANOVITZ:  My objection
24 is on the record.
25         MR. ZUCKERBROD:  Just say

Page 44

1          S. Greenwald
2  objection to the form.  That's how it is
3  done.
4          MR. ZELMANOVITZ:  Go ahead.  Ask
5  your question, Mr. Zuckerbrod.
6          MR. ZUCKERBROD:  Can you read
7  back my question, please.
8          (The record was read.)
9     Q.   I am going to ask you a different
10 question.  Okay?
11         Was this document the subject of
12 discussions between the attorney for the purchaser
13 and the attorney for the seller between September
14 10th and September 19th?
15    A.   I don't know.
16    Q.   You don't know, as you sit here today?
17    A.   I don't know.
18    Q.   Okay.  So we will --
19    A.   I should say I don't recall at that
20 point.
21    Q.   Well, what do you recall?
22    A.   What I told you, which is that I spoke
23 to Mr. Schwartz about this document.
24    Q.   Mr. Schwartz told you what?
25         MR. STEVENS:  He answered that

Page 45

1          S. Greenwald
2  already.
3     A.   I told you that he told me that this
4  document is not valid.
5     Q.   Okay.  So let's take it from there.
6  Did he say why he thought it was not valid?
7     A.   I think I made the points already.
8  That it wasn't signed by Mr. Dong --
9     Q.   So let's start there.  So he said it
10 was not valid because it was not signed by Mr. Dong?
11    A.   Right.
12    Q.   Who was one of the LLC members?
13    A.   Right.  As far as the transfer of
14 membership.
15         MR. ZELMANOVITZ:  Let him finish
16 the answer.
17    A.   As far as the transfer of membership
18 interest.
19         In addition, as I mentioned before,
20 the -- which is a requirement of the original
21 operating agreement.  And that there was a lender
22 that restricted the transfer of shares of membership
23 interest.
24    Q.   That there was a lender that
25 restricted -- so can you explain what Mr. Schwartz,

SHAUL C. GREENWALD

Page 46

1           S. Greenwald
2  to your understanding, meant by that?
3       A.    That any document trying to transfer
4  interest or changing the operating agreement would
5  be invalid.
6       Q.    Because the lender had the right to
7  restrict the transfer of shares?
8       A.    Yes. I think I said that.
9       Q.    So in Mr. Schwartz' opinion, as you
10 understood it, he was saying essentially that
11 Mr. Miller had no authority to transfer any shares;
12 correct?
13      A.    To transfer the shares that he
14 transferred.
15      Q.    And as a result, this document was not
16 valid?
17      A.    That's what I said.
18      Q.    Did you talk to Mr. Miller after you
19 spoke with Mr. Schwartz about that subject?
20      A.    I don't believe so.
21      Q.    You didn't check with him?
22      A.    No.
23      Q.    You didn't check with him to see
24 whether he had obtained the consent of the lender to
25 transfer shares?

Page 47

1           S. Greenwald
2       A.    No.
3       Q.    Now, did Mr. Schwartz give you any
4  other reasons why he believed the document was not
5  valid?
6       A.    Other than the ones I stated?
7       Q.    Yes, other than the ones you stated.
8       A.    I don't recall.
9       Q.    Okay. Did Mr. Schwartz tell you or
10 say anything about the document being signed under
11 any pressure, any duress, or anything like that?
12      A.    I don't recall.
13      Q.    So even though Mr. Schwartz told you
14 that he believed the document was not valid because
15 there were restrictions on the ability of Mr. Miller
16 to transfer shares, there were efforts undertaken to
17 obtain the consent of the other parties to this
18 document -- the other parties being Mr. Yang and
19 Mr. Chau -- to sign a document in which they would
20 terminate their interest; correct?
21      A.    I don't recall.
22      Q.    Let me refer you to some other
23 documents which might help refresh your recollection
24 a little bit.
25          Before I do that, you would agree that

Page 48

1           S. Greenwald
2  by this document itself, just looking at the
3  document, it says that Mr. Miller apparently does
4  not have the authority to sell the property absent
5  written consent of the majority of the members;
6  correct?
7           MR. ZELMANOVITZ: The
8       document --
9       Q.    Take a look at paragraph 2 at the
10 bottom of page 1.
11          MR. ZELMANOVITZ: The document
12      speaks for itself, but I will let the
13      witness answer.
14          MR. ZUCKERBROD: Well, he
15      is an -- yes. Thank you.
16      A.    (Reviewing documents.) Yes, I would
17 agree with that statement.
18      Q.    Okay. Take a look at the deposition
19 book which contains the exhibits of the Schwartz
20 deposition. I don't know if it's in that same book.
21 It might be in the second one.
22          MR. ZELMANOVITZ: Schwartz. It
23      must be this one.
24      Q.    Yes. It's a little hard to find the
25 Schwartz tab too. It's hidden some place.

Page 49

1           S. Greenwald
2           MR. ZELMANOVITZ: Got it. Which
3      number?
4       Q.    Exhibit 10, Schwartz Exhibit 10. So I
5  am going to refer you -- it's a chain of emails. I
6  am going to refer you to the first email on top,
7  which is an email dated September 10, 2014, from
8  Mr. Schwartz to Polina Kohan, Karla at
9  RSAbstract.com, and a cc to yourself and Mr. Schon.
10 Do you see that one?
11      A.    Yes.
12      Q.    Okay. So Mr. Schwartz states to the
13 group that there is a recorded operating agreement,
14 and he asks the question, "What would we need to
15 have filed to remove it of record?" Then he goes on
16 to state "Would a simple document entitled
17 'termination' suffice?" Do you see that?
18      A.    Yes.
19      Q.    Did you respond to that at all? Did
20 you have any input into Mr. Schwartz' question
21 there?
22      A.    I don't recall.
23      Q.    So if -- I guess the question is: If,
24 as you understand it, Mr. Schwartz told you that
25 this recorded operating agreement was not valid, why

SHAUL C. GREENWALD

Page 50

1           S. Greenwald
2  was he undertaking these efforts to have it removed?
3           MR. ZELMANOVITZ: Objection.
4  Calls for speculation.
5           MR. ZUCKERBROD: If he knows.
6       Q.  Based on your discussion with
7  Mr. Schwartz.
8       A.  I don't know.
9       Q.  Did you believe it should be removed?
10      A.  I don't recall.
11      Q.  Take a look -- we are going to jump
12  back and forth mostly between the Schwartz and
13  Miller exhibits, so if you could have them handy.
14      A.  Okay.  Where is Miller?
15      Q.  So take a look at Miller Exhibit 20.
16          MR. ZELMANOVITZ: You have to
17      get smaller books.
18      Q.  So on Miller Exhibit 20 I would ask
19  you to go to the fourth page of the document, which
20  has a Bates-stamp number at the bottom 05338.
21          MR. ZELMANOVITZ: Just give me
22      one second.
23      Q.  Tell me when you are ready.
24          So I am looking at the email,
25  Mr. Schwartz' email of September 11th, 12:25 p.m.,

Page 51

1           S. Greenwald
2  to your --
3       A.  Could I -- do you want me only to read
4  this email, or do you want me to read the
5  communication --
6       Q.  I am going to ask about a couple of
7  emails, but I am referring to the email at the
8  bottom of page 05338 to start.
9       A.  Okay.
10      Q.  It's an email from Mr. Schwartz on
11  September 11th to Karla at RS Abstract and yourself.
12      A.  Uh-huh.
13      Q.  And Mr. Schwartz asked the question,
14  "Please see attached draft termination and advise if
15  this is sufficient to remove the recorded first
16  amendment from record." Do you see that?
17      A.  Yes.
18      Q.  So do you recall receiving from
19  Mr. Schwartz a draft termination --
20      A.  No.
21      Q.  -- agreement?
22      A.  No.
23      Q.  Do you know why Mr. Schwartz wanted a
24  termination agreement?
25      A.  No.

Page 52

1           S. Greenwald
2       Q.  If Mr. Schwartz -- as far as you know,
3  if he believed that the recorded amendment was not
4  valid, why was this an issue?  Why were --
5           MR. ZELMANOVITZ: Objection.
6           MR. ZUCKERBROD: Let me finish
7       the question, please.
8           MR. ZELMANOVITZ: Go ahead.
9       Q.  Why was this a topic of concern?
10          MR. ZELMANOVITZ: Objection.
11      Asked and answered.
12          MR. NASH: You can answer.
13      A.  I don't recall.
14      Q.  Take a look at the email on the top of
15  that same page where Mr. Schwartz that same day,
16  half an hour later, writes to you and Karla again
17  saying, "Sorry to bug on this, but we have a
18  2:00 p.m. meeting to get this executed, and I need
19  to know whether it will be sufficient." Do you see
20  that?
21      A.  Yes.
22      Q.  So how did you respond?
23      A.  I didn't, I don't think.  I don't
24  recall.
25      Q.  Well, if you turn to the previous

Page 53

1           S. Greenwald
2  page, which has a number 3 on the bottom.
3       A.  Yes.
4       Q.  Mr. Schon writes back to Mr. Schwartz
5  and yourself and Ms. Miller and says, "It looks
6  fine, but please change the name of one of the
7  parties"; correct?
8       A.  Correct.
9       Q.  So why was your -- one of your
10  counsel, Mr. Schon, participating in the discussions
11  about this agreement if Mr. Schwartz and perhaps you
12  yourself, if that's the case, didn't think this
13  recorded agreement was an issue?
14          MR. ZELMANOVITZ: Objection.
15      A.  I don't recall.
16      Q.  Did you ever go back and look at the
17  original operating agreement?
18      A.  Have I since that time?
19      Q.  No.  At this time in September, when
20  this issue had come up, did you ever go back and
21  look at the original operating agreement?
22      A.  I don't recall.
23      Q.  So as the CEO of Riverside and as the
24  chief lawyer there and as an owner of the company,
25  you never went back and looked at that operating

SHAUL C. GREENWALD

Page 54

1              S. Greenwald
2 agreement to validate Mr. Schwartz' opinion?
3      A.   I didn't say I didn't.  I said I don't
4 recall.
5      Q.   Well, from that answer it sounds like
6 you did.
7           MR. ZELMANOVITZ:  Objection.
8      A.   That's not what I said.
9      Q.   So you may have or you may not have?
10     A.   It's possible, of course.
11     Q.   So you are acting as the agent for Old
12 Republic Title Company, you are binding them to a
13 $65 million insurance policy; correct?
14     A.   Correct.
15     Q.   And you are insuring the contract;
16 correct?
17     A.   Correct.
18     Q.   And an issue had come up about whether
19 Mr. Miller had authority to execute that contract;
20 correct?
21     A.   Correct.
22     Q.   And you are telling me you never went
23 back and looked at the operating agreement?
24           MR. ZELMANOVITZ:  Objection.
25      That's not his testimony.

Page 55

1              S. Greenwald
2           MR. ZUCKERBROD:  Stop yelling.
3 I heard his testimony.  Just object to
4 the form.
5           MR. ZELMANOVITZ:  Just stop the
6 trickery.
7           MR. ZUCKERBROD:  Don't tell me
8 to stop the trickery.
9           MR. NASH:  It's not trickery.
10 The man has answered about 90 percent of
11 the questions "I don't recall."
12           MR. ZUCKERBROD:  Yes.  So I am
13 going to go to help him recall.
14           MR. ZELMANOVITZ:  You are
15 helping him recall what you would like
16 him to recall, not what he recalls.
17           MR. ZUCKERBROD:  He is going to
18 recall what he wants to recall.  So I am
19 going to help him with the documents.
20           MR. ZELMANOVITZ:  Go on.
21           MR. ZUCKERBROD:  And stop
22 interrupting me.
23           Can you read back my last
24 question and the answer, please.
25           (The record was read.)

Page 56

1              S. Greenwald
2      Q.   And the answer is?
3      A.   I don't recall.
4      Q.   Do you know if Mr. Schon, Elliot
5 Schon, was more involved in the day-to-day
6 discussions on this issue than you were?
7      A.   It seems so.
8      Q.   So if you don't recall certain
9 answers, would Mr. Schon have those answers?
10           MR. ZELMANOVITZ:  It calls for
11      speculation.  Objection.
12      Q.   If you know.
13           Would he know more than you do on the
14 subject?
15      A.   I don't know.
16      Q.   Please look at the same document, the
17 email from Mr. Schon, on September 11th at
18 5:02 p.m., where he asked "If other members are on
19 board" --
20           MR. ZELMANOVITZ:  Could you tell
21      us exactly where you are reading from?
22           MR. ZUCKERBROD:  Yes.  Page 1,
23      email from Elliot Schon, 5:02 p.m.,
24      9/11/2014.
25           MR. NASH:  What exhibit is that

Page 57

1              S. Greenwald
2 again?
3           MR. ZUCKERBROD:  Same exhibit,
4      Miller 20.
5      Q.   Mr. Schon asks the question "If other
6 members are" --
7           MR. ZELMANOVITZ:  One second.
8           MR. ZUCKERBROD:  I am sorry.
9           MR. ZELMANOVITZ:  Okay.
10      Q.   So my question is:  Mr. Schon says in
11 his email, "If other members are on board and can
12 you get the info I requested below from them."  Do
13 you see that?
14      A.   Yes.
15      Q.   You are copied on the email; correct?
16      A.   Yes.
17      Q.   Do you know what he was referring to
18 there?
19      A.   I can read the agreement.  I can read
20 the email that you have in front of me.  Is that
21 what you want me to do?
22      Q.   Yes.
23      A.   There are a bunch of different people
24 that were listed on the agreement, and they were
25 getting their consent.  It sounds like they wanted

SHAUL C. GREENWALD

Page 58

1        S. Greenwald
2  to get their consent for -- I guess it is talking
3  about the termination still.  It says "I call for
4  the termination of the operating agreement."
5        Q.   So they were trying to get -- someone
6  was trying to get the consents of the people listed
7  on the recorded agreement; correct?
8        A.   Correct.
9        Q.   Take a look at Schwartz Exhibit 19,
10 please.  Can you take a moment and look at it, and
11 can you please tell me what that document is?
12       A.   (Reviewing document.)  I don't know.
13       Q.   You don't know what this document is?
14       A.   It's a title commitment.  It looks
15 like a title commitment.
16       Q.   Is this part of a title commitment
17 Schedule B from the 45 John Street transaction?
18       A.   It doesn't look like my form.
19       Q.   Do you believe that this is somebody
20 else's form?
21       A.   I don't know.
22       Q.   Let me refer -- let's take a look at
23 page 6 of the document.  If you look at the top it
24 says Schedule B, page 6 of 11.
25       A.   Maybe we are looking at the wrong

Page 59

1        S. Greenwald
2  document.
3            MR. ZELMANOVITZ:  Here it is.
4        A.   Got it.
5        Q.   So you will see in the left-hand
6  margin there are some notations on that page.  It
7  says "Amended 9/12/14, MGS."  Do you see where that
8  is?
9        A.   Yes, I see that.
10       Q.   Do you know what that reference is?
11       A.   I don't know.
12       Q.   Do you know what "MGS" stands for?
13       A.   No idea.
14       Q.   So as you sit here today, you can't
15 identify this document?
16       A.   I cannot identify this document.
17       Q.   Let's take a look then at Sprei
18 Exhibit 10.
19            MR. ZELMANOVITZ:  Which exhibit?
20            MR. ZUCKERBROD:  Sprei Exhibit
21       10.
22            MR. ZELMANOVITZ:  Sprei.  Any
23       particular --
24       Q.   Yes.  So Sprei Exhibit 10 is the
25 contract agreement of purchase and sale.  It's a

Page 60

1        S. Greenwald
2  signed contract.  And attached to it as an exhibit,
3  as Exhibit C, is something called a marked-up title
4  commitment.  So I would ask you to turn to that
5  document, which starts with Bates-stamp number GWFG
6  2344 on the bottom right-hand corner.
7        A.   Okay.
8        Q.   Okay.  And you can take a moment and
9  look through that.  And I will ask the same
10 question, whether you recognize this document.
11       A.   (Reviewing documents.)  Yes.
12       Q.   And what do you recognize it to be?
13       A.   It's a Riverside abstract commitment.
14       Q.   Is this the marked-up commitment that
15 became part of the contract and represents the
16 commitment to issue the insurance on behalf of
17 Chicago Title?
18       A.   Well, I am not sure how you are
19 qualifying that.  But it seems like a commitment
20 that was marked up, and that's not the policy.  So
21 it's not the actual policy, but it is a commitment
22 that was marked up.
23       Q.   My understanding is that a policy is
24 not issued or finalized until sometime after a
25 closing?

Page 61

1        S. Greenwald
2        A.   No.
3        Q.   No?
4        A.   That's not correct.
5        Q.   So is the actual policy handed to the
6  insured at the closing?
7        A.   In New York, that's generally -- and
8  again, we're not talking about a closing in this
9  case.  We are talking about a contract.
10       Q.   Right, a contract.
11       A.   But again, in New York, generally the
12 owner or the attorney gets a -- receives a policy
13 for the owner or in this case a contract of deed at
14 the time of the closing.
15       Q.   At the time of the closing.
16            Was that done in this case, the 45
17 John Street transaction?
18       A.   I don't recall.
19       Q.   I would ask you to review and search
20 your records.  And if you have not produced it
21 already, to produce the final title policy that was
22 issued at the closing of the contract here.
23       A.   Okay.
24       Q.   Okay?
25            MR. ZELMANOVITZ:  I am pretty

SHAUL C. GREENWALD

Page 62

1    S. Greenwald
2    sure we actually produced it.
3         MR. ZUCKERBROD: Okay. And I
4    will double-check.
5         MR. ZELMANOVITZ: In fact,
6    multiple copies.
7    Q.   Okay. So explain to me what happens,
8    or as you look at this document, what the markups
9    are and what does this show?
10   A.   A commitment is a -- as we discussed
11   before, a commitment is generally just a status of
12   title at the moment of the commitment. We don't
13   always have all of the correct information as far as
14   different unreported items.
15        For example, in this case, we don't
16   know when their closing date would be; we don't know
17   who our closer would be; we don't know who the
18   proposed insured is in this situation. It could be
19   left as TBD. We didn't know a dollar value, et
20   cetera. So many different things that could have
21   happened. And many times it could be a continuation
22   of title prior to -- on the day of the closing, the
23   day before the closing, and we would add that to the
24   commitment. So there are other things that change
25   at this point.

Page 63

1    S. Greenwald
2    Q.   Okay. So looking at this document it
3    appears that something was issued initially and then
4    it was recertified, it looks like on 9/18/2014?
5    A.   That's what it looks like.
6    Q.   Who is Alan Hirsch?
7    A.   Alan Hirsch is an independent closer.
8    Q.   He attends closings on behalf of --
9    A.   At times, yes.
10   Q.   So it looks to me as if the policy was
11   marked to show that insurance in the amount of
12   $64,500,000 was going to be issued?
13   A.   That's what it looks like, yes.
14   Q.   And it looks like the proposed insured
15   has now been identified as HS 45 John LLC?
16   A.   That's correct.
17   Q.   Do you see that?
18   A.   Yes, I do.
19   Q.   Above that it says "ALTA loan policy
20   with New York endorsement modifications." What does
21   that mean?
22   A.   It's just a standard form, so it came
23   on there. I don't know why it would be there. But
24   it does say ALTA loan policy.
25   Q.   I am sorry.

Page 64

1    S. Greenwald
2    A.   An ALTA loan policy is a -- generally
3    what a lender would get if there was a refinance of
4    a transaction.
5    Q.   And then here it says "Borrower, 45
6    John Lofts LLC"?
7    A.   Yes.
8    Q.   So was Riverside issuing -- again, on
9    behalf of the title company -- a loan policy?
10   A.   I don't recall. But the facts that I
11   know now, we did not insure a loan policy.
12   Q.   Did the discussions start out to issue
13   a loan policy here?
14   A.   I don't have recollection of that at
15   the beginning of what happened. I know at some
16   point, from documentation, potentially that was the
17   case.
18   Q.   Okay. So if you could turn a few
19   pages in, starting with the Schedule B exceptions.
20   A.   Uh-huh.
21   Q.   Okay. Which starts on the bottom of
22   Bates-stamp page 2348. And again, in the left-hand
23   margin there are handwritten notation. Can you just
24   explain what those are, what they mean?
25   A.   Yes. A title closer would mark up a

Page 65

1    S. Greenwald
2    title commitment with information relevant to each
3    exception. So the first one, for example, taxes,
4    tax liens, tax sales, water rates, sewer rates, and
5    assessments set forth herein is a standard
6    exception.
7         He wrote "herein" which means that
8    there will be a tax search that would be potentially
9    later on in the document.
10   Q.   Right.
11   A.   And you would be able to look over
12   there and see what the disposition was on that
13   particular exception, title exception.
14   Q.   If the notation, for example, number 4
15   says "except" -- I think that's what it says.
16   A.   Yes.
17   Q.   What does that mean, as a practical
18   matter?
19   A.   So "except" means that will be in your
20   final policy, and we're not insuring over that --
21   Q.   It's an exception to insurance?
22   A.   It's an exception. Except as in
23   E-X-C-E-P-T.
24   Q.   Again, turning the page, there are
25   some handwritten notations that would seem to say

SHAUL C. GREENWALD

Page 66

```
1            S. Greenwald
2   "omit"; correct?
3       A.   Correct.
4       Q.   What does "omit" mean?
5       A.   Omit generally means -- not generally
6   means -- that the insurance policy will not bring
7   that particular exception up on their final policy.
8       Q.   It's omitted as an exception?
9       A.   It's omitted as an exception.
10      Q.   So turn to the next page, which is
11  Bates-stamp No. 2350 on the bottom.  So --
12      A.   Uh-huh.
13      Q.   So let's look at Items 15 and 16,
14  which looks like are omitted; correct?
15      A.   (No verbal answer.)
16      Q.   So in Item 15, it states that "Proof
17  is required as to the following with regard to 45
18  John Lofts LLC."  Do you see that?
19      A.   Yes.
20      Q.   So was that proof furnished to
21  Riverside prior to the issuance of the title policy?
22      A.   Just for clarification purposes, do
23  you mind telling me 45 John Lofts LLC is again the
24  seller; correct?
25      Q.   Seller.
```

Page 67

```
1            S. Greenwald
2       A.   Just too many Johns going on around
3   here.
4            I don't recall.
5       Q.   Who would have the answer to that?
6       A.   I wouldn't know who has the answer to
7   that, but someone likely in my office.
8       Q.   Would your files reflect that?
9       A.   Likely, we would have.
10      Q.   So would any documentation that was
11  provided with regard to these requests be contained
12  in your files?
13      A.   I assume so, yes.
14      Q.   If they were not contained in the
15  files, does that mean you didn't receive it?  If you
16  know.
17      A.   I don't recall.  I don't know.
18      Q.   Take a look at Item 16.
19      A.   Yes.
20      Q.   Which says "Proof of compliance with
21  first amendment to operating agreement," and then it
22  goes on to say -- which I believe is the same
23  recorded operating agreement we have seen before as
24  Miller Exhibit 4.  And that exception is omitted.
25  Do you see that?
```

Page 68

```
1            S. Greenwald
2       A.   Yes.
3       Q.   Was that proof furnished?
4       A.   Could we look at the -- if that's the
5   same -- what is that?  That's Miller --
6       Q.   Miller 4, it's the recorded first
7   amendment to the 45 John Lofts.
8            MR. ZELMANOVITZ:  What was that
9       exhibit?
10           MR. ZUCKERBROD:  Miller
11      Exhibit 4.
12           MR. ZELMANOVITZ:  4.
13      A.   Again, I would have to assume if we
14  omitted it that we made a determination that --
15      Q.   You are speaking very softly.
16      A.   I would have to assume if we made a
17  determination to omit that there was a reason for
18  it.
19      Q.   Well, my question is a little
20  different.  My question is:  Did you receive proof
21  of compliance with that document?
22      A.   I don't recall.
23      Q.   And going back to your last answer, I
24  think -- what did you say?  You said you assume
25  there was a reason that you omitted it; correct?
```

Page 69

```
1            S. Greenwald
2       A.   (No verbal answer.)
3       Q.   What was the reason you omitted it?
4       A.   I don't recall.
5       Q.   As you sit here today, you can't tell
6   us why that exception was omitted from this title
7   policy?
8       A.   I don't recall.
9       Q.   Who would know the answer to that
10  question?
11      A.   I don't know.
12      Q.   Mr. Greenwald, that seems to be the
13  hundred-thousand-dollar question in this litigation,
14  or one of them.  So we have spent a lot of time in
15  depositions and documents trying to find out the
16  answer to that question, which is why Riverside
17  omitted that exception.
18           Just so I understand your testimony,
19  you are saying you don't know, as you sit here
20  today?
21      A.   I said I don't recall.
22      Q.   Do you know?
23      A.   I can't tell you what happened at that
24  point.  I don't recall.
25      Q.   Let me ask you this:  Could you go
```

SHAUL C. GREENWALD

| Page 70 | Page 72 |
|---|---|
| 1        S. Greenwald<br>2  back and find out, from reviewing your files or<br>3  speaking with people, why that was omitted as an<br>4  exception?<br>5          MR. ZELMANOVITZ: Objection.<br>6  Calls for speculation.<br>7          MR. ZUCKERBROD: No. It's a<br>8  yes-or-no question.<br>9          MR. ZELMANOVITZ: No. It calls<br>10  for speculation. "Could you" calls for<br>11  speculation.<br>12          MR. ZUCKERBROD: Your objection<br>13  is noted.<br>14     Q.  Please answer the question.<br>15     A.  I could try to speak to people in my<br>16  office and try to recollect or try to go back and<br>17  see, but --<br>18     Q.  Who would you speak to in your office?<br>19     A.  I would speak to Elliot Schon, I<br>20  think.<br>21     Q.  Anybody else?<br>22     A.  Others that were involved in the file<br>23  that I mentioned before.<br>24     Q.  Who do you think is the person most<br>25  likely to know the answer to that question? | 1        S. Greenwald<br>2  the answer to that question?<br>3          MR. ZELMANOVITZ: Objection.<br>4  Calls for speculation.<br>5     Q.  If you know.<br>6     A.  I don't know.<br>7          MR. NASH: Can I just ask one<br>8  question?<br>9          MR. ZUCKERBROD: Sure.<br>10          MR. NASH: Did you have any<br>11  conversations with Old Republic as to<br>12  why Riverside omitted 15 and 16 on the<br>13  abstract?<br>14          MR. ZELMANOVITZ: Objection.<br>15  Direction not to answer that question.<br>16          MR. NASH: On what basis?<br>17          MR. ZELMANOVITZ: Attorney-<br>18  client.<br>19          MR. NASH: Attorney-client, Old<br>20  Republic?<br>21          MR. ZUCKERBROD: How is that<br>22  attorney-client?<br>23          MR. ZELMANOVITZ: He is an agent<br>24  of Old Republic and the people he spoke<br>25  to at Old Republic were counsel. |

| Page 71 | Page 73 |
|---|---|
| 1        S. Greenwald<br>2     A.  I don't know.<br>3     Q.  Is it Elliot Schon?<br>4     A.  Possibly.<br>5     Q.  What about Karla Miller? Would she<br>6  know?<br>7     A.  I don't know.<br>8     Q.  What about Polina Kohan? Would she<br>9  know?<br>10     A.  Likely not.<br>11     Q.  Likely not. Okay. We will take her<br>12  off the list.<br>13        What about Mark Pollak? Would he<br>14  know?<br>15     A.  Likely not.<br>16     Q.  Likely not.<br>17        What about Azi, the CFO? Would he<br>18  know?<br>19     A.  Definitely not.<br>20     Q.  Definitely not. Okay.<br>21        So it sounds like the people that<br>22  might know would be Elliot Schon or Karla Miller;<br>23  correct?<br>24     A.  Yes.<br>25     Q.  Is there anybody else that might know | 1        S. Greenwald<br>2          MR. NASH: But he is not looking<br>3  for legal advice.<br>4          MR. ZUCKERBROD: This is a<br>5  business transaction.<br>6          MR. ZELMANOVITZ: You are<br>7  talking about a title policy claim that<br>8  has been made, and you are asking about<br>9  conversations with Old Republic relating<br>10  to that claim between Mr. Greenwald and<br>11  people at Old Republic who are counsel<br>12  at Old Republic.<br>13          MR. NASH: No. What we are<br>14  trying to do --<br>15          MR. ZELMANOVITZ: Direction not<br>16  to answer.<br>17          MR. NASH: Okay. You are just<br>18  going down the wrong path. What we are<br>19  trying to do, and we find his testimony<br>20  quite incredible, that he does not<br>21  recall, does not know why these two<br>22  significant omissions were made.<br>23        Now, everybody has testified in<br>24  this case -- has asked a lot more<br>25  difficult questions and have given more |

SHAUL C. GREENWALD

Page 74

1        S. Greenwald
2    comprehensive answers than "I don't
3    know," and I can tell you that. So I
4    find it unbelievable that he doesn't
5    know.
6        However, I also find it
7    unbelievable that Old Republic didn't
8    ask him, and I know they had to ask him,
9    and I know he had to answer them. And
10   for you to cover up that discussion
11   under the cloak of some attorney-client
12   privilege when it's a business
13   relationship between a principal and an
14   agent is just -- you are just trying to
15   delay us from getting to the bottom of
16   this. And it's unfair.
17       We have convened this deposition
18   to accommodate your client. We have
19   done everything we can to get it. We
20   started at 8:00 o'clock on a holiday
21   weekend, and all of that. But we are
22   here just to get answers. And you are
23   just not giving us any answers, and you
24   are obviously covering things up.
25       Now, I would like you to rethink

Page 75

1        S. Greenwald
2    that position, to discuss it with your
3    client, and just give us what really
4    happened here so we can make sense of
5    it. Because I find it incredible. I
6    think everybody else in this room finds
7    it incredible that nobody knows why they
8    omitted two very significant items when
9    there is an email trail up and down as
10   to trying to get terminations, not
11   terminations, and so forth.
12       MR. ZELMANOVITZ: It's
13   incredible to me how many inaccuracies
14   you have placed in your statement after
15   I have read the transcripts that have
16   taken place and the depositions here,
17   including of your client.
18       So you are one of the most
19   cynical --
20       MR. NASH: You are right, that I
21   am.
22       MR. ZELMANOVITZ: I must tell
23   you -- and for someone who talks about
24   cordiality, raising your voice at my --
25       MR. ZUCKERBROD: No one is

Page 76

1        S. Greenwald
2    raising your voice.
3        MR. ZELMANOVITZ: Let me finish
4    now.
5        MR. ZUCKERBROD: Now you are
6    raising your voice.
7        MR. NASH: Nobody is raising
8    their voice.
9        MR. ZELMANOVITZ: I am going to
10   finish. I just sat here for five
11   minutes where Mr. Nash has wasted all of
12   our time --
13       MR. NASH: Oh, please.
14       MR. ZELMANOVITZ: -- doing a
15   colloquy, which is of no purpose
16   whatsoever.
17       If you want to continue this
18   deposition, do so. If you have a
19   problem, deal with it quickly, on the
20   record. We are only here for a limited
21   period of time.
22       MR. NASH: Who said that also?
23       MR. ZUCKERBROD: Let me finish.
24   BY MR. ZUCKERBROD:
25       Q.   Okay. Mr. Greenwald --

Page 77

1        S. Greenwald
2        A.   Yes.
3        Q.   -- as you sit here today and as best
4    as you can recall, were there reasons other than
5    Mr. Schwartz telling you that he didn't believe the
6    recorded first amendment to the operating agreement
7    was valid, were there other reasons, other than what
8    Mr. Schwartz told you, why Items 15 and 16 were
9    omitted as exceptions?
10       A.   I know that was on my side when I
11   spoke to him. It was not -- definitely not close to
12   September 10th or 11th, that I recall. It had to be
13   likely closer to the day of the closing.
14       I don't get involved almost at all
15   with files that may close. We have had hundreds and
16   hundreds of files that haven't closed. Probably
17   close to a thousand closings a year that we input
18   into our system, we deal with and we don't close.
19   That's a lot of time, a lot of effort, a lot of
20   money that goes into it. Lots and lots of things.
21   I try to keep myself busy with big picture items. I
22   do not get involved almost at all in anything else.
23       I am copied on lots of emails, lots of
24   emails. When I say lots, probably an average of
25   over 500 emails a day that I receive, since the last

SHAUL C. GREENWALD

Page 78

1        S. Greenwald
2  few years, every day, at least. I work very long
3  hours. I am in my office every day 7:30 in the
4  morning. I leave my office not before -- after
5  dinner or whatever else I am doing, back and forth,
6  going back to my office emails -- but generally, I
7  don't get home before 10:00 o'clock at night.
8  Usually later. I am in my office Sundays, quite
9  busy.
10        I try to keep myself as efficient as
11  possible. I don't get involved in details of my
12  day-to-day operation unless it's necessary.
13        So I don't recall many details of this
14  transaction, but I can tell you that I did speak to
15  Mr. Schwartz prior to this closing. I don't recall
16  the date. But I am almost certain that I wouldn't
17  have gotten involved in any of this conversation
18  prior to close, very close to the closing.
19        Let me just explain, because I am a
20  very straightforward and honest person. But let me
21  explain to you that the time frame of this
22  closing -- aside from the fact that we do have a
23  large office and a lot going on -- happened to be
24  the Friday, that particular day, was my son's bar
25  mitzvah. We had --

Page 79

1        S. Greenwald
2        Q. Your son's bar mitzvah was on the
3  18th?
4        A. It was the 18th. It was on Friday
5  evening. That week was pretty hectic for me. Aside
6  from the fact that I run a business and quite a busy
7  office, I do get a little bit involved in family
8  issues, at times. I have five children, and my
9  fourth son was being bar mitzvah'd on that day. So
10  I could tell you that a lot was going on.
11        So if I sound like I am not trying to
12  answer the questions, I am trying to be as
13  straightforward and honest of what I actually do
14  recall.
15        I do recall having a conversation with
16  Mr. Yisroel Schwartz. I believe that a very
17  significant part of the reason why we omitted this
18  was based on the conversation I had personally with
19  Yisroel Schwartz.
20        Q. Okay. I understand that. So my
21  question is: Other than your conversation with
22  Mr. Schwartz, are there any other reasons you can
23  think of or is anything else out there that led
24  Riverside to omit this as an exception?
25        A. While we are speaking, I could tell

Page 80

1        S. Greenwald
2  you that there was potential that -- not potential.
3  I would probably -- see, I am a little bit -- I
4  don't want to say confused, but definitely not sure
5  if it's from my recollection from the documents I am
6  seeing or from what I actually recall.
7        But from the documents I see it seems
8  that they were trying to remove this document of
9  record. That's clear. Why they were trying to do
10  that, I don't recall why they wanted to do that.
11  Because based on what Yisroel Schwartz did tell me
12  at some point, there potentially was no reason to
13  remove it. By the fact that we closed it, I
14  would -- it would tend to suggest that we didn't
15  think it was necessary. However, from the emails it
16  would seem that even -- this wasn't a closing, let's
17  clarify. It was a contract vendee policy. That we
18  felt or that I was told -- I shouldn't say we felt.
19  I was told in the emails and from, again, I can't
20  recall if I was actually told by Yisroel Schwartz
21  during this conversation, but definitely in the
22  emails it seems like it was pretty much on that -- I
23  don't know how you are referring to your group.
24  The --
25        Q. The Asian investors?

Page 81

1        S. Greenwald
2        A. The Asian investors, whatever. Is
3  that your operating agreement, the Asian investors'
4  operating agreement?
5        Q. I am not sure what you are talking
6  about.
7        A. The one we were talking about, the
8  schedule -- was it 4?
9        Q. Yes. Miller Exhibit 4 is the recorded
10  first amendment to the original 45 John Lofts LLC
11  agreement that on the surface shows my clients
12  having membership interests.
13        A. Okay. So that they were -- they
14  have -- pretty much your group, that they were going
15  to just dispose of this operating agreement, in any
16  case. But we wouldn't -- that wouldn't be a reason
17  to omit an operating agreement. If you need to
18  dispose of it, then we need to dispose of it.
19        Q. Right.
20        A. So the recollection I had currently
21  and from the one conversation I do recall having
22  with Mr. Schwartz was that the issues brought up
23  were why -- and this was, if I have to guess, if I
24  had to take a really --
25        MR. ZELMANOVITZ: Don't guess.

SHAUL C. GREENWALD

Page 82

1        S. Greenwald
2        Just what you recall.
3        A.   If I have to recall, it was very close
4   to the closing that this conversation happened.
5   That the only reason that we would have decided to
6   omit this operating agreement was based on the
7   reasons that Mr. Miller -- Mr. Schwartz had spoken
8   to me about.
9        Q.   Okay.  So it sounds like the answer to
10  my question -- again, correct me if I am wrong --
11  was that, as you sit here today, there are no other
12  reasons that you can think of why this was omitted
13  other than what Mr. Schwartz told you?
14       A.   Correct.
15       Q.   And despite what Mr. Schwartz had told
16  you, why was it that attorneys and your firm seemed
17  to be spending a lot of time -- and again, my
18  characterization, not yours -- trying to get the
19  Asian investors to sign a document relinquishing or
20  acknowledging they had no membership interests?
21       MR. ZELMANOVITZ:  Objection.
22       Asked and answered.
23       Q.   If you know.
24       A.   I don't recall.  But it's pretty
25  standard practice that if our clients ask us to help

Page 83

1        S. Greenwald
2   them with something, we will help them with
3   something that is not relevant to our title issues.
4        Q.   But that was something that Mr. Sohn's
5   counsel wanted?
6        A.   I don't recall.
7        Q.   Was it something that Mr. Schwartz
8   wanted?  And when I say something wanted, I mean --
9        A.   The documents speak for themselves.
10  That's what it says.
11       Q.   No.  Listen to my question.  Did
12  Mr. Schwartz want the Asian investors to sign a
13  termination agreement removing that issue?
14       A.   I don't have personal knowledge of
15  that from -- other than seeing the documents.
16       Q.   From what you recall.
17       A.   I don't recall.
18       Q.   Take a look at Schwartz Exhibit 22.
19       A.   Is that the one that's GWFG 6417?
20       Q.   Yes, 6417.  So I am going to refer you
21  to the second email from the bottom, which is
22  Mr. Schwartz to OldenEquitiesGroup@gmail.  You know
23  that to be Sam Sprei's email?
24       A.   Yes, I do.
25       Q.   At 3:45 -- it doesn't say a.m. or p.m.

Page 84

1        S. Greenwald
2        A.   Okay.
3        Q.   Mr. Schwartz states, "As long as the
4   removal of the recorded agreement and relinquishment
5   of any interest the Chinese claim is a closing
6   condition, I see no reason we can't enter into a
7   contract."  Do you see that?
8        A.   Yes.
9        Q.   Okay.  Do you agree with that
10  statement?
11       A.   I wasn't involved in this email.
12       Q.   Well, that's not my question.  My
13  question is:  Do you agree with that statement?
14       A.   Based on what I saw today?
15       Q.   Yes.
16       A.   I don't believe so.
17       Q.   You don't believe so?
18       A.   No.
19       Q.   Okay.  So you believe that -- is it
20  your testimony that you believe they could not enter
21  into a contract unless they had that recorded
22  agreement removed?
23       A.   I don't understand what you are
24  saying.
25       Q.   Okay.  Mr. Schwartz seems to be saying

Page 85

1        S. Greenwald
2   that as long as the removal of the recorded
3   agreement is a closing condition, he sees no reason
4   they can't sign a contract.
5        So my question is:  Do you understand
6   that and do you agree with that?
7        A.   Our company omitted the exception for
8   the Chinese group to need their signature on the
9   contract of sale.  So correct.
10       Q.   No.  I think they are talking about
11  the signature on the document removing the recorded
12  agreement.
13       A.   I don't understand what your question
14  is.
15       Q.   Okay.  Let me ask this question:  Did
16  the fact that you were only insuring a contract and
17  not a closing of title or a transfer of title, was
18  that a factor in omitting the exception?  Did that
19  make a difference?
20       A.   No.  Not until -- not to my
21  recollection.
22       Q.   Take a look at Schwartz Exhibit 14,
23  please.  The bottom -- I am sorry.  On the second
24  page of the document.
25       Actually, I am going to go back to the

SHAUL C. GREENWALD

Page 86

1          S. Greenwald
2    last page of the document, which is the first --
3          So page 3, Bates number 4634, there is
4    an email to you. And go back to the prior page, I
5    believe it's from Mr. Schwartz on September 17th,
6    where he says, "This is the file we want the
7    contract vendee policy on." Do you see that?
8      A.    Yes.
9      Q.    So as best as you recall, is this the
10   first time they had asked for the vendee policy?
11     A.    I don't recall.
12     Q.    And then if you go to the email above
13   from Rivka Cohen back to Mr. Schwartz and yourself.
14   She says, "Riverside can issue the requested
15   contract vendee policy." Do you see that?
16     A.    Yes.
17     Q.    And was she saying that, despite the
18   fact that you had this recorded agreement out there
19   on record?
20     A.    That's not what the email says.
21     Q.    Okay. Well, tell me what you believe
22   it says.
23     A.    The email is talking about someone
24   that asked if you could get a contract vendee
25   policy.

Page 87

1          S. Greenwald
2      Q.    Right.
3      A.    And she said we can get you a contract
4    vendee policy. What the policy will include or not
5    include is not the subject of that email.
6      Q.    So those exceptions, omissions still
7    have to be dealt?
8      A.    Yes.
9      Q.    This was two days before
10   September 19th, quote, unquote, "closing"; correct?
11     A.    That's what it seems.
12     Q.    Take a look at -- I am going to show
13   you another document, which has not been previously
14   marked. So we will mark this as Greenwald
15   Exhibit 1.
16         Here is one for the witness and
17   counsel.
18         (Email document Bates-stamped
19         R000987 was marked Greenwald Exhibit 1
20         for identification, as of this date.)
21     Q.    I show you what has been marked as
22   Exhibit 1.
23     A.    Uh-huh.
24     Q.    And I would ask if you could identify
25   this.

Page 88

1          S. Greenwald
2      A.    Yes.
3      Q.    So this, I take it, is an email from
4    Rivka Cohen of your office to Mr. Schwartz, and you
5    are cc'd on it along with Mr. Schon?
6      A.    Yes.
7      Q.    So Ms. Cohen asks Mr. Schwartz to send
8    her the operating agreement for 45 John Lofts. She
9    says she has received the first amendment, but
10   hasn't seen the initial one.
11         So do you know whether she or you ever
12   received the initial operating agreement and looked
13   at it?
14     A.    I don't recall.
15     Q.    She goes on to further ask for
16   confirmation that the operating agreement sets forth
17   that Chaim/Harry Miller is the managing member with
18   authority to bind the company. Do you see that?
19     A.    Yes.
20     Q.    So was that ever confirmed?
21     A.    I don't recall.
22     Q.    At this time, September 18th, the day
23   before the closing of the contract, do you know
24   whether the attorneys in your firm were involved in
25   trying to obtain a termination by the Asian

Page 89

1          S. Greenwald
2    investors of the recorded operating agreement?
3      A.    I don't know.
4      Q.    Did you ever see a draft of a
5    termination agreement, proposed termination
6    agreement, where the Asian investors would
7    acknowledge in writing a relinquishment of their
8    interest?
9      A.    I don't recall.
10         MR. ZELMANOVITZ: Ever see?
11         MR. ZUCKERBROD: Yes.
12         MR. ZELMANOVITZ: At that time
13   or now?
14         MR. ZUCKERBROD: At that time.
15     A.    I don't recall.
16     Q.    Have you seen it since reviewing the
17   documents for the deposition?
18     A.    I remember seeing something which says
19   that -- yesterday, when I was looking at something
20   about an attached -- something attached, but I don't
21   recall the document.
22     Q.    Were you directly hands-on in the loop
23   on that, trying to obtain that termination, or was
24   that handled by others at your office?
25     A.    For sure handled by others at my

SHAUL C. GREENWALD

|  | Page 90 |
|---|---|
| 1 | S. Greenwald |
| 2 | office. |
| 3 | Q.   I can't hear you. |
| 4 | A.   Definitely handled by others in my |
| 5 | office. Not me. |
| 6 | Q.   Now, let's talk about the closing or |
| 7 | the closings on September 19th. Did you attend a |
| 8 | closing? Or tell me what your participation was in |
| 9 | the closing, as I use that term. |
| 10 | A.   I didn't participate in the closing as |
| 11 | far as physically being there or being involved. I |
| 12 | don't even know if I was in my office that day. As |
| 13 | I mentioned, I had some other family matters to |
| 14 | attend to. |
| 15 | Q.   Right. |
| 16 | A.   So I was involved by email |
| 17 | potentially, that I had some emails that came in and |
| 18 | out, and I made some phone calls. |
| 19 | Q.   There was a lot of action going on |
| 20 | that day, I take it? |
| 21 | A.   In many different areas of my company. |
| 22 | Q.   Do you know if there was a physical |
| 23 | closing and people from your office were attending? |
| 24 | A.   From what I recall. Not from my |
| 25 | office. Alan Hirsch was the closer. |

|  | Page 91 |
|---|---|
| 1 | S. Greenwald |
| 2 | Q.   Was anybody else from your office |
| 3 | attending physically? |
| 4 | A.   I don't recall, but I can't believe |
| 5 | anybody else would be there. |
| 6 | Q.   By September 19th, the day of the |
| 7 | closing of the contract, can you tell me how, if at |
| 8 | all, the issue of the recorded first amendment was |
| 9 | addressed or resolved? |
| 10 | A.   Explain that to me again. I am sorry. |
| 11 | Q.   Yes. September 19th, the day of the |
| 12 | closing, is this recorded first amendment still an |
| 13 | issue? Or by that time had you or someone made the |
| 14 | decision not an issue, for whatever reason? |
| 15 | A.   When say on September 19th -- |
| 16 | Q.   Yes. |
| 17 | A.   -- you are talking about the actual |
| 18 | day of September 19th? |
| 19 | Q.   Yes, the day of September 19th. |
| 20 | A.   Or at the time of the closing? Once |
| 21 | we closed, once we issued our policy? |
| 22 | Q.   Starting that morning and then leading |
| 23 | up to the closing, was it still an issue first thing |
| 24 | in the morning? |
| 25 | A.   I wouldn't recall that. I don't |

|  | Page 92 |
|---|---|
| 1 | S. Greenwald |
| 2 | recall. |
| 3 | Q.   You don't know? |
| 4 | A.   I just know from the policy, as we |
| 5 | mentioned, that it was omitted. |
| 6 | Q.   Okay. So you just know from the |
| 7 | policy it got resolved to your satisfaction? |
| 8 | A.   Correct. |
| 9 | Q.   Now, that same day Riverside was |
| 10 | participating in a closing that Mr. Miller was doing |
| 11 | with four other properties in Brooklyn; correct? |
| 12 | A.   Correct. |
| 13 | Q.   And were those going on |
| 14 | simultaneously? |
| 15 | A.   I don't think so. I think -- I don't |
| 16 | know. I don't think so. |
| 17 | Q.   Well, what was your involvement or |
| 18 | your knowledge about the other closing for the four |
| 19 | Brooklyn properties with Mr. Miller? |
| 20 | A.   There was some interplay between all |
| 21 | of these transactions. There was a requirement on |
| 22 | the other four properties for funds to utilize in |
| 23 | order to satisfy the obligations on these other four |
| 24 | properties. And all of these properties were |
| 25 | connected in some sort of way in order to make that |

|  | Page 93 |
|---|---|
| 1 | S. Greenwald |
| 2 | happen. So they all seemed to have to close within |
| 3 | a time frame. |
| 4 | Q.   And everyone was aware that Mr. Miller |
| 5 | was using or the seller was using the deposit from |
| 6 | the purchaser of 45 John to go into the closing |
| 7 | involving the four Brooklyn properties? |
| 8 | MR. ZELMANOVITZ: Objection. |
| 9 | Who do you mean by "everyone"? |
| 10 | Q.   Did you know that? |
| 11 | A.   Can you repeat the question? |
| 12 | Q.   Yes. Were you aware that the deposit |
| 13 | that was coming from the purchaser of 45 John, which |
| 14 | was the subject of the contract that Riverside was |
| 15 | insuring, were you aware that that $14 or |
| 16 | $13 million deposit was being used to fund |
| 17 | Mr. Miller buying out the interest of a Mr. Zhu on |
| 18 | the four Brooklyn properties? |
| 19 | A.   I was aware that there was money that |
| 20 | they needed in order to fund those four properties; |
| 21 | correct. |
| 22 | Q.   We have been going for a while. Let's |
| 23 | take a five-minute break or something. |
| 24 | A.   What time is it? |
| 25 | Q.   It's five minutes before 10:00. |

SHAUL C. GREENWALD

Page 94

1           S. Greenwald
2       (Recess taken 9:54 a.m. to 10:02 a.m.)
3   BY MR. ZUCKERBROD:
4       Q.   Please take a look at what has been
5   marked as Miller Exhibit 6.
6       A.   Yes.
7       Q.   Have you seen this document before?
8       A.   Yes.
9       Q.   And is this a document that was
10  prepared by your firm?
11          MR. ZELMANOVITZ:  Which -- this
12      is many pages.
13      Q.   Okay.  Let's take a look at the first
14  two pages.
15      A.   Yes.
16      Q.   What is this document?
17      A.   Some sort of a ledger of the funds
18  that came in and went out on these -- it seems like
19  these -- it seems like for all of the transactions
20  together.
21      Q.   Both the 45 John transaction and the
22  four Brooklyn property transactions?
23      A.   Yes.  That's the first page it look
24  likes, yes.
25      Q.   Right.

Page 95

1           S. Greenwald
2       A.   Yes.
3       Q.   If you know, did you review this
4   document as it was being prepared and prior to being
5   distributed?
6       A.   No.
7       Q.   Who would have prepared this document
8   or who did prepare it?  If you know.
9       A.   Someone in my office.
10      Q.   Who?
11      A.   In the accounting department.
12      Q.   So let's take a look at the top part
13  of the document.
14      A.   Uh-huh.
15      Q.   Which talks about John Street.  And
16  above the bold "Total received: 30,249,341," there
17  is a number of what appear to be itemized entries of
18  money coming into the transaction; correct?
19      A.   It appears to be.
20      Q.   So there is an entry or item listed
21  "Goldberg Weprin, $227,341," and then to the right
22  of that it says "RS invoice."  Do you see that?
23      A.   Yes.
24      Q.   What does that mean, that entry?
25      A.   It seems like a payment to our invoice

Page 96

1           S. Greenwald
2   for that.
3       Q.   So Goldberg Weprin is sending in that
4   amount of money toward payment of --
5       A.   Toward payment of that, yes.
6       Q.   -- of Riverside's invoice?
7       A.   Yes.
8       Q.   And then below that there is an entry
9   "3839 Holdings, $618,088.02."  Do you see that?
10      A.   Yes.
11      Q.   What is that?
12      A.   I don't recall.
13      Q.   Do you know what 3839 Holdings is?
14      A.   Yes.
15      Q.   What is it?
16      A.   3839 Holdings is a company that --
17  it's a company, I believe it's an LLC -- that has
18  similar ownership to Riverside Abstract, and is
19  sometimes used for lending money.  They do some
20  private loans from there.
21      Q.   Okay.  That's a company that you are
22  involved in?
23      A.   Yes.
24      Q.   So who are the other principals of
25  that company?

Page 97

1           S. Greenwald
2       A.   Myself and the Yoel Zagelbaum.
3       Q.   Your partner in Riverside.
4          So explain to me why or what 3839
5   Holdings was doing in this transaction?  Why --
6   apparently -- well, what was the $618,000?
7       A.   I don't recall what the $618,000 is.
8       Q.   So you and your partner through this
9   entity, 3839 Holdings, lent $618,000 and change to
10  Mr. Miller?
11      A.   I don't recall.
12      Q.   Did you loan money to 45 John Street?
13      A.   I don't recall.
14      Q.   Do you have any records that would
15  shed light on this?
16      A.   There could be some records that I saw
17  in preparation of the deposition.
18      Q.   I am sorry?
19      A.   There were some records in preparation
20  for the deposition that may be relevant.
21      Q.   So after reviewing those records in
22  preparation for the deposition, did that not refresh
23  your recollection any further as to what this
24  represents?
25      A.   Not on the 618,000.

SHAUL C. GREENWALD

| Page 98 | Page 100 |
|---|---|

**Page 98**

1        S. Greenwald
2        Q.    Well, do you recall any discussions
3    with Mr. Miller or Mr. Sprei about them needing
4    additional money and asking to borrow money from
5    you?
6        A.    I don't recall a conversation with
7    them as far as needing more money at that point. I
8    don't recall that.
9        Q.    Do you recall any discussions with
10    Mr. Miller or Mr. Sprei about needing money at any
11    point?
12        A.    I recall a discussion about money
13    being needed. I don't know who the discussion was
14    with.
15        Q.    And the discussion that you recall
16    about money being needed, you said you don't recall
17    who that discussion was with?
18        A.    No.
19        Q.    Do you recall for what purpose the
20    money was needed?
21        A.    No. I don't have a recollection.
22        Q.    Was the discussion with someone other
23    than Mr. Miller and Mr. Sprei?
24        A.    The only other person possible was
25    Mr. Schwartz.

**Page 99**

1        S. Greenwald
2        Q.    And as you sit here today, you can't
3    further identify --
4        A.    I don't recall.
5        Q.    As you sit here today, can you shed
6    any more light on your knowledge of that loan by
7    3839 Holdings?
8        A.    I don't recall.
9        Q.    Does Mr. Miller know who 3839 Holdings
10    is?
11        A.    I don't know.
12        Q.    Does Mr. Sprei know the name of that
13    entity?
14        A.    I don't know.
15        Q.    Does Mr. Schwartz know the name of
16    that entity?
17        A.    I don't know.
18        Q.    But they were aware that you through
19    your firm through some entity had lent money to
20    either 45 John or Mr. Miller; correct?
21        A.    I wouldn't know that.
22        Q.    I am sorry?
23        A.    I wouldn't know that.
24        Q.    Was the money lent -- let me ask you
25    this. Was the money lent to 45 John Lofts LLC, or

**Page 100**

1        S. Greenwald
2    was it lent to either Mr. Miller or Mr. Sprei
3    individually, or some other entity?
4        A.    I don't recall.
5            MR. ZUCKERBROD:  Again, I would
6        ask for those documents from your
7        records.
8        Q.    Okay?
9        A.    Okay.
10        Q.    Okay.  Did 3839 Holdings receive any
11    money from the closing?
12        A.    I don't recall.
13        Q.    Take a look at Schwartz Exhibit 28,
14    please. I am going to refer you to the email on the
15    bottom of the first page of that document, Bates No.
16    10064.
17            You might as well take a look at the
18    whole document to see if that helps refresh your
19    recollection on some questions that I am going to
20    ask you.
21        A.    (Reviewing documents.) Okay.
22        Q.    So having looked at Schwartz Exhibit
23    28, I will ask my question again, which is whether
24    3839 Holdings LLC received any money out of the
25    closing of these transactions.

**Page 101**

1        S. Greenwald
2        A.    Again, I don't have specific
3    knowledge. Based on the email it seems that there
4    was some sort of email about this.
5        Q.    Let's take a look at the email you
6    mentioned. So on the bottom of page 10064, there is
7    an email from Mr. Schwartz to yourself and others on
8    September 19th where Mr. Schwartz writes to the
9    Riverside team stating that he is expecting a wire
10    of approximately $13 million from the purchaser
11    under the contract, talking about disbursements.
12    And he says that $2,332,000 is to be -- is to go to
13    3839 Holdings LLC, and then he asked you to provide
14    wire instructions. Do you see that?
15        A.    Yes.
16        Q.    So what was that for?
17            MR. ZELMANOVITZ: If you know.
18        A.    Could I confer with counsel? I just
19    don't understand how to answer the question, as far
20    as what you are looking for.
21            MR. NASH: No, you can't. You
22        have to answer the question.
23        Q.    Not while the question is pending.
24            MR. NASH: You can't. You
25        can't. Mister --

SHAUL C. GREENWALD

| Page 102 | Page 104 |
|---|---|
| 1       S. Greenwald<br>2       MR. ZUCKERBROD: Note for the<br>3   record --<br>4       MR. ZELMANOVITZ: Just testify<br>5   to what you know -- what you know of<br>6   your own recollection. If this<br>7   refreshes your recollection and you<br>8   recall, then you can testify to it.<br>9   Don't just read back what this says.<br>10      MR. NASH: We are talking about<br>11   $2,332,000.<br>12      MR. ZELMANOVITZ: Kevin, enough<br>13   with the histrionics.<br>14      MR. NASH: Hardly histrionics.<br>15   You don't remember what happened to<br>16   2,332,000?<br>17      MR. ZELMANOVITZ: Kevin, you are<br>18   wasting everybody's time.<br>19   Q.   Answer the question, sir.<br>20   A.   Okay. So I will tell you that from my<br>21   recollection from -- after I have seen these<br>22   documents -- that we did lend -- when I say "we,"<br>23   3839 Holdings LLC lent money to -- not 2,233,000,<br>24   less than that -- to Mister -- based on the<br>25   documents in here, again, based on my recollection, | 1       S. Greenwald<br>2   Q.   So sometime that month 3839 Holdings<br>3   LLC lent $2.2 million to Mr. Sprei or Mr. Miller, or<br>4   some entity?<br>5   A.   Right. It seems.<br>6   Q.   Did they sign a note? Did they sign<br>7   any documentation to that, evidencing the loan?<br>8   A.   I don't recall.<br>9   Q.   So you lent or your firm lent that<br>10   much money and you just don't recall whether there<br>11   is any paperwork?<br>12   A.   Yes.<br>13   Q.   Does your firm or this entity, 3839<br>14   Holdings LLC, does it make a practice or have there<br>15   been other circumstances where it has lent that much<br>16   money, more than $2 million, without any paperwork?<br>17      MR. ZELMANOVITZ: Objection to<br>18   form.<br>19   Q.   You can answer.<br>20   Have there been times when you lent<br>21   that much money without any documentation?<br>22      MR. ZELMANOVITZ: There is a<br>23   question pending.<br>24      MR. ZUCKERBROD: I am asking the<br>25   same question. |

| Page 103 | Page 105 |
|---|---|
| 1       S. Greenwald<br>2   to an entity that Sam Sprei and Mr. Miller were<br>3   involved with prior to the closing. And at this<br>4   closing we were told that we would get it back.<br>5   That's what seems to -- what happened.<br>6   Q.   Again, it's a little unclear to me.<br>7   Let's try to understand this.<br>8   So 3839 Holdings LLC lent money to an<br>9   entity that Mr. Miller and Mr. Sprei were involved<br>10   with prior to the closing?<br>11   A.   Yes.<br>12   Q.   And what entity was that? Was it<br>13   connected to any of these properties?<br>14   A.   I don't recall.<br>15   Q.   How much money was lent to them?<br>16   A.   I believe $2,200,000.<br>17   Q.   $2.2 million?<br>18   A.   Yes.<br>19   Q.   When was that loan made?<br>20   A.   Sometime right before this closing. I<br>21   don't recall the date.<br>22   Q.   Well, when you say "right before," was<br>23   it a day before? Was it five days before? Was it a<br>24   month before? Was it a year before?<br>25   A.   Sometime in September. | 1       S. Greenwald<br>2   A.   I am thinking.<br>3   Q.   Yes.<br>4   A.   I am sure there have been times.<br>5   Q.   Okay. So it sounds like this was a<br>6   short-term loan; correct?<br>7   A.   Correct.<br>8   Q.   And you don't recall the purpose for<br>9   which the loan was made?<br>10   A.   I do recall that there was a -- I want<br>11   to get this right.<br>12   There may have been a purpose with the<br>13   other four transactions, that they may have had a<br>14   reason they needed some of that money for -- maybe<br>15   there was an extension that he needed or something<br>16   like that, and they were going to close this very<br>17   soon thereafter. So that potentially was the<br>18   purpose.<br>19   Q.   Okay. So you believe the purpose<br>20   might have been to help Miller and Sprei obtain an<br>21   extension of the time to close on another property?<br>22   A.   Right.<br>23   Q.   And that other property might have<br>24   been one of the Brooklyn properties?<br>25   A.   Correct. |

SHAUL C. GREENWALD

Page 106

1           S. Greenwald
2      Q.   Involving Mr. Zhu?
3      A.   I don't recall a name.
4      Q.   Do you recall who Mr. Zhu is?
5      A.   No.
6      Q.   You don't have any recollection of
7   Mr. Zhu being a partner with Mr. Miller in any
8   properties?
9      A.   No.
10     Q.   Do you know an entity called Renatus,
11  R-E-N-A-T-U-S?
12     A.   Only from the documents I have read.
13          MR. ZUCKERBROD:  Again, if I
14      haven't asked for it before I would ask
15      for any documentation to be produced
16      regarding this loan.
17          THE WITNESS:  Sure.
18     Q.   Turn to the third page of Schwartz
19  Exhibit 28.  Can you tell me what that is?
20     A.   Based on the document?
21     Q.   Yes.
22     A.   It seems like an agreement that --
23  between 3839 Holdings and 3112 Emmons Avenue Lofts
24  that is a loan, contemplated loan, between the
25  parties, an iska, for a profit or an interest rate,

Page 107

1           S. Greenwald
2   for lack of a better term.  I am not sure if you
3   know what an "iska" is.
4      Q.   We have heard some testimony about it
5   before.  And, in fact, the document has been marked
6   as an exhibit, and Mr. Schwartz talked about it a
7   little bit.
8      A.   So you don't need any more information
9   on that?
10     Q.   I am happy to hear whatever else have
11  you to say about it.
12     A.   In Jewish law charging interest may be
13  prohibited.  So one of the ways to circumvent that
14  prohibition is to do it as a business venture.  So
15  that's basically the concept.
16          I am not a rabbi, so I can't testify
17  for sure.
18     Q.   Do you know who prepared this
19  document, page 10066, the iska?
20     A.   I think there is mention in this of
21  Yisroel Schwartz.  It says in the email.
22          MR. ZELMANOVITZ:  He is not
23      asking you to say what the email says.
24      He is asking you if you know.
25     A.   I don't have a recollection on it, of

Page 108

1           S. Greenwald
2   this email.
3      Q.   Do you know whether this iska, this
4   document, was signed?
5      A.   I don't recall.
6      Q.   This unsigned document talks about a
7   loan from 3839 Holdings to 3112 Emmons Avenue Lofts
8   LLC in the amount of $1,750,842.  Do you see that?
9      A.   Yes.
10     Q.   Was that a separate transaction from
11  the $2.2 million loan that you previously just
12  testified about?
13     A.   I believe that there was a
14  $2.2 million loan which was ostensibly being paid at
15  this closing.
16     Q.   Right.
17     A.   And replaced by another loan with that
18  1.7.  So the end result was that there was --
19     Q.   I see.  So the $2.2 million loan was
20  repaid in the amount of $2,332,000 at closing?
21     A.   I don't recall.
22     Q.   Just go back to Schwartz 28, the first
23  page.
24     A.   Yes.
25     Q.   You are requested to provide wire

Page 109

1           S. Greenwald
2   instructions for the repayment of -- or for the
3   payment $2,332,000; correct?
4      A.   Correct.
5      Q.   And I believe you said that stems from
6   or is connected to an original $2.2 million loan
7   that you made sometime in September to one of
8   Mr. Miller's entities?
9      A.   Correct.
10     Q.   So that $2.2 million loan was repaid
11  at closing; correct?
12          MR. ZELMANOVITZ:  Objection.
13      Asked and answered.
14          MR. ZUCKERBROD:  Well, I am
15      trying to understand.  It's not clear.
16      So forgive me for asking --
17          MR. ZELMANOVITZ:  You are
18      pointing to an email that doesn't come
19      from Mr. Greenwald.
20          MR. ZUCKERBROD:  Mr. Greenwald
21      is copied on --
22          MR. ZELMANOVITZ:  And is, in
23      fact, a draft, because you can see the
24      blank here.
25          MR. ZUCKERBROD:  It's not a

SHAUL C. GREENWALD

## Page 110

1   S. Greenwald
2   draft. This is an email was sent with a
3   blank in it. So it was sent to
4   Mr. Greenwald.
5       MR. ZELMANOVITZ: Answer the
6   question, if you can.
7       A.  I could tell you that the idea was --
8   that I do recall -- the idea was that we would have
9   a payment from this closing. And then there -- at
10  some point, we were anticipating that we would get
11  the full 2.332, and we would not have any other
12  further loans on this transaction.
13      Q.  Okay.
14      A.  And that was pretty much the story at
15  that point.
16      Q.  So my question is: Did you receive
17  the $2,332,000 at closing? When I say "you," I mean
18  3839 Holdings LLC.
19      A.  I don't recall.
20      Q.  You don't recall, as you sit here
21  today, whether you received --
22      MR. ZELMANOVITZ: Let's not be
23  argumentative, please.
24      MR. ZUCKERBROD: I am not being
25  argumentative. Stop interrupting.

## Page 111

1   S. Greenwald
2       MR. ZELMANOVITZ: The question
3   was answered.
4       MR. ZUCKERBROD: Stop
5   interrupting. Stop interrupting.
6       MR. ZELMANOVITZ: You are
7   repeating your questions over and over.
8       MR. ZUCKERBROD: Stop
9   interrupting. I am not repeating
10  myself.
11      MR. ZELMANOVITZ: You take the
12  answers you are given.
13      MR. ZUCKERBROD: No. You object
14  by saying "objection to the form," and
15  leave it at that.
16      Q.  I am going to ask the question again.
17  As you sit here today, you don't recall whether 3839
18  Holdings received $2,332,000 from this closing?
19      A.  That's correct.
20      Q.  Did it receive anything from the
21  closing?
22      A.  I don't recall.
23      MR. NASH: Okay. I ask for
24  production of all of the bank records of
25  this entity from August 1st or July 1st

## Page 112

1   S. Greenwald
2   to the present.
3       This is nonsense.
4       Q.  Does 3839 Holdings maintain bank
5   records?
6       A.  We have a bank, yes.
7       Q.  And would the payments in and out of
8   that account reflect this loan?
9       A.  I don't know.
10      MR. ZUCKERBROD: I would ask for
11  the production of those records.
12      Q.  When we talk about the iska and the
13  amount stated here of a million seven fifty and
14  change, you mentioned that -- if I understood
15  correctly and I may not have -- that that was or
16  might have been a new loan. Can you just explain
17  that a little clearer, please? Because I didn't
18  understand it.
19      Was that money lent?
20      A.  What I said was that there was a --
21  the concept was that we lent $2,200,000 prior to
22  this closing. There was a -- I don't know exactly
23  what the purpose was for this. But I recall that
24  there was a shortfall or potentially a shortfall in
25  this closing, and they needed some -- or for some

## Page 113

1   S. Greenwald
2   other payment outside of this closing. And when I
3   say "this closing," I didn't mean this closing as
4   John Street. I meant to say the larger transaction.
5       And we did not get payment in full on
6   the 2.3 million. What we did is -- there is still
7   an outstanding balance of 1,750,842.
8       Q.  It sounds like -- again, correct me if
9   I am wrong -- that you received a partial payment of
10  the 2.2 million?
11      A.  If I recall, that's what happened.
12      Q.  So in effect, there was a balance due
13  of a million fifty and change?
14      A.  Correct.
15      Q.  Has that money been repaid?
16      A.  No. Not to my knowledge. Not
17  completely.
18      MR. ZUCKERBROD: Again, I would
19  ask for full production of any
20  documentation regarding that loan.
21      MR. NASH: You say "not
22  completely." Was it partially repaid?
23      THE WITNESS: I don't have the
24  information. But I believe there was
25  some sort of payment, yes.

SHAUL C. GREENWALD

### Page 114

1  S. Greenwald
2  MR. NASH: When was that second
3  payment?
4  THE WITNESS: That I don't
5  recall.
6  MR. NASH: Was it in the last
7  five months?
8  MR. ZELMANOVITZ: Okay. We're
9  not going to do this. We are going to
10  have one person complete the examination
11  and then the next person can go.
12  I don't care what your protocol
13  was until now. We're not going to go
14  back and forth like a ping-pong ball.
15  MR. ZUCKERBROD: Let me mark as
16  Greenwald Exhibit 2 another document
17  bearing Bates numbers R000705 and 706.
18  (Email document Bates-stamped
19  R000705 and R000706 was marked Greenwald
20  Exhibit 2 for identification, as of this
21  date.)
22  Q.  Mr. Greenwald, did you have to approve
23  all of the payments that were disbursed from this
24  closing?
25  A.  I don't know if I had to approve all

### Page 115

1  S. Greenwald
2  of the disbursements. When you say -- as far as --
3  I don't understand.
4  Q.  Yes. Going back to Miller Exhibit 6,
5  which was the disbursement journal, there is a whole
6  series of line items about total disbursed,
7  $30 million.
8  So my question was: Did you have to
9  give approval before those monies could be released?
10  A.  Again, vis-a-vis who? Which party did
11  I have to get approval of? There are many parties.
12  Q.  Any party.
13  A.  Our company would have to get
14  approval.
15  Q.  If you look at the bottom of page 705.
16  A.  Yes.
17  Q.  There is an email from Mr. Schwartz to
18  Mr. Pollak, yourself, and Mr. Mindick, with cc's to
19  others at your firm. And Mr. Schwartz is saying
20  that certain funds are left.
21  And he says, "In addition, you will
22  have 1,750,842 delivered for the title invoices,
23  which pursuant to the iska, is funded back to the
24  deal." Do you see that?
25  A.  Yes.

### Page 116

1  S. Greenwald
2  Q.  So having seen that, does that help
3  refresh your recollection about the iska that we
4  talked about in the previous document?
5  A.  I don't think that it's accurate.
6  Q.  How is it inaccurate? What really
7  happened?
8  A.  As I said before, there was a
9  shortfall. He is categorizing that the 1,750,842 is
10  delivered for the title invoice, and that's being
11  funded back to the deal.
12  The way -- there was some sort of a
13  need for funds, and they asked for that amount to
14  have it -- it may have been based on having the
15  title invoice in that amount. I don't know why they
16  would have asked for that. But, ultimately, that
17  was the amount. And that is the iska that we ended
18  up --
19  Q.  "That amount" being the million seven
20  fifty and change?
21  A.  Yes.
22  Q.  So that was the shortfall at the
23  closing?
24  A.  No, not a shortfall at closing. I
25  don't know. That I can't explain, what it was a

### Page 117

1  S. Greenwald
2  shortfall for.
3  Q.  Do you know what that money was needed
4  for?
5  A.  Well, I have a recollection, when I
6  see these emails, from the email, that there was a
7  Babad wire. One is for Babad.
8  Q.  What is Babad?
9  A.  Some sort of a -- they have a
10  relationship. There is a fellow, Mr. Babad, and
11  they have a relationship, some sort of relationship.
12  Q.  I didn't hear the last part.
13  A.  And they have some sort of
14  relationship, Mr. Miller and Mr. Sprei have a
15  relationship with Babad.
16  Q.  Did Mr. Miller and Mr. Sprei owe
17  Mr. Babad money?
18  A.  I don't know the reason.
19  Q.  Do you know Mr. Babad?
20  A.  I know of him. I don't think I -- I
21  don't recall if I have ever met him.
22  Q.  What do you know of him? What does he
23  do?
24  A.  He is in real estate, does some life
25  insurance settlement, I believe.

SHAUL C. GREENWALD

| Page 118 | Page 120 |
|---|---|
| 1          S. Greenwald | 1          S. Greenwald |

1    S. Greenwald
2    Q.   What?
3    A.   Life insurance settlement. I don't
4  know much more about him, other than that he is a
5  member of the -- he lives in Brooklyn, and people
6  say that he is very active in -- that he prepares
7  life insurance settlements and real estate.
8    Q.   So at the top of this document,
9  Greenwald Exhibit 2, there is an email from
10  Mr. Schwartz on September 19th to yourself,
11  Mr. Pollak, and Mr. Mindick, asking to please try to
12  get the Babad wire out, it's important. Do you see
13  that?
14    A.   Uh-huh.
15    Q.   Why was it important?
16    A.   I don't know.
17    Q.   They never explained?
18    A.   No.
19    Q.   Did you ask?
20    A.   I don't recall.
21    Q.   Did that wire go out as requested?
22    A.   Definitely, there was a wire and the
23  list -- I remember the one we were looking at
24  before, that had the word "Babad" on it. I think
25  there was a $2 million wire.

**Page 119**

1    S. Greenwald
2    Q.   Did Mr. Miller explain to you what it
3  was for, or why it was important?
4    A.   No.
5    Q.   Mr. Sprei?
6    A.   No.
7    Q.   Going back to the disbursement list,
8  Miller Exhibit 6. Do you have that in front of you?
9        MR. ZELMANOVITZ: Go back to
10      Miller Exhibit 6.
11    A.   Yes.
12    Q.   There is a payment in the amount of
13  2,827,000 and change to Mega International?
14    A.   Yes.
15    Q.   Do you know what that was for?
16    A.   From the documents I have read, I
17  sort -- it was some sort of payoff to Mega
18  International.
19    Q.   That was money that Mr. Miller had
20  owed to somebody else?
21    A.   It was a payoff. That's all I know.
22        MR. ZELMANOVITZ: Not in a
23      derogatory term, payoff.
24    Q.   I understand. A real estate payoff?
25    A.   Real estate payoff. Mortgage payoff.

**Page 120**

1    S. Greenwald
2  I don't even think of payoff --
3        MR. ZUCKERBROD: Let me mark as
4      Greenwald Exhibit 3 a one-page document
5      bearing Bates number R000790.
6        (Document Bates-stamped R000790
7      was marked Greenwald Exhibit 3 for
8      identification, as of this date.)
9    Q.   Before I ask you about that exhibit,
10  Mr. Greenwald, are there any prohibitions under the
11  insurance laws about lending money?
12    A.   I don't know.
13    Q.   You don't know.
14        As far as you know, you are allowed to
15  have a separate business lending money?
16    A.   I believe so.
17    Q.   So take a look at Exhibit 3.
18    A.   Uh-huh.
19    Q.   What is this document?
20    A.   It's a Riverside Abstract invoice for
21  the 45 John Street closing, it looks like. Or not
22  closing, the --
23    Q.   This is your firm's invoice for the
24  closing; correct?
25    A.   That's what -- yes.

**Page 121**

1    S. Greenwald
2    Q.   Riverside was paid this amount;
3  correct?
4    A.   Yes. It matches to that number.
5    Q.   Okay. So how does it work with the
6  title company? How were those fees split?
7    A.   Generally, policies and endorsements
8  are split between the underwriter and the agent,
9  depending on the agent and underwriter relationship.
10  But somewhere -- and depending on the state. But in
11  New York, generally, somewhere between 20 percent
12  and 15 percent go to the underwriter and 80, 85
13  percent is standard for --
14    Q.   Is it regulated by statute, by the
15  insurance law? The exact split.
16    A.   No, not the split. In New York.
17    Q.   But the amount of the premium is
18  regulated; correct?
19    A.   The amount of the premium is exactly
20  regulated; correct.
21    Q.   Take a look at Sprei Exhibit 14,
22  please.
23    A.   Yes.
24    Q.   Have you ever seen this letter before?
25    A.   I have seen it within production.

SHAUL C. GREENWALD

|  | Page 122 |
|---|---|
| 1 | S. Greenwald |
| 2 | Q.   Okay. |
| 3 | A.   At some point. |
| 4 | Q.   Had you seen -- prior to reviewing |
| 5 | documents after the litigation started in |
| 6 | anticipation of litigation, had you seen this letter |
| 7 | before? |
| 8 | A.   Never. |
| 9 | Q.   When I say "this letter," I am talking |
| 10 | about any variations of this letter with a different |
| 11 | date or a different signature? |
| 12 | A.   Never. |
| 13 | Q.   Did Mr. Miller or Mr. Sprei ever tell |
| 14 | you that they had requested someone draft a letter |
| 15 | indicating that another title company was holding |
| 16 | money on their behalf? |
| 17 | A.   No. |
| 18 | Q.   When was the first time you learned |
| 19 | about the existence of this letter? |
| 20 | A.   I don't recall. But either -- |
| 21 | probably when it was filed with the action. I don't |
| 22 | remember. |
| 23 | Q.   When the litigation started? |
| 24 | A.   Yes. I definitely didn't know |
| 25 | beforehand, so... |

|  | Page 124 |
|---|---|
| 1 | S. Greenwald |
| 2 | deposition room.) |
| 3 | Q.   Have you ever spoken with Mr. Babad? |
| 4 | A.   On a business level, yes. |
| 5 | Q.   And what have you spoken with him |
| 6 | about? |
| 7 | A.   Trying to work together on title |
| 8 | insurance. |
| 9 | Q.   Did you ever speak to him about 45 |
| 10 | John Street and his loan here? |
| 11 | A.   No. |
| 12 | MR. ZUCKERBROD: Let me mark as |
| 13 | Greenwald Exhibit 4 a one-page document |
| 14 | Bates number R000068. |
| 15 | (Email document Bates-stamped |
| 16 | R000068 was marked Greenwald Exhibit 4 |
| 17 | for identification, as of this date.) |
| 18 | Q.   What is this document, Mr. Greenwald? |
| 19 | A.   This document is an email from -- |
| 20 | originally from myself to myself, and then from |
| 21 | myself to my executive assistant. |
| 22 | Q.   Okay. |
| 23 | A.   Stating what it says. You can read it |
| 24 | yourself. |
| 25 | Q.   Okay. So this is the Monday after the |

|  | Page 123 |
|---|---|
| 1 | S. Greenwald |
| 2 | Q.   Did you speak to Mr. Miller or |
| 3 | Mr. Sprei after this letter came to your knowledge? |
| 4 | A.   I don't think I did. |
| 5 | Q.   Did it surprise you when you saw this |
| 6 | letter? |
| 7 | A.   I didn't know if it was true or -- oh, |
| 8 | as far as that they were holding -- I don't know. |
| 9 | Let me read the letter, because I |
| 10 | don't even know what the letter says. So let me |
| 11 | make sure before I answer. |
| 12 | I mean, I don't think it was relevant |
| 13 | to me at all as far as -- I don't think I had an |
| 14 | opinion either way. Maybe; maybe not. There is |
| 15 | nothing -- |
| 16 | I mean, it's amazing that they have |
| 17 | things, great. |
| 18 | Q.   I am sorry? |
| 19 | A.   It was good that they had the money. |
| 20 | It was good. |
| 21 | Q.   But did you eventually come to learn |
| 22 | they didn't have the money? |
| 23 | A.   I don't know that for a fact, but it |
| 24 | seems so. It sure seems like that. |
| 25 | (Mr. Chun Peter Dong enters the |

|  | Page 125 |
|---|---|
| 1 | S. Greenwald |
| 2 | closing. Why is it that you wanted to speak with |
| 3 | Mr. Babad about John Street? |
| 4 | A.   So it wasn't really about John Street, |
| 5 | to my recollection. Although I wrote -- the point |
| 6 | was that I have -- if you notice in the email, the |
| 7 | body of the email, it says "Dovid Gottlieb." |
| 8 | THE REPORTER: It says what? |
| 9 | THE WITNESS: Dovid Gottlieb. |
| 10 | D-O-V-I-D, G-O-T-T-L-I-E-B. I am not |
| 11 | sure if that's the correct spelling, but |
| 12 | that's what it says. |
| 13 | A.   (Continuing) I am friendly with Dovid |
| 14 | Gottlieb. He is a friend of mine. And he works for |
| 15 | Mr. Babad. I was trying to arrange a meeting to go |
| 16 | and talk to him about business. |
| 17 | Q.   New business opportunities? |
| 18 | A.   Yes. |
| 19 | Q.   Okay. |
| 20 | A.   But I guess the point of the email -- |
| 21 | Q.   Yes. |
| 22 | A.   -- if you don't mind me adding to it, |
| 23 | is that once I saw his name on John Street, he was |
| 24 | getting money, I know he is active, I said -- it |
| 25 | jogged my memory, I am going to go -- that's what I |

SHAUL C. GREENWALD

Page 126

1        S. Greenwald
2    do all day is I try to go after new business.
3         MR. ZUCKERBROD:  Let me mark as
4    Greenwald Exhibit 5 a one-page document,
5    R000547.
6         (Document Bates-stamped R000547
7    was marked Greenwald Exhibit 5 for
8    identification, as of this date.)
9    Q.    What is this next exhibit?
10   A.    An email between Mr. Sprei and myself
11   on Sunday, November 9th, in the afternoon, saying "I
12   didn't want John at recordid."
13        MR. ZELMANOVITZ:  Who is saying
14   that?
15        THE WITNESS:  That's what
16   Mr. Sprei says on the email.
17   Q.    Then you replied by saying "What?"
18   A.    I am assuming.  I didn't know what he
19   was talking about.
20   Q.    Right.  And then he clarified or said
21   something further saying, "John Street contract
22   recordid"?
23   A.    Yes.
24   Q.    Did you have any discussions with
25   Mr. Sprei about the recording of the John Street

Page 127

1        S. Greenwald
2    contract?
3    A.    No.
4    Q.    Did Mr. Sprei ever tell you that he
5    was surprised that the John Street contract was
6    recorded or that it was a problem for him in some
7    way?
8    A.    This -- on the email?
9    Q.    Forget about the email.
10        I am asking did you have any
11   discussions --
12   A.    No.
13   Q.    -- with Mr. Sprei about that subject?
14   A.    No.
15   Q.    So how was this email discussion
16   resolved or left off?  That was it?  End of
17   discussion here?
18   A.    I think there was -- was there another
19   email that I said it was recorded?  I think that --
20   I don't think this is the complete copy of the
21   email.
22   Q.    Okay.  Well, this is all that I have,
23   or we have, in terms of production.
24   A.    No.  No.  You are missing something.
25   Q.    Okay.  So tell me what you recall

Page 128

1        S. Greenwald
2    again about your discussion, how this issue was left
3    off.
4    A.    I saw this document yesterday in
5    preparation.
6    Q.    Yes.
7    A.    And the answer, I think, was of course
8    it was recorded.  I think that's -- right.
9    Q.    And that was the end of it?
10   A.    I would have to ask him.
11        Yes.
12   Q.    Did Mr. Sprei respond to that in any
13   way?
14   A.    I don't believe so.
15        MR. ZUCKERBROD:  All right.  I
16   don't have any further questions at this
17   point.
18        What I do want to do is just
19   mark as exhibits these documents you
20   gave me.  And I may have a question or
21   two at the end, if I could just look at
22   them.  But so one, two --
23        MR. ZELMANOVITZ:  Could we have
24   copies made of them?
25        MR. ZUCKERBROD:  Yes.  We will

Page 129

1        S. Greenwald
2    do that.  So it looks like there are
3    five separate documents.
4        MR. ZELMANOVITZ:  Those are the
5    ones you requested, were exactly -- I
6    believe that's correct.
7        MR. ZUCKERBROD:  Okay.  So why
8    don't -- is it okay if we mark them and
9    then make copies for everyone?
10       MR. RUBINSTEIN:  Yes, we will
11   get somebody to make copies.
12       MR. ZUCKERBROD:  Okay.  I don't
13   have to take up time now doing this, but
14   I just want to let you know that I am
15   going to mark these as exhibits, and I
16   may have a question or two of follow up.
17   EXAMINATION
18   BY MR. NASH:
19   Q.    Mr. Greenwald, I have a few questions.
20   A.    Okay.
21   Q.    Are you involved in any business
22   dealings with Mr. Miller concerning 3 Mitchell
23   Place?
24   A.    Define "involved."
25   Q.    What do you understand the word

SHAUL C. GREENWALD

---

**Page 130**

```
 1              S. Greenwald
 2  "involved" mean?
 3      A.   I am currently involved with -- I
 4  mean, anything about 3 Mitchell Place.
 5      Q.   Mr. Miller has testified that you are
 6  partners with him in the flip of the contract at 3
 7  Mitchell Place.  Does that help you understand the
 8  word "involved"?
 9      A.   Right.  I understand the word
10  "involved."
11      Q.   Okay.  So tell me --
12          MR. ZELMANOVITZ:  You asked him
13      a question.  Let him answer it.
14          And by the way, what's the
15      relevance to this case?
16          MR. NASH:  The relevance is we
17      are tracing money through -- starting at
18      45 John into that larger transaction,
19      into other transactions, and so that's
20      the relevance, sir.
21          MR. ZELMANOVITZ:  I will let it
22      go for a bit, but --
23      A.   It's questionable as far as the
24  characterization of what our relationship is in that
25  deal.
```

**Page 131**

```
 1              S. Greenwald
 2      Q.   How would you characterize your
 3  relationship?
 4          MR. ZELMANOVITZ:  Let him
 5      finish.  He is in the middle of the
 6      answer.  Patience.
 7      A.   I would characterize it at this point
 8  that Mr. Miller and Mr. Sprei have nothing to do
 9  with that transaction.  None of their funds were
10  relevant to that transaction.  And that's pretty
11  much the relevance for Mr. Miller and Mr. Sprei.
12      Q.   When did you get involved in the
13  transaction involving 3 Mitchell Place?
14      A.   Late December 2014.
15      Q.   How did you get involved?
16      A.   I believe Mr. Sprei approached me.
17      Q.   What did he say to you when he
18  approached you?
19      A.   That he has this contract that he is
20  trying to get into contract on, 3 Mitchell Place,
21  and he needed some assistance with getting a deposit
22  for that contract.
23      Q.   Okay.  Now, when he approached you in
24  December of 2014, did he indicate to you that he was
25  under contract to buy the property?
```

**Page 132**

```
 1              S. Greenwald
 2      A.   No.
 3      Q.   What did he indicate to you?
 4      A.   He has the potential to get involved
 5  in the contract on that property.
 6      Q.   So he said he has a potential to
 7  execute a contract for that property?
 8      A.   Correct.
 9      Q.   What did he ask you to do?
10      A.   He asked me to help him secure some
11  funds for a short-term -- really, a loan to get it
12  to contract, and he would pay me back shortly.  A
13  very short-term loan.
14      Q.   So he asked you for a short-term loan;
15  correct?
16      A.   Uh-huh.
17      Q.   How much did he ask you for?
18      A.   I don't recall the number that he
19  asked me for.
20      Q.   Was it the full deposit?
21      A.   Sorry.
22      Q.   Was it the full deposit needed for the
23  contract?
24      A.   I don't recall if he asked me for the
25  full deposit.
```

**Page 133**

```
 1              S. Greenwald
 2      Q.   You don't recall how much he asked
 3  you.  How much did you give him?
 4      A.   So we actually were -- when I say we,
 5  meaning an entity -- that lent money or had some
 6  rights at that point.  I don't know how you
 7  characterize it.
 8      Q.   Is that 3839?
 9      A.   No, it's not 3839.  Another entity.
10  They were -- a very short-term loan.  It was
11  supposed to be a very short-term loan of $6 million.
12      Q.   What was the name of that entity that
13  gave the loan?
14      A.   I believe, Kingspark Holdings LLC.
15      Q.   Kingspark?
16      A.   Uh-huh.
17      Q.   Are you a principal of that?
18      A.   I am one of the members.
19      Q.   Who else are the members?
20      A.   I am not sure, but likely my partner,
21  Yoel Zagelbaum.
22      Q.   Is that a lending entity?
23      A.   We have done lending through that
24  entity.
25      Q.   Is it an active lending entity today?
```

SHAUL C. GREENWALD

Page 134

1                S. Greenwald
2      A.   I don't know.
3      Q.   Did it do a one-time loan, Kingspark,
4  or has it done other loans?
5      A.   It has done other loans.
6      Q.   What is the relationship between
7  Kingspark and 3839?
8      A.   Similar relationship.
9      Q.   So it's an affiliate?
10          MR. ZELMANOVITZ:  It depends on
11     how you define "affiliate."
12     Q.   With common members.  Is that an
13 affiliate?
14     A.   I don't characterize is it as an
15 affiliate.  I characterize it as I am involved in
16 many different businesses, and this is one of the
17 businesses I am involved.
18     Q.   Does 3839 Holdings have the same
19 members as Kingspark Holdings?
20     A.   I am not a hundred percent sure.
21     Q.   Did there come a time when a loan was
22 actually made for $6 million?  Money changed hands?
23     A.   Yes.
24     Q.   Who was the loan given to?
25     A.   The loan was a -- the money that was

Page 135

1                S. Greenwald
2  paid out of Kingspark Holdings went into -- for a
3  deposit for the 3 Mitchell Place transaction.
4      Q.   But what entity actually received the
5  money?
6      A.   Riverside Abstract escrow.  It went
7  into escrow.
8      Q.   It went into escrow?
9      A.   It never left our escrow account, as
10 far as at that point.
11     Q.   Are you doing the title work on this
12 contract?
13     A.   Was I?
14     Q.   Was Riverside.
15     A.   At some point we could have, yes.
16     Q.   I am just trying to understand.  So
17 Sprei and Miller needed a $6 million deposit;
18 correct?
19     A.   Uh-huh.
20     Q.   You put up the deposit, you being
21 Kingspark Holdings; correct?
22     A.   Kingspark Holdings put up the deposit,
23 yes.
24     Q.   And you put it up -- and you held it
25 as the escrow agent; correct?  For the contract.

Page 136

1                S. Greenwald
2      A.   Yes.
3      Q.   Was there any agreement signed between
4  Kingspark Holdings and Miller and Sprei?  Loan
5  agreements?  Anything of that nature?
6      A.   Could I get a time frame on that?
7      Q.   When this happened in December of
8  2014.
9      A.   At that point, I don't recall.
10          MR. ZUCKERBROD:  I call for the
11     production of all loan agreements.
12          MR. ZELMANOVITZ:  Taken under
13     advisement.
14     Q.   Where did Kingspark get $6 million to
15 loan?
16          MR. ZELMANOVITZ:  Okay.  I am
17     going to let this go just about a step
18     or two further, and then I am going to
19     cut it off.
20          MR. NASH:  You can't cut it off.
21          MR. ZELMANOVITZ:  You are
22     wasting everybody's time.
23          MR. NASH:  I am hardly wasting
24     anybody's time.
25          MR. ZELMANOVITZ:  I can do what

Page 137

1                S. Greenwald
2  I am going to do.
3          MR. NASH:  The fact that you get
4  so incensed means I am not wasting
5  anybody's time.
6          MR. ZELMANOVITZ:  Answer this
7  question.
8      A.   It was not from any funds that are
9  relevant to this scenario.
10     Q.   Where did it come from?
11     A.   From Kingspark Holdings.
12     Q.   Where did Kingspark Holdings get the
13 money to lend $6 million?
14     A.   We had different ways of locating
15 money.
16     Q.   I am not asking you if you had
17 different ways.  I am asking you where did Kingspark
18 get $6 million to put into the Riverside escrow
19 account as a deposit for the contract?
20     A.   I don't recall.
21     Q.   Now, at the time that Kingspark lent
22 $6 million for the deposit of the contract, did
23 Miller and Sprei still owe you a million seven?
24     A.   I don't recall the exact number.
25     Q.   Well, you recall testifying about that

SHAUL C. GREENWALD

Page 138

1          S. Greenwald
2    there was a balance of about a million seven that
3    was still owed to you?
4          A.    At the time of the closing --
5          MR. ZELMANOVITZ:  He also
6          testified there was a subsequent
7          payment.
8          Q.    Yes.  How much was the subsequent
9    payment?
10         A.    I don't recall.
11         Q.    Did they owe any money to you at the
12    time that you lent them another $6 million?
13         A.    Yes.
14         Q.    How much did they owe you?
15         A.    I don't recall.
16         Q.    Did it concern you when you lent them
17    $6 million that they owed you money on other deals?
18         MR. ZELMANOVITZ:  Objection as
19         to form.
20         Q.    You can answer.
21         A.    Did it concern me?  I wouldn't have
22    lent it if I was concerned about the money.
23         Q.    What were the terms of the loan?
24         A.    The terms of the loan was that we were
25    giving them $6 million and within a few days they

Page 139

1          S. Greenwald
2    would replace the money.
3          Q.    Did you sign an iska agreement?
4          A.    I don't recall, but I don't think so.
5          Q.    When you say "within a few days," how
6    many days?
7          A.    My recollection, within a week.
8          Q.    Did you ask them before you gave them
9    $6 million how they were going to replace the money?
10         A.    Of course.
11         Q.    What did they say?
12         A.    Let me go back.  Originally -- now
13    that you mentioned this, I do recall one more point.
14         Q.    I can't hear you.  You have to speak
15    up.
16         A.    Now that you mentioned this, I do
17    recall one more point.  They originally asked me for
18    $4 million.  As they got closer to the point where
19    they had to -- ostensibly, they had to sign a
20    contract, otherwise they wouldn't be able to get it
21    or whatever else he told me at that point, he asked
22    for another additional $2 million.  I told him I
23    don't want to lend him more money.  He brought to my
24    home at night another fellow who signed a personal
25    guaranty.

Page 140

1          S. Greenwald
2          Q.    Who was that fellow?
3          A.    An older gentlemen named -- I am bad
4    with names.  I forget his name.
5          Q.    We are talking about between 4 and
6    $6 million.
7          A.    Yes.  If you give me a moment, I might
8    remember, but --
9          Q.    Did you --
10         MR. ZELMANOVITZ:  Let him finish
11         his answer.
12         Q.    Yes.
13         A.    He came to my home.  He was this
14    fellow who I have done some business with.  I
15    shouldn't even say that.  He is not a client of
16    mine.  I just knew him from around, but I know he
17    has been involved.
18         And he came and he told me that
19    he's -- actually, he gave me a check for $2 million.
20    Mr. Sprei did.
21         Q.    He came to borrow --
22         MR. ZELMANOVITZ:  Wait.  Wait.
23         We're not finished yet.
24         Q.    Yes.
25         A.    He comes to my house.  He gives -- he

Page 141

1          S. Greenwald
2    has a check prepared for $2 million.  He said the
3    check is not -- there were no -- the funds will be
4    available, I don't remember what date.  The funds
5    would be available shortly.  He gives me a check for
6    $2 million.
7          I said I don't care if you give me a
8    check for $2 million.  It's not meaningful to me.  I
9    need someone behind it.  Which at that point, I said
10    it doesn't mean anything.
11         So he brought this other fellow, who
12    wrote up, if I recall, a handwritten personal
13    guaranty, that this fellow, who I was comfortable
14    with that, to sign a personal guaranty on those
15    funds.  And that was regarding $2 million.
16         Q.    Who was this comfortable fellow?  Do
17    you know his name?
18         A.    I know his name.  I just have to pull
19    it out of my memory.
20         Yosef Billig.  Yosef Billig,
21    B-I-L-L-I-G.
22         Q.    And he signed the guaranty in your
23    house?
24         A.    Yes, if I recall.
25         Q.    And based upon that guaranty you now

SHAUL C. GREENWALD

Page 142

1           S. Greenwald
2   increased your loan from 4 million to 6 million?
3       A.   Yes.
4       Q.   And did you sign any other documents
5   with Mr. Billig besides the guaranty?
6       A.   Not to the best of my knowledge.
7       Q.   Who drew the check?  Who was the check
8   drawn on for $2 million?
9       A.   I don't remember.  Not Mr. Billig.  It
10  was one of Sprei, Miller -- I don't recall that.
11      Q.   And they asked you to put money into
12  your escrow account as a deposit for $6 million?
13      A.   They asked me, yes; correct.
14          MR. STEVENS:  I am still waiting
15      to see where the connection to 45 John
16      Street is.
17          MR. NASH:  Relax.
18          MR. ZELMANOVITZ:  No, I am not
19      going to relax.  I am going to let this
20      go on for about two minutes more.
21          MR. NASH:  You can do whatever
22      you want.  You will be before the judge
23      on Monday.  You can do whatever you want
24      to do.
25          MR. ZELMANOVITZ:  That's okay.

Page 143

1           S. Greenwald
2       I have been before the judge enough.
3       Just show where this connects to 45
4       John.
5       Q.   Okay.  Now, the entity that signed the
6   contract to purchase Mitchell Place, what's the name
7   of that entity?
8       A.   Something like 3 Mitchell Place Lofts,
9   LLC.  Something like that.
10      Q.   Did you form that entity?
11      A.   I think I was involved in the
12  formation.  I don't recall.
13      Q.   How were you involved in the
14  formation?
15      A.   It may have gone through one of our
16  services that forms entities.
17      Q.   Are you a principal of 3 Mitchell
18  Place Lofts LLC?
19      A.   I am a member of 3 Mitchell Place -- I
20  shouldn't say "I."  Kingspark Holdings is now a
21  member of 3 Miller Lofts.
22      Q.   Was it an original member?
23      A.   I don't recall.
24      Q.   Who were the original members?
25      A.   I don't recall.  I believe the idea

Page 144

1           S. Greenwald
2   was we are putting in, at that point, until we get
3   back our money -- we had 75 percent of the entity.
4       Q.   Who had the other 25 percent?
5       A.   The party -- well, I can't really
6   answer that right now.
7       Q.   Did Miller and Sprei have any interest
8   in it?
9       A.   I don't know.
10      Q.   Have you ever seen an operating
11  agreement for 3 Mitchell Place Lofts LLC?
12      A.   Yes.
13      Q.   What does that operating agreement
14  reflect as to the members?
15      A.   I am trying to recall.  I think it's
16  75 percent of my entity and 25 percent is -- I think
17  it may have said Sam Sprei.  I don't know.
18      Q.   Were you represented by an attorney in
19  connection with the 3 Mitchell Place Lofts
20  organization?
21      A.   Explain what does that mean.
22      Q.   Did you engage an attorney to
23  represent your interests in connection with the 3
24  Mitchell Place Lofts LLC?
25          MR. ZELMANOVITZ:  In regard to

Page 145

1           S. Greenwald
2       what aspect?
3       Q.   Have you engaged an attorney in any
4   aspect relating to 3 Mitchell Place, your interest
5   in connection with that transaction?  Any aspect.
6   Have you retained an attorney?
7       A.   At that point?
8       Q.   At any point.
9       A.   Sure.
10      Q.   Who was the attorney?
11      A.   I have worked with Jeffrey Fleishman
12  at some point.
13      Q.   Was Yisroel Schwartz --
14          MR. ZELMANOVITZ:  Wait.  He
15      didn't finish.
16      Q.   Is there another attorney?
17      A.   Well, at the beginning, when they --
18  when the contract was done, I believe Yisroel
19  Schwartz was the attorney handling that transaction.
20      Q.   So Yisroel Schwartz handled the
21  transaction on behalf of 3 Mitchell Place Lofts;
22  correct?
23      A.   Yes, I believe so.
24      Q.   Did he prepare the operating
25  agreement?

SHAUL C. GREENWALD

Page 146

1              S. Greenwald
2      A.   At some point, yes.
3      Q.   Did he prepare the contract of sale?
4      A.   That, I don't know.
5      Q.   Who were the authorized signers under
6  the operating agreement?  Were you an authorized
7  signer?
8              MR. ZELMANOVITZ:  At what point
9          in time?
10     Q.   At any point in time.
11     A.   I am an authorized signer.
12     Q.   When did you become an authorized
13  signer?
14     A.   We have been since December.  At the
15  beginning it was supposed to be quick, in and out.
16  I wasn't supposed to have any money in the deal.  It
17  was supposed to be really very short term.
18          But since that point there have been
19  many discussions about my rights, my rights to this
20  property.  And ultimately, we have -- and I don't
21  recall a time frame -- but we have agreed that I do
22  have rights to the -- to that entity.
23     Q.   Okay.  So I asked you a question.
24  When he came to you and said, "I want to borrow
25  6 million," I asked you did you ask him how he is

Page 147

1              S. Greenwald
2  going to pay you back, and you said "of course."
3  What did he say?
4      A.   So I had a personal guaranty from
5  Mr. Billig, and --
6      Q.   Did Mr. Billig have --
7              MR. ZELMANOVITZ:  Wait a minute.
8          You are not waiting for him to finish.
9      Q.   Fine.  Go.  Mr. Billig.
10     A.   I can do it either way.
11     Q.   Your lawyer wants you to talk, talk.
12     A.   Okay.  Yes, I -- Mr. Billing signed a
13  personal guaranty.  I haven't collected on the
14  personal guaranty.  I haven't been able to.  The
15  remaining $4 million, what I was told was -- and
16  this I don't recall if it was prior to or right
17  after the signing of the contract, I don't recall --
18  but there was another fellow -- I don't recall his
19  name -- that was brought to me by Mr. Sprei or
20  introduced to me by Mr. Sprei.  I don't think he was
21  with me at the meeting.  He said, "Oh, I want you to
22  before" -- I assume -- again, I can't say for sure.
23  But I believe it was before the contract was signed
24  that I asked him -- he was telling me it was going
25  to be filled within a week.  I said, okay, that

Page 148

1              S. Greenwald
2  means you are pretty much there.  What's the
3  situation?
4          Someone came to me that he introduced
5  to me, and he said he is going to buy the property
6  at a higher price.
7      Q.   Okay.  So --
8              MR. ZELMANOVITZ:  Now, I am
9          going to note for the record --
10             MR. NASH:  You can note.  You
11         can note.
12             MR. ZELMANOVITZ:  Just be quiet
13  for a second.  It's 11:00 a.m.  We had
14  agreed to stay here until 11:00 a.m.  We
15  are going to give you a couple of more
16  minutes.  But I find it unbelievable
17  that you are spending so much time on a
18  transaction that has absolutely nothing
19  to do with 45 John Street.
20             MR. NASH:  Okay.
21             MR. ZELMANOVITZ:  And you are
22  spending all of the time and the money
23  for all of the clients that are being
24  represented at this table.
25          I am telling you now I am giving

Page 149

1              S. Greenwald
2  you a couple more minutes and then we
3  are out of here.
4              MR. NASH:  The rule is seven
5  hours for a deposition.  So I don't know
6  where you think --
7              MR. ZELMANOVITZ:  You were on
8  the phone call with the judge --
9              MR. NASH:  Okay.
10             MR. ZELMANOVITZ:  -- when the
11  judge said give him three hours, and
12  that's exactly what we are doing.
13             MR. NASH:  That didn't limit --
14             MR. ZELMANOVITZ:  And there was
15  an agreed form of order, where that was
16  put into the order.  No one objected to
17  it.
18          Then on this last phone call
19  with the judge, the judge asked how long
20  the deposition was going to go, and I
21  said three hours.  No one piped up and
22  objected.
23          I am not going to stand here and
24  listen to talk about seven hours.  All
25  right?  This is a subpoenaed witness.

SHAUL C. GREENWALD

Page 150

```
1              S. Greenwald
2      You are spending time on a transaction
3      that has absolutely nothing to do with
4      45 John Street.
5              MR. NASH: It has to do with
6      everything with Miller and Sprei. So
7      let's get to it.
8              MR. ZELMANOVITZ: Miller and
9      Sprei are not the issue here. 45 John
10     is the issue here.
11             MR. NASH: Okay. Let's get to
12     it.
13   BY MR. NASH:
14     Q.   Who did you indicate that you were
15   holding $6 million in your escrow account to under
16   this contract? Did you indicate to anybody that you
17   were holding $6 million?
18     A.   Of course.
19     Q.   Who did you tell that to?
20     A.   We signed a contract.
21     Q.   That your firm was holding $6 million
22   as the escrow agent?
23     A.   Sure.
24     Q.   Now, when you signed the contract --
25     A.   Not $6 million.
```

Page 151

```
1              S. Greenwald
2      Q.   How much was it?
3      A.   It was $8 million.
4      Q.   $8 million. When you signed the
5    contract, did you indicate in the contract that you
6    had loaned -- you, Riverside, or an affiliate of
7    Riverside -- had loaned the deposit to the
8    purchaser?
9              MR. ZELMANOVITZ: Objection as
10     to form.
11     A.   It was irrelevant.
12     Q.   Did you notify anybody of that?
13     A.   No.
14             MR. ZELMANOVITZ: Notify who?
15     Q.   Now, who retained you as the title
16   company for this transaction on Mitchell Place?
17     A.   At that point?
18     Q.   Yes.
19     A.   Mr. Schwartz and Mr. Sprei and
20   Mr. Miller.
21     Q.   At that point in time Mr. Sprei had a
22   25 percent interest in the purchasing entity?
23     A.   I don't recall.
24     Q.   Did that contract ever go into
25   default?
```

Page 152

```
1              S. Greenwald
2      A.   Yes.
3      Q.   When did it go into default?
4      A.   I don't recall exact dates, but
5    whatever the terms of the contract were.
6      Q.   How was the default resolved?
7      A.   That's is a good question, how was it
8    resolved. It was in default. And then it was a
9    large issue for us, because it was a lot of money at
10   stake. It was an LP put on to the property by the
11   entity, through Mr. Sprei's -- someone who --
12     Q.   What do you mean, an LP?
13     A.   A lis pendens.
14     Q.   Who put a lis pendens on the property?
15     A.   I believe that the scenario may have
16   started the opposite way, where the seller brought
17   an action. I don't know what type of action. I am
18   not sure. But an action in order to clear the issue
19   that there was money that was released for a
20   deposit.
21     Q.   So you were in --
22             MR. NASH: I am just trying to
23     get it clarified. Just relax.
24             MR. ZELMANOVITZ: You relax.
25     Wait.
```

Page 153

```
1              S. Greenwald
2      A.   So there was money that was actually
3    released for the deposit.
4      Q.   Right.
5      A.   Not only in the escrow account. At
6    some point the contract called for a release of
7    deposit. The money was actually released to the
8    seller. That amount was $8 million, as discussed.
9    $8 million was released.
10             And then in order for the seller to --
11   I guess, they felt in order to sell the company --
12   sell the property, that they wanted to go to court
13   and just resolve the issues. They went to court.
14   At some point thereafter there was a lis pendens put
15   on the property. The judge set some sort of
16   discovery on it or some sort of time frame on it for
17   sometime in late July. And then there was a
18   stipulation of settlement that was entered into at
19   some point.
20     Q.   What's a stipulation of settlement?
21     A.   That there would be a new buyer that
22   would have the opportunity to come in and to
23   purchase the property.
24     Q.   Was there an additional deposit given?
25     A.   Yes.
```

SHAUL C. GREENWALD

Page 154

1                    S. Greenwald
2        Q.   How much was the additional deposit?
3        A.   $8 million.
4        Q.   Did you put up that $8 million?
5        A.   No, I did not.
6        Q.   Who put that up?
7        A.   The buyer.
8        Q.   Who is the new buyer?
9        A.   I don't know the name of the LLC, but
10   it was a -- I don't recall, but an LLC.
11       Q.   So you found a new buyer?
12       A.   I actually did.
13            I shouldn't say that. I had a client
14   of mine who I spoke to about the transaction, and
15   then -- a friend of mine -- and he found a new
16   buyer.
17       Q.   Do you know the name of the new buyer?
18       A.   No.
19       Q.   Is the new buyer closing that
20   transaction on Monday?
21       A.   I am not sure when they are closing.
22   They are trying to close as soon as possible.
23       Q.   And if that transaction closes, what
24   do you receive at closing?
25       A.   I hope to receive some part of my

Page 155

1                    S. Greenwald
2   deposit back.
3        Q.   How much do you hope to receive?
4        A.   As much as possible.
5        Q.   Why wouldn't you get the entire
6   deposit back?
7        A.   Because the structure of the deal is
8   that I won't be getting my full deposit back.
9        Q.   What is the structure of the deal?
10       A.   There are a series of notes that in
11   order to make this deal work for the buyer, I was
12   willing to wait to save my deposit, which I
13   potentially could have lost -- I was willing to wait
14   for a certain period of time to give the buyer some
15   time to stabilize the asset and -- or whatever other
16   requirements he had. I didn't really care what the
17   reasons are. My main concern was to make sure that
18   this deal gets to the -- to try to find a new buyer.
19       Q.   So the new buyer, is that -- he has
20   been referred to by Mr. Miller as a Russian
21   investor. Is that the new buyer?
22       A.   Yes, correct.
23       Q.   You don't know the Russian investor's
24   name?
25       A.   No, I don't.

Page 156

1                    S. Greenwald
2        Q.   And the Russian investor is going to
3   give you money, and he is going to give you notes;
4   correct?
5        A.   No.
6        Q.   So what are you getting?
7        A.   I have three notes.
8        Q.   You are holding three notes. Who is
9   the maker of those notes?
10       A.   The -- I believe -- I don't recall.
11       Q.   Is Sprei and Miller the maker of those
12   notes?
13       A.   No.
14       Q.   Anybody affiliated with Sprei and
15   Miller the maker of those notes?
16       A.   No.
17       Q.   So you are taking notes, and you don't
18   know who is going to be the one that is paying you
19   for those notes?
20       A.   It has nothing to do with Sprei and
21   Miller.
22       Q.   But I am asking you.
23       A.   Someone affiliated --
24            MR. ZELMANOVITZ: And what's the
25   relevance of that?

Page 157

1                    S. Greenwald
2        A.   -- with the buying entity, that's for
3   sure. I just don't know the name. You asked me for
4   a name.
5        Q.   So who is the principal?
6        A.   I don't know his name.
7        Q.   What does the firm of Fink &
8   Zelmanovitz have to do with this?
9        A.   They are the nominee under the note,
10   that I am friends with, and I didn't want the money
11   to be just put anywhere else. So I said that I
12   wanted it to go as nominee to them so we could make
13   sure that we receive our money.
14       Q.   So Fink & Zelmanovitz are your
15   nominee?
16       A.   Nominee for -- yes, for the notes, as
17   far as getting any funds back when we get the money
18   back on the notes, correct.
19       Q.   Is that a law firm?
20       A.   Yes, it is.
21       Q.   Does it have any connection to this
22   Zelmanovitz?
23            MR. ZELMANOVITZ: In what sense?
24            MR. NASH: In any sense. The
25   coincidence that it's the same last

SHAUL C. GREENWALD

Page 158

1              S. Greenwald
2        name.
3              MR. ZELMANOVITZ: You can
4        answer.
5        A.   Yes. It's actually Mr. Zelmanovitz'
6    son is one of the principals or one of the partners
7    at the firm. To the best of my knowledge, he is a
8    partner. He is named.
9        Q.   So you are using this law firm -- are
10   they the direct payee, or are you the payee and you
11   are directing the monies be sent to the law firm?
12       A.   Explain the question.
13       Q.   You said Fink & Zelmanovitz were your
14   nominee?
15       A.   Yes.
16       Q.   Do you have an agreement between
17   Fink & Zelmanovitz and you?
18             MR. ZELMANOVITZ: Okay. That's
19   it. No more questions.
20             I am directing you not to answer
21   any longer.
22             You have had enough time to show
23   any kind of connection whatsoever.
24             MR. NASH: Oh, please.
25             MR. ZELMANOVITZ: You are

Page 159

1              S. Greenwald
2        abusing this witness.
3              MR. NASH: Please. You are
4        using your son as a nominee for this man
5        who is doing business with Sprei and
6        Miller. You have to stop.
7              MR. ZELMANOVITZ: Stop. Don't
8        answer him.
9        Q.   All right. Now, when you issued the
10   title abstract on 45 John, did you discuss that with
11   anybody at Riverside before you issued the abstract?
12       A.   I don't understand the question.
13       Q.   At Old Republic. Did Riverside
14   discuss issuing the title abstract with anybody at
15   Old Republic before you did?
16       A.   I don't recall.
17       Q.   When you issued what we have marked, I
18   guess, Sprei No. 10, as part of Sprei No. 10 -- can
19   you go to your Riverside Abstract LLC form, Schedule
20   A.
21             MR. ZELMANOVITZ: You are
22        looking at the attachment on this?
23             MR. NASH: Yes.
24       A.   Yes. We saw this before.
25       Q.   Right.

Page 160

1              S. Greenwald
2        A.   Yes. I see it.
3              MR. ZELMANOVITZ: Schedule A,
4        you are looking at?
5              MR. NASH: Right.
6        Q.   Now, it says as an agent for Chicago
7    Title Insurance Company. Do you see that?
8        A.   Yes.
9        Q.   Now, it also says or there is
10   reference to this that this is a recertification
11   from an earlier effective day.
12       A.   I don't know if you understand what
13   the word "recertified" means.
14       Q.   Well, were you consulted at an earlier
15   date for a lender policy at any point in time?
16             MR. ZELMANOVITZ: A lender
17        policy?
18             MR. NASH: Yes.
19       A.   All I could tell you is --
20       Q.   To issue a policy in connection with a
21   loan or a refinancing.
22       A.   The commitment says effective date
23   June 26, 2014.
24       Q.   Right.
25       A.   So there is a recertified date, which

Page 161

1              S. Greenwald
2    just means that at the closing we run a rundown or a
3    continuation of title to check the subject matter of
4    title, and that was done through 9/18/2014.
5        Q.   So you first started running title in
6    June of 2014?
7        A.   No. That's not necessarily what it
8    means. I don't know what date. It could have been
9    an earlier date. It could have been a later date.
10             But when it says effective date, at
11   least on this commitment at this point, this title
12   number RANY-16467, the effective date is June 26,
13   which is usually a few days -- maybe 15 to 30 days
14   prior to the date that this is actually issued, in
15   order that we just make sure that we have everything
16   that is included up to that period.
17       Q.   Okay. Can you go to Schwartz Exhibit
18   16, please.
19       A.   Yes.
20       Q.   Do you recognize these emails?
21       A.   I saw them in production.
22       Q.   Okay. It says -- the first email,
23   July 23, I am reading from the top. This is from
24   Schwartz to Polina Kohan; you are cc'd with Elliot
25   Schon. Do you see that?

SHAUL C. GREENWALD

| Page 162 |
|---|
| 1              S. Greenwald |
| 2      A.   Yes. |
| 3      Q.   It says, "We lost the battle. Lender |
| 4  is insisting that Chicago run point, with Riverside |
| 5  as 50 percent co-insurer. I'll provide the contact |
| 6  person at Chicago as soon as possible." |
| 7            What does that email referring to? |
| 8      A.   I can tell you what it says, and what |
| 9  I believe he is referring to. There are many |
| 10 underwriters, as we mentioned before. And the |
| 11 lender seems to -- which happens often, on a lot of |
| 12 the transactions -- that the lender will have a |
| 13 relationship with the title. |
| 14            They want to use Chicago Title to run |
| 15 point, which usually means to -- what we call in the |
| 16 industry standard, to know -- to lead the |
| 17 transaction. They would handle the transaction on |
| 18 the loan. And Riverside will just be what we call |
| 19 co-insurance, or at each endorsement we issue, which |
| 20 would basically insure 50 percent. But we wouldn't |
| 21 be involved in the running of the entire |
| 22 transaction, and we wouldn't get our full premium -- |
| 23 and we wouldn't receive our full premium on the |
| 24 transaction. |
| 25      Q.   Now, who is the lender that they are |

| Page 163 |
|---|
| 1              S. Greenwald |
| 2  referring to? |
| 3      A.   I don't know. |
| 4      Q.   Did you understand that in July of |
| 5  2014, 45 John Lofts was seeking a mortgage |
| 6  refinancing? |
| 7      A.   I don't recall. |
| 8      Q.   Did you understand that when the |
| 9  abstract was first run for Chicago Title Insurance, |
| 10 it was done in connection with a mortgage |
| 11 refinancing? |
| 12           MR. ZELMANOVITZ: Objection as |
| 13      to form. |
| 14      Q.   You can answer. |
| 15      A.   I don't recall. |
| 16      Q.   When did Chicago Title drop out as the |
| 17 underwriter and Old Republic come in? |
| 18           MR. ZELMANOVITZ: Objection as |
| 19      to form. |
| 20           You can answer. |
| 21      A.   I don't recall. |
| 22      Q.   You do recall, though, Old Republic |
| 23 actually issued the policy? |
| 24      A.   Not for that time period. |
| 25      Q.   Who do you recall issued the policy? |

| Page 164 |
|---|
| 1              S. Greenwald |
| 2      A.   I don't -- |
| 3           MR. ZELMANOVITZ: At that time? |
| 4      July? |
| 5      Q.   No. |
| 6      A.   In September. |
| 7      Q.   In the John transaction. |
| 8      A.   I don't recall at that point. |
| 9      Q.   Was Chicago Title still involved in |
| 10 potentially issuing the policy in September of 2014? |
| 11      A.   All I know is that Old Republic |
| 12 issued -- we issued the policy through Old Republic. |
| 13 I don't recall what title -- |
| 14      Q.   Did you call Old Republic? |
| 15      A.   I don't recall. |
| 16      Q.   You have no recollection as to how Old |
| 17 Republic came to be the issuer of the title policy? |
| 18      A.   I don't recall. |
| 19      Q.   Who in your organization would be |
| 20 involved in contacting potential underwriters to |
| 21 issue title policies? |
| 22      A.   Almost anyone that runs either the |
| 23 coordination, attorneys, anyone could call Old |
| 24 Republic and discuss deals with them. |
| 25      Q.   Okay. |

| Page 165 |
|---|
| 1              S. Greenwald |
| 2      A.   I am not sure about -- let me just |
| 3  point out something about my company. I think it's |
| 4  important to know. |
| 5            We underwrite through various |
| 6  underwriters. We decide who to put our paper, who |
| 7  to transact business with generally based on a |
| 8  relationship with the underwriters and other |
| 9  factors. So I don't know why we put it on Old |
| 10 Republic. But I can tell you that most of our |
| 11 deals, probably in excess of 50 percent of our |
| 12 deals, we do try to put on Old Republic because we |
| 13 do have a very good relationship with them. In the |
| 14 past, for sure, until today. |
| 15           MR. ZELMANOVITZ: Kevin, can I |
| 16      ask you how much longer you have? |
| 17           MR. NASH: Probably a good half |
| 18      hour. |
| 19           MR. ZELMANOVITZ: He can't stay |
| 20      that long. You are not going to have a |
| 21      half hour. We can't stay that long. I |
| 22      can give you about 10 or 15 minutes. |
| 23      Q.   Who at Riverside has the relationship |
| 24 at Old Republic? Do you have that? |
| 25      A.   Sure. Together with others. |

SHAUL C. GREENWALD

Page 166

1           S. Greenwald
2     Q.   Who is your relationship with at Old
3  Republic?
4     A.   Various parties.
5     Q.   Name some.
6     A.   We work together with Marvin Bagwell;
7  he is an attorney. Paul Reisman, who is an
8  attorney. R-E-I-S-M-A-N, I believe. We have --
9  well, now I came to Maria through this situation.
10         We do have a couple of reps that we
11  deal with on a -- you know, time-to-time basis.
12     Q.   Do you recall when you first contacted
13  Old Republic in connection with getting involved in
14  this transaction?
15     A.   I don't recall.
16         MR. ZELMANOVITZ: Objection as
17         to form. He said he didn't recall
18         contacting Old Republic.
19     Q.   Well, they were contacted; right?
20     A.   I don't recall.
21     Q.   Well, they issued the policy?
22     A.   That's correct. They issued the
23  policy.
24     Q.   When you contact an insurance
25  underwriter regarding a deal, do you do it in

Page 167

1           S. Greenwald
2  writing?
3     A.   Not always.
4         MR. NASH: I call for production
5         of all documents relating to the
6         issuance of the policy from Riverside
7         Abstract and Old Republic.
8     Q.   When Old Republic issued the policy,
9  were there any discussions with them as to the
10  authority of the seller, 45 John Lofts LLC, to sign
11  a contract?
12         MR. ZELMANOVITZ: Can I hear the
13         question back, please?
14         (The record was read.)
15         MR. ZELMANOVITZ: Objection as
16         to form.
17     Q.   Did you have any discussions with
18  anybody at Old Republic about that?
19     A.   I don't recall.
20     Q.   Did you review with Old Republic your
21  marked-up abstract, which is Exhibit 10?
22     A.   I don't recall.
23     Q.   Would it be a usual practice, before
24  an underwriter issues a title policy, to review with
25  them your marked-up abstract so the title company

Page 168

1           S. Greenwald
2  knows what they are actually insuring?
3     A.   No.
4     Q.   So is it your testimony there is no
5  verification by Old Republic as to your omissions in
6  a title abstract? They just take your word for it
7  that you have done all of the necessary due
8  diligence, and they will issue it based upon
9  whatever you write in that abstract?
10         MR. ZELMANOVITZ: Objection.
11         That was your testimony, not the
12         witness' testimony.
13     Q.   You can answer.
14     A.   As my attorney said, I didn't say
15  that.
16     Q.   What information did you provide to
17  Old Republic before they issued the title policy?
18     A.   I don't recall.
19     Q.   Is there a file about that?
20     A.   I don't recall.
21     Q.   Did you ever have conversations with
22  anybody at Old Republic after the title policy was
23  issued and this lawsuit started?
24         MR. ZELMANOVITZ: Yes or no,
25         answer.

Page 169

1           S. Greenwald
2     A.   Could you repeat the question?
3     Q.   Did you ever have any conversations
4  with anyone at Old Republic, after this lawsuit was
5  issued, regarding the abstract?
6     A.   Yes.
7     Q.   Did anybody at Old Republic ever ask
8  you what you relied upon when you omitted items --
9         MR. ZUCKERBROD: 15 and 16.
10     Q.   -- 15 and 16 from Schedule B of the
11  exception?
12         MR. ZELMANOVITZ: Objection.
13         Direct you not to answer.
14         MR. NASH: On what basis?
15         MR. ZELMANOVITZ: Attorney-
16         client.
17     Q.   Well, when you say -- tell me who was
18  involved in those communications so we can see if
19  there is any possible foundation.
20         MR. ZELMANOVITZ: Who did you
21         speak to at Old Republic, is basically
22         what he is asking. If you spoke to them
23         on that subject.
24     A.   I spoke to Maria. I was in their
25  office. I don't recall if I spoke to anyone else.

SHAUL C. GREENWALD

Page 170

1        S. Greenwald
2  I spoke to Maria about this particular scenario.
3       Q.   And who is Maria?
4       A.   Maria Filippelli.  She is in this room
5  at this point.
6       Q.   And who is?
7       A.   She is counsel for Old Republic for
8  claims.
9       Q.   Is she your attorney?
10      A.   I am an agent to Old Republic.
11      Q.   Is she your attorney?
12           MR. ZELMANOVITZ:  Objection.
13      Asked and answered.
14           That's it.  Don't answer any
15      more questions like that.
16      Q.   Is she your attorney?
17           MR. ZELMANOVITZ:  His personal
18      attorney?
19           MR. NASH:  Yes.
20           MR. ZELMANOVITZ:  Is she your
21      personal attorney?
22           THE WITNESS:  She is not my
23      personal attorney.
24      Q.   Is she Riverside's attorney?
25      A.   We are an agent to Old Republic.

Page 171

1        S. Greenwald
2       Q.   But is she Riverside's attorney?
3           MR. ZELMANOVITZ:  You take it
4      the way it is.
5           MR. NASH:  I am not going to
6      take it the way it is.
7           MR. ZELMANOVITZ:  Objection.
8      Asked and answered.
9           I direct you not to answer.
10      Q.   Did you produce any documents for Old
11  Republic after this lawsuit was started?
12           MR. ZELMANOVITZ:  You can answer
13      that yes or no.
14      A.   Yes.
15      Q.   Did you produce any written
16  memorandums and summaries of the events that
17  happened?
18           MR. ZELMANOVITZ:  I direct you
19      not to answer.
20           You are not to tell Mr. Nash
21      what you produced to Old Republic.
22      Q.   Did you tell Old Republic, "Oh, by the
23  way" --
24           MR. ZELMANOVITZ:  This is not a
25      litigation over the title policy claim.

Page 172

1        S. Greenwald
2      If you want to start a separate action
3      on that, that's separate.  This is about
4      45 John.  You are totally off base.
5      Q.   Did you tell anybody at Old Republic
6  that you had a loan transaction with affiliates of
7  Miller and Sprei and that your companies received
8  $2 million at the -- in connection with the larger
9  closing?
10           MR. ZELMANOVITZ:  Objection.
11      Don't answer any further
12      questions about what you spoke to Old
13      Republic about subsequent to the
14      transaction.
15      Q.   Now, did you understand that without
16  the deposit that Miller and Sprei could not buy out
17  Mr. Zhu and you could not get paid money from that
18  larger transaction?
19      A.   Repeat --
20           MR. NASH:  Can you repeat that
21      question, please?
22           (The record was read.)
23           MR. ZELMANOVITZ:  What deposit
24      are we talking about now?
25      Q.   The debtor's deposit, you acknowledge,

Page 173

1        S. Greenwald
2  a great bulk of it was used to fund the settlement
3  with Mr. Zhu, and you knew about that?
4           MR. ZELMANOVITZ:  Absolutely
5      not.  And if you take a look at the
6      direction letter, which you are trying
7      to avoid, you would see that's not the
8      case.
9      Q.   Do you understand that?
10           It's not the case.  Let's look at
11  Exhibit 6.  Let's go back to Exhibit 6.  And let's
12  stop playing games here.
13           MR. ZELMANOVITZ:  Okay.  You
14      have five more minutes, and then that's
15      it.
16           MR. NASH:  I have as much time
17      as I need.  Okay?
18      Q.   Do you see Exhibit 6, the first two
19  pages?
20      A.   I am not there yet.
21           Yes.
22      Q.   Do you see that Exhibit 6 references
23  various transactions that were closing together?
24      A.   Yes.
25      Q.   Do you see that the monies from the

SHAUL C. GREENWALD

## Page 174

1    S. Greenwald
2  various transactions that were closing together were
3  commingled for the purposes of distribution? Do you
4  see that?
5              MR. ZELMANOVITZ: Objection.
6        That's not what this says.
7     Q.  Do you see that?
8     A.  I see that there are a lot of numbers
9  on here and there is an accounting of where all of
10 these funds from these various transactions were.
11    Q.  And they all went into Riverside, and
12 Riverside made the disbursement after collecting
13 funds from various sources? Do you see that?
14    A.  At different points, yes.
15    Q.  At different points. It's at or about
16 September 18th and 19th; correct?
17    A.  Correct.
18    Q.  And one of the sources is from your
19 own company, 3839 Holdings; correct?
20    A.  Correct.
21    Q.  The other source is from Goldberg
22 Weprin of nine million seven fifty.
23          Now, you understood that was the bulk
24 of the contract deposit; correct?
25              MR. ZELMANOVITZ: Which contract

## Page 175

1              S. Greenwald
2        deposit?
3              MR. NASH: The one with the
4        debtor.
5     A.  Yes.
6     Q.  You also understood that the other
7  sources of money from Kriss & Feuerstein, that was
8  from mortgage financing from Madison that was
9  funding the Zhu transaction; correct?
10    A.  The Kriss & Feuerstein money came from
11 that transaction; correct.
12    Q.  You also understood the Morgan Stanley
13 money of three million five eighty was contributed
14 by Mr. Sohn as part of the debtor's deposit;
15 correct?
16    A.  You keep saying the word "understood."
17 I just want to clarify. The word "understood" or
18 the word "understand"?
19          I didn't understand then. I don't
20 recall every detail, as I mentioned. I don't
21 recall.
22          At this point I understand the things
23 you said before. The Morgan Stanley number, I
24 actually don't know.
25    Q.  You saw that the monies disbursed went

## Page 176

1              S. Greenwald
2  to various sources; right? They all came in
3  together, and they went out to various sources?
4     A.  I did.
5              MR. ZELMANOVITZ: Objection as
6        to form.
7              Okay.
8     Q.  Do you see that?
9              MR. ZELMANOVITZ: Two more
10       minutes.
11    A.  Okay.
12    Q.  Now, it says sum of invoices,
13 1,753,217.60. What does that represent?
14    A.  There are one, two, three, four --
15 five different title numbers that were relevant to
16 those numbers, that were all part of the four
17 transactions what we were dealing with. And it
18 seems like those were the actual payments for those
19 invoices.
20    Q.  Now, did those invoices represent the
21 actual bill, or did they also cover certain payments
22 that were owed to your company, 3839, that you
23 used -- that you included as part of the invoices?
24    A.  No. They all -- they are invoices
25 that, I think, you have. So I think you should know

## Page 177

1              S. Greenwald
2  that there are invoices in here that are Riverside
3  invoices for Riverside Abstract's services.
4     Q.  And it's your testimony that the
5  actual charges incurred by Riverside for these
6  transactions was 1,753,217.60, and that was only for
7  title charges and did not include any monies that
8  were going to be passed back to your company 3839
9  Holdings under cover of these invoices?
10    A.  You are categorizing it incorrectly.
11    Q.  Well, then explain it to me.
12              MR. ZELMANOVITZ: Stop.
13    Q.  Explain it to me.
14    A.  There is $1,753,217.60 that were on
15 Riverside invoices. Riverside invoices, as are
16 typical, include the mortgage tax, recording taxes,
17 all types of recording charges, other things.
18 Anything that has to do with title. It doesn't mean
19 that Riverside got all of this money to Riverside
20 Abstract as a company. We did receive this money as
21 a -- involved with the transaction, and then we
22 disbursed it as needs to be.
23          As to your question, if any of these
24 monies went 3839, the answer is that they did not go
25 in repayment of any money to 3839.

SHAUL C. GREENWALD

Page 178

1        S. Greenwald
2        MR. ZELMANOVITZ: And that's
3    where we are going to stop. Thank you.
4        MR. ZUCKERBROD: What do you
5    mean, you are stopping?
6        MR. NASH: It doesn't work --
7        MR. ZELMANOVITZ: That's the
8    time we gave.
9        MR. NASH: It doesn't work that
10   way.
11       MR. ZUCKERBROD: Mr. Schneider
12   hasn't had a chance to ask questions.
13       MR. ZELMANOVITZ: If you had
14   asked questions --
15       MR. ZUCKERBROD: Let me finish,
16   and then you can speak. You also showed
17   up here at 8:20 or 8:25. Look, let me
18   finish, and you can talk.
19       Obviously, there was a
20   miscommunication. I am not blaming
21   anybody for that.
22       The point is that we started
23   late. You said you could stay -- you
24   told me outside in the hall you could
25   stay probably until 11:45. It's now

Page 179

1        S. Greenwald
2    11:34.
3        The judge is not going to
4    appreciate hard deadlines and hard
5    cutoffs. We are trying to cooperate.
6    We are trying not to bring the witness
7    back.
8        MR. ZELMANOVITZ: I appreciate
9    what you are saying. But we stayed here
10   for a good half hour of a total waste of
11   time.
12       MR. ZUCKERBROD: That's your
13   opinion.
14       MR. ZELMANOVITZ: I understand.
15   Let me finish. I waited for you to
16   speak. Now you can do the same for me.
17       We have been going on -- sitting
18   here while Mr. Nash has gone on and on
19   with histrionics about matters that have
20   nothing to do with 45 John. You all sat
21   here and you watched as he wasted
22   everybody's time. Nobody objected.
23   Okay?
24       I am not going to be -- I am not
25   responsible, nor is my client

Page 180

1        S. Greenwald
2    responsible for your consent to his
3    playacting.
4        MR. NASH: Okay. Speaking of
5    playacting, do you want an Emmy or do
6    you want an Oscar?
7        MR. ZELMANOVITZ: I didn't
8    finish.
9        MR. NASH: Okay. Do you want an
10   Emmy or Oscar? You want a Tony? I will
11   give you a Tony.
12       MR. ZELMANOVITZ: You want ten
13   more minutes, that's it.
14       MR. NASH: I have one question.
15   I am ending mine. But in respect to
16   Mr. Schneider, I am going to defer, as
17   they say, to the gentleman.
18       MR. SCHNEIDER: I only need five
19   minutes.
20   BY MR. NASH:
21       Q.   I notice that Quick Title Search is
22   located in Lakewood, New Jersey. Does Riverside
23   have an office in Lakewood, New Jersey?
24       A.   Yes, we do.
25       Q.   Are you familiar with Quick Title

Page 181

1        S. Greenwald
2    Search?
3        A.   Only as a name. I don't know them.
4        Q.   Are you familiar with an Abraham
5    Teitelbaum?
6        A.   No.
7        Q.   Are you familiar with anybody that
8    works at Quick Title?
9        A.   I don't know who works there.
10       Q.   Does anybody work at Quick Title that
11   also works for Riverside Abstract?
12       A.   No. There is no relationship. At
13   least to my knowledge. I don't know what people do
14   on the side.
15       MR. NASH: I am going to give
16   some time to Mr. Schneider. I am not --
17   I am not finished with my questions. I
18   reserve the right to call him back.
19       MR. SCHNEIDER: Thank you,
20   Counselor.
21       Please mark as Greenwald 5 a
22   two-page --
23       MR. ZELMANOVITZ: 6.
24       MR. SCHNEIDER: 6. A two-page
25   document bearing Riverside Bates numbers

SHAUL C. GREENWALD

Page 182

```
1              S. Greenwald
2    270 to 271.
3              (Resolution Bates-stamped
4    R000270 and R000271 was marked Greenwald
5    Exhibit 6 for identification, as of this
6    date.)
7    EXAMINATION
8    BY MR. SCHNEIDER:
9        Q.   Mr. Greenwald, please turn to the
10   second page of that document. Does your signature
11   appear on that page?
12       A.   Yes, it does.
13       Q.   Above the line for notary public;
14   correct?
15       A.   Yes.
16       Q.   You notarized Mr. Miller's signature;
17   correct?
18       A.   It is my signature.
19       Q.   And that occurred on September 18,
20   2014; correct?
21       A.   It says that.
22       Q.   Do you have any independent
23   recollection of seeing Mr. Miller on September 18,
24   2014, and notarizing his signature?
25       A.   I don't recall.
```

Page 183

```
1              S. Greenwald
2        Q.   You have no recollection whatsoever?
3        A.   No. I don't recall.
4        Q.   How did this document come about?
5        A.   I don't recall.
6        Q.   Who prepared the document?
7        A.   I don't recall.
8        Q.   Did you or anyone at Riverside
9    Abstract ask Mr. Miller for a resolution from 45
10   John Lofts?
11       A.   I don't recall.
12       Q.   How did it come about that you
13   notarized Mr. Miller's signature?
14       A.   I don't recall.
15       Q.   Please explain the purpose of this
16   resolution.
17            MR. ZELMANOVITZ: If you know.
18       A.   It seems like an authorization for him
19   to enter into or sell the trans- -- to sell this
20   property.
21       Q.   How did it come about that you and
22   Mr. Miller got together on September 18th for you to
23   notarize this resolution?
24       A.   I don't recall.
25       Q.   Did you do take any action whatsoever
```

Page 184

```
1              S. Greenwald
2    to verify any of the facts in this resolution?
3        A.   I don't recall.
4        Q.   Is it fair to say you have no specific
5    recollection or understanding that any of the facts
6    in this resolution were verified by anyone on behalf
7    of Riverside?
8        A.   No.
9             What does that mean? I am not sure
10   what your question is.
11            MR. SCHNEIDER: Please read back
12       the question.
13            (The record was read.)
14       A.   Again, I still don't understand.
15   Sorry.
16       Q.   After this resolution was given to
17   Riverside, was any exception to the Riverside title
18   policy made?
19            MR. ZELMANOVITZ: Objection as
20       to form.
21       Q.   Answer it, if you can.
22       A.   I don't understand the question.
23            MR. NASH: Exhibit 10.
24       Q.   Did you have any discussion with
25   Mr. Miller at the time you took his signature on
```

Page 185

```
1              S. Greenwald
2    this document?
3        A.   I don't recall.
4        Q.   Was anyone else present besides you
5    and Mr. Miller at the time that you took his
6    signature?
7        A.   I don't recall.
8        Q.   Where were you located when you took
9    his signature?
10       A.   I don't recall.
11            MR. SCHNEIDER: Okay.
12   EXAMINATION
13   BY MR. ZUCKERBROD:
14       Q.   I have a few follow-up questions.
15            Mr. Greenwald, are you supposed to or
16   are expecting to receive any kind of broker's fee or
17   other fee under the transaction with the Russian
18   investors on the Mitchell Place transaction?
19       A.   Explain what you mean by broker's fee.
20       Q.   Some kind of fee in connection with
21   putting that deal together and helping Mr. Sprei
22   out.
23       A.   We have the notes. The only amount
24   that we are getting back is $8 million, potentially.
25   That's the maximum.
```

SHAUL C. GREENWALD

Page 186

1          S. Greenwald
2    Q.   That's all you are getting back?
3    A.   That's the maximum amount.
4    Q.   So if someone else testified that you
5    were supposed to receive some other fee, they would
6    be mistaken?
7    A.   Explain what other fee you are --
8    Q.   I am just asking if someone else
9    testified that you are supposed to receive some
10   additional finder's fee or broker fee or anything
11   else in connection with the Mitchell Place
12   transaction, would they be mistaken?
13   A.   They are mistaken in the fact that the
14   maximum amount that we could receive from this
15   transaction, or at least until this point, is --
16   there is a fee -- of $8 million. There is a
17   potential. I did introduce them to a lender, so we
18   could get a broker's fee on the mortgage that's
19   being handled. But a small fee, potentially.
20   Q.   I didn't hear or understand the last
21   part.
22   A.   There is a mortgage broker that we
23   introduced the parties to.
24   Q.   A mortgage broker?
25   A.   Yes.

Page 187

1          S. Greenwald
2    Q.   Who was that?
3    A.   Meridian. Meridian -- I don't know
4    what they call themselves, but Meridian Capital.
5    Q.   We saw in this transaction that
6    Meridian has already received $500,000. Is that
7    separate and apart from the fee that --
8    A.   Not the --
9          MR. ZELMANOVITZ: By "the
10   transaction," you mean 45 John?
11   Q.   45 John.
12   A.   45 John Street has nothing to do with
13   this transaction.
14   Q.   I understand that. We have seen in
15   the 45 John Street documents that Meridian has
16   received $500,000.
17   A.   I believe so, yes.
18   Q.   Is that separate and apart from this
19   other fee that --
20   A.   That has nothing to do with it. This
21   is separate.
22   Q.   The last question. You said that you
23   could not recall any discussions that you may have
24   had with anyone at Old Republic about the recorded
25   first amendment or Mr. Miller's authority; correct?

Page 188

1          S. Greenwald
2    A.   I said I don't recall. I didn't
3    respond to that. I don't think I said that -- I
4    don't think that's correct. You said -- what was
5    the question again?
6    Q.   I thought you testified earlier when
7    Mr. Nash was asking you questions that you could not
8    recall any discussions that you may have had with
9    Old Republic about the authority of Mr. Miller to
10   sign that contract.
11         MR. ZELMANOVITZ: At the time of
12   the transaction?
13   A.   At the time of the transaction?
14   Q.   At the time of the transaction, yes.
15   A.   Yes, that's correct.
16   Q.   Did anyone else at Riverside at your
17   firm have any discussion with Old Republic about
18   that issue?
19         MR. ZELMANOVITZ: At the time of
20   the transaction?
21         MR. ZUCKERBROD: Yes.
22   A.   I don't recall.
23         MR. ZUCKERBROD: Okay. Nothing
24   further.
25         MR. ZELMANOVITZ: Thank you.

Page 189

1          S. Greenwald
2          MR. ZUCKERBROD: As I said
3    before, I am going to mark those
4    documents that you gave to me as
5    exhibits.
6          But I don't have any questions
7    about them.
8          MR. ZELMANOVITZ: I will wait
9    for them.
10         MR. ZUCKERBROD: So there are
11   five documents here. If you could just
12   mark these as the next five exhibits,
13   and then we will make copies.
14         (Email document Bates-stamped
15   R00152 was marked Greenwald Exhibit 7
16   for identification, as of this date.)
17         (Email document Bates-stamped
18   R001505 was marked Greenwald Exhibit 8
19   for identification, as of this date.)
20         (Email document Bates-stamped
21   R001256 was marked Greenwald Exhibit 9
22   for identification, as of this date.)
23         (Email document Bates-stamped
24   R000988 was marked Greenwald Exhibit 10
25   for identification, as of this date.)

SHAUL C. GREENWALD

## Page 190

1                    S. Greenwald
2        (Email document, two pages,
3    marked Greenwald Exhibit 11 for
4    identification, as of this date.)
5        (Whereupon, at 11:45 a.m., the
6    deposition was concluded.)
7
8             _____
              Shaul C. Greenwald
9
10  Subscribed and sworn to before me
11  this _____ day of _____, 2015.
12
13    _____
        Notary Public
14
15
16
17
18
19
20
21
22
23
24
25

## Page 191

1                    S. Greenwald
2               I N D E X
3  Witness: Shaul C. Greenwald     Page

4  Examination by Mr. Zuckerbrod    4, 185
5  Examination by Mr. Nash        129
6  Examination by Mr. Schneider    182

7
8
9             E X H I B I T S
10  Greenwald     Description     Page
     For Ident.
11

12  1    Email document Bates-stamped R000987  87
13  2    Email document Bates-stamped R000705  114
14      and R000706
15  3    Document Bates-stamped R000790    120
16  4    Email document Bates-stamped R000068  124
17  5    Document Bates-stamped R000547    126
18  6    Resolution Bates-stamped R000270 and  182
19      R000271
20  7    Email document Bates-stamped R00152   189
21  8    Email document Bates-stamped R001505  189
22  9    Email document Bates-stamped R001256  189
23  10   Email document Bates-stamped R000988  189
24  11   Email document, two pages      190

25

## Page 192

1                    S. Greenwald
2     I N D E X (Continued)
3  INFORMATION REQUESTED        Page

4  Documents in question        100
5  Any documentation regarding this loan    106
6  Production of all of the bank records    111/112
     for entity in questions from August 1st
7    or July 1st to the present
8  Full production of any documentation    113
     regarding the loan in question
9
     Production of all loan agreements     136
10
     Production of all documents relating to   167
11  the issuance of the policy from Riverside
     Abstract and Old Republic

12
13  INSTRUCTIONS NOT TO ANSWER
     Page
14
15  10 - "And you said that you reviewed some documents.
     What documents did you review?"
16  72 - "Did you have any conversations with Old Republic
     as to why Riverside omitted 15 and 16 on the
17  abstract?"
18  171 - "But is she Riverside's attorney?"
19  171 - "Did you produce any written memorandums and
     summaries of the events that happened?"
20
21  172 - "Did you tell anybody at Old Republic that you
     had a loan transaction with affiliates of Miller and
22  Sprei and that your companies received $2 million at
     the -- in connection with the larger closing?"
23
24
25

## Page 193

1                    S. Greenwald
2          C E R T I F I C A T E
3  STATE OF NEW YORK  )
4             ) ss.
5  COUNTY OF NEW YORK )
6        I, Leah Allbee, a Registered
7  Professional Reporter and Notary
8  Public of the State of New York, do
9  hereby certify that the foregoing
10  Deposition, of the witness, Shaul C.
11  Greenwald, taken at the time and place
12  aforesaid, is a true and correct
13  transcription of my shorthand notes.
14        I further certify that I am
15  neither counsel for nor related to any
16  party to said action, nor in any way
17  interested in the result or outcome
18  thereof.
19        IN WITNESS WHEREOF, I have
20  hereunto set my hand this 13th day of
21  July, 2015.
22
23    _____
24     Leah Allbee, RPR
25

# EXHIBIT C

00906802.1

| Riverside Abstract | | | |
|---|---|---|---|
| RANY 16467 | | | |
| John Street | | | |
| | | | |
| Morgan Stanley | $ 3,580,000.00 | | |
| Kriss and Fuersrstein | $ 2,575,919.22 | | |
| Kriss and Fuesrstein | $ 5,587,269.33 | | |
| Kriss and Fuesrstein | $ 7,910,723.43 | | |
| Goldberg Weprin | $ 9,750,000.00 | | |
| Goldberg Weprin | $ 227,341.00 | RS Invoice | |
| 3839 Holdings | $ 618,088.02 | | |
| | | | |
| **Total received** | **$ 30,249,341.00** | | |
| | | | |
| | | | |
| Herrick, Feinstein LLP | $ 19,672,687.23 | | |
| Goldberg Weprin | $ 3,007,341.00 | | |
| Meridian capital | $ 500,000.00 | | |
| Goldberg Weprin | $ 70,000.00 | | |
| Javier Doral | $ 1,000.00 | | |
| Mega International | $ 2,827,312.77 | | |
| Babad | $ 2,000,000.00 | | |
| 3052 Brighton Street | $ 1,200,000.00 | | |
| Reliable abstract | $ 500,000.00 | | |
| Blaivas | $ 242,000.00 | | |
| RS Invoice | $ 227,341.00 | | |
| Rs Escrow | $ 1,659.00 | | |
| | | | |
| **Total disbursed** | **$ 30,249,341.00** | | |
| | | | |
| RANY-12445 | | | |
| Kriss and Fuesrstein | $ 107,791.19 | | |
| | | | |
| RANY-16788 | | | |
| Kriss and Fuesrstein | $ 1,304,610.37 | Holding 500K in escrow | |
| | | | |
| RANY-17030 | | | |
| Kriss and Fuesrstein | $ 165,433.30 | | |
| | | | |
| RANY-17030A | | | |
| Kriss and Fuesrstein | $ 173,016.74 | | |
| | | | |
| RANY-17030B | | | |
| Kriss and Fuesrstein | $ 2,366.00 | | |
| | | | |
| **Sum of invoices** | **$ 1,753,217.60** | | |

R000100