# EXHIBIT A

1
                    UNITED STATES BANKRUPTCY COURT
2                   SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------X
                                         :   15-10368 (SHL)
4    In re:                              :
                                         :   One Bowling Green
5        HS 45 JOHN LLC,                 :   New York, New York
                                         :
6                    Debtor.             :   June 27, 2016
     ------------------------------------X
7
          TRANSCRIPT OF HEARING ON (188) MOTION TO AUTHORIZE
8     TERMINATION OF THE CELL TOWER LEASE, OR ALTERNATIVELY,
               REJECTING THE CELL TOWER LEASE
9             BEFORE THE HONORABLE SEAN H. LANE
               UNITED STATES BANKRUPTCY JUDGE
10
     APPEARANCES:
11
     For the Debtor:           J. TED DONOVAN, ESQ.
12                             Goldberg Weprin Finkel Goldstein LLP
                               1501 Broadway, 22nd Floor
13                             New York, New York 10036

14   For AT&T:                 DAVID A. ROSENZWEIG, ESQ.
                               Norton Rose Fulbright US LLP
15                             666 Fifth Avenue
                               New York, New York 10103
16
     For the Purchaser:        ALLAN R. FREEDMAN, ESQ.
17                             150 Broadway, Suite 900
                               New York, New York 10038
18

19
     Court Transcriber:        MARY GRECO
20                             TypeWrite Word Processing Service
                               211 N. Milton Road
21                             Saratoga Springs, New York 12866

22

23

24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

```
 1   (Proceedings began at 10:33 a.m)

 2           THE COURT:  The next matter is HS 45 John LLC.

 3   Good morning.  Let me get appearances starting on this side of

 4   the room working that way.

 5           MR. ROSENZWEIG:  Sure.  Good morning.  David

 6   Rosenzweig; Norton Rose Fulbright for AT&T.

 7           MR. DONOVAN:  Ted Donovan; Goldberg Weprin Finkel

 8   Goldstein for the debtor, HS 45 John.

 9           MR. FREEDMAN:  Allan Freedman on behalf of the

10   purchaser.

11           THE COURT:  All right.  So I looked the papers that I

12   got and people don't need to repeat what's in the papers, but I

13   want to make sure I'm understanding a few things.  If I'm

14   understanding correctly, there doesn't seem to be any dispute

15   that there was no notice of this sale, the free and clear sale,

16   to the movant here.  That doesn't seem to be a disputed fact,

17   meaning written notice of the motion.

18           MR. ROSENZWEIG:  I think that's undisputed, yes.

19           THE COURT:  All right.  So --

20           MR. DONOVAN:  Your Honor?

21           THE COURT:  Yes.

22           MR. DONOVAN:  There was no specific written notice

23   given.  They did not appear in the affidavit of service that

24   was filed.  There are some open questions about whether and

25   when AT&T became aware that there was a bankruptcy.  They had
```

3

1    contacted our office shortly after the contract was signed in

2    the fall before we filed in February to get access to the

3    property.    They contacted us several times during the

4    bankruptcy to get access.    And we believe as a result of those

5    conversations they were made aware that there was a bankruptcy.

6    There's no specific testimony on it and they certainly did not

7    get formal notice of the sale.

8             THE COURT:    Right.

9             MR. DONOVAN:    Or a confirmation letter.

10            THE COURT:    Well, the papers I got in opposition are

11   pretty thin, so I was looking around.    I saw there was

12   something saying what they knew, what they didn't know.    No

13   one's really made a full blown constructive notice argument to

14   me.    I don't want to over think this but, you know, notice

15   issues are a big deal.    You know, you can look at Judge

16   Gerber's decision in GM dealing with plan notice issues even

17   when other parties raised exactly the same arguments.    Notice

18   is a big deal.    So it's my starting point to say how can I

19   apply the free and clear order to the movants here if they

20   didn't have notice of the sale?

21            MR. ROSENZWEIG:    Your Honor, that's really -- what

22   counsel is doing is turning it on its head.    One of AT&T's

23   counsel was in contact with them and they still didn't give any

24   notice.    So there's no -- they put in no evidence that they

25   told AT&T about the bankruptcy.    And in fact, that contact is

4

1   exactly why they should have put us on the notice list so we

2   could show up.  We're a known party so we're entitled to actual

3   service, not sort of just publication or anything else.

4          THE COURT:  I don't know who's lying in the weeds and

5   who's not in cases like this.  I only know what I see.  So if

6   somebody wants to make a constructive notice argument, they

7   have to give me the facts and they have to give me the law, and

8   I don't have either.  So it's an adversary system for a reason

9   and I'm not a UN commission who's going to go on a fact finding

10  mission and go to people's offices and find out who was talking

11  and who went and looked at telephone logs.  I rely on what

12  people give me.  So I don't have a constructive notice

13  argument.  No one's given me facts and the law to say why the

14  fact that the sale motion wasn't served on the movants is not a

15  problem.

16         MR. FREEDMAN:  I would like to agree with AT&T's

17  counsel who on the second page says should the party be

18  entitled to a better outcome from the sale solely because the

19  debtor did not give notice of the existence of the property.

20  And I would suggest to Your Honor that in a case like this

21  where we're talking about a lease for about $20,000 a year the

22  sale of a property, which Your Honor knows sold for about $70

23  million, it's very much a case of the tail wagging the dog.  If

24  the matter had been brought up during the course of the

25  bankruptcy, what AT&T could do is file an objection to their

5

1  rejection of the lease, file something that says it's cost us

2  so much money and therefore let us get paid by the debtor.  The

3  debtor has made that motion to reject the lease.  It said we

4  haven't been paid for 20 months or whatever.  AT&T put in some

5  documents that show they paid somebody, but who this somebody

6  is there's no explanation.

7          THE COURT:  Well, I can't blame -- I don't know who

8  to blame and frankly, I don't think I'll ever be able to figure

9  it out as to what the confusion was before everything happened.

10  There was a colorful cast of folks here in the courtroom in

11  this case and communication was not high on the list.  To give

12  debtor's counsel credit, they basically had to wrestle this

13  case to the floor to get it to go forward.  So any money that

14  was paid, who knows?  I'm sure you could as a forensic

15  accountant figure it out, somebody could figure it out.  But I

16  don't know what to make of that.  Frankly, I don't make

17  anything of it.  It is what it is.  I don't know if some of the

18  folks who had judgments entered against them ended up with

19  money in their pockets.  I have no idea.

20          But my problem is that they could have done a lot of

21  things but they didn't get notice and nobody -- again, you've

22  got to make arguments and give me something to work with here

23  because I can't even figure out what people are saying sort of

24  on this side about what the debtor can do or can't do because

25  at the one point I'm hearing debtors are not responsible

6

1    because they're not a party to the lease.  But on the other

2    hand, they're trying to reject the lease.  And so I know they

3    were a contract vendee and I know the settlement was premised

4    upon their ability to sell the property.  So it's a mess, but

5    nobody's given me anything.  So I don't know what you want me

6    to do with this.  This does seem to be the tail wagging the dog

7    but it also seems clear that people are not cooperating with

8    each other.  And I don't have any illusions that I never know.

9    I may think I know, but I don't know.  And so I'm the option of

10   last resort.  So if people can work it out, it does seem to be

11   a fairly modest issue that we've spent a lot more time on

12   attorneys fees than it's worth.  But I guess what you want me

13   to do is grant the motion to reject the lease but the debtor is

14   I think a party to the lease and therefore doesn't have any

15   obligation.  So I don't know who's rejecting what and I don't

16   have any authority dealing with it, so --

17          MR. ROSENZWEIG:  Your Honor, just to put some

18   context, I know that counsel wants to make this into the tail

19   wagging the dog, but it's an important issue for a telecom

20   carrier to have the sale --

21          THE COURT:  Well, you have whatever legal rights you

22   have.

23          MR. ROSENZWEIG:  But my point is it's not just well

24   it's only this amount of rent or whatever.  It goes in and out

25   and that affects our business.

7

1        THE COURT:  I know, but there are many buildings in

2   Manhattan.  I'm sure that this is not the only place you can

3   put a cell tower.

4        MR. ROSENZWEIG:  Yeah, and it costs money to move it.

5   So yeah, there's a bigger -- there are bigger issues here.  Our

6   --

7        THE COURT:  Well, all I'm saying is if somebody --

8   money talks.  So if somebody wants to write you a check large

9   enough to say here is what it's going to cost to move your

10  tower and to compensate people and that's essentially we'll

11  treat it like rejection damages whether or not the debtor is a

12  party to the lease or not, just like we sold it, whether it was

13  unclear whether the debtor was the vendee in possession or

14  whatever it was, we just sort of said you get it done.  So if

15  somebody wants to do that because it's worth it to you having

16  bought the building and you can work with debtor with the money

17  you got existing, I mean fine.  But you know, I'm not the

18  negotiating party.  It seems to me that there's probably a

19  price point somewhere that everybody can live with and hold

20  their nose and go away but --

21        MR. FREEDMAN:  Your Honor, we had a meeting in order

22  to do exactly what Your Honor suggested.  AT&T was supposed to

23  get back to us with the results of their survey, how much it's

24  going to cost, what they need to do, what they have to do, who

25  has to do what.  They never got back to us.  They never said a

8

1    word about it.

2              MR. ROSENZWEIG:   Your Honor --

3              MR. FREEDMAN:  What we haven't had in the time that

4    we've owned the building, okay, we've owned the building since

5    the beginning of this year, and we haven't had a nickel of

6    rent.  AT&T comes up with to me a very new kind of argument.

7    They say a footnote on the last page of their brief that they

8    haven't paid any rent and the reason they haven't paid it is

9    because there have been discussions to resolve it and the

10   purchaser refused to acknowledge it, and the purchaser denied

11   access.  But there's no question that the purchaser gave

12   access.  They denied some access.

13             THE COURT:  Well, people came in here because there

14   was a fight about access.

15             MR. FREEDMAN:  Right.

16             THE COURT:  So --

17             MR. FREEDMAN:  And then they got it.

18             MR. ROSENZWEIG:  It's still --

19             MR. FREEDMAN:  And then they got it.

20             THE COURT:  All right.

21             MR. ROSENZWEIG:  Look, Your Honor, we --

22             MR. FREEDMAN:  And we haven't had a nickel of rent --

23             THE COURT:  All right, all right.

24             MR. FREEDMAN:  I'm sorry, Your Honor.

25             THE COURT:  Don't talk over each other.  All right?

9

1   This is among the dumber disputes I've had to preside over in

2   quite a while. And the papers are lousy. So you're not

3   helping yourself. If you want some relief, you've got to write

4   better papers than this.

5          So here's what I'm going to do. You're going to

6   figure out -- there's money going one way or the other here.

7   Either you've got to pay rent which you haven't paid or you've

8   got to pay them to go away. And I don't know if there's some

9   money available in escrow and then there's obviously other

10  money. If it's a value for you, an important value for you

11  that you want them off there, then you're going to have to pay

12  for it. So that seems to be the swing unless I'm totally

13  misreading this.

14         MR. ROSENZWEIG:  No. Economically that's an issue

15  but that means move. We'd rather not move. We'd rather keep

16  it on the building and --

17         THE COURT:  I know, but do you really want to have a

18  trial on constructive notice? I mean we're going to drag

19  witnesses in here and say what did you know, when did you -- I

20  mean there are in the cases that you cited, you know, there are

21  not -- these are one of these cases that would be a wonderful

22  law school exam to torment young lawyers with and spend a lot

23  of time and a lot of money. And there's a couple of things in

24  the cases. One is about constructive notice. I don't know who

25  knew what when, who sat on what rights or didn't. The argument

10

```
 1  is it's certainly not fully developed.  But then there's also a
 2  line of cases about rights of parties whose interests have been
 3  compromised where the rights are unclear and whether you're
 4  supposed to give notice and how that works.  So there's a lot
 5  of interesting things here.  I don't know how important it is
 6  for AT&T to be in this particular building.  I don't know how
 7  important it is for you to get rid of.  But there's money going
 8  one way or the other that you should be able to quantify.
 9          MR. ROSENZWEIG:  That may be and it's significantly
10  more than this escrow, okay?  Significantly.  That I know.
11  Exactly how much, I don't have a number on that.  That's just -
12  - now we've had meetings, we've had discussions, and we simply
13  are told basically --
14          THE COURT:  Well, I don't want to get into what
15  people are told.
16          MR. ROSENZWEIG:  I know, but you're sending us back
17  to --
18          THE COURT:  What I -- no, I'm not going to send
19  anybody anywhere.  What I'm going to do is I'm going to leave
20  the bench.  I'm going to ask both of you to write down a number
21  on a piece of paper, at least a ballpark figure as to what is
22  going to take -- I mean how much rent is owed and what it's
23  going to take to get you off the building.  So I can't imagine
24  AT&T has a particular affection for this building such that
25  it's about that.  I understand your frustration.  You didn't
```

11

1    get notice, you're supposed to get notice of the sale.  I

2    understand that.  What I'm trying to do is find a way that

3    respects the sale order in a case that was a --

4             MR. ROSENZWEIG:  And we're not trying to upset the

5    sale order but --

6             THE COURT:  Well, you have to.  I understand that.

7             MR. ROSENZWEIG:  But as to us, yeah.  And my point is

8    if we had gotten notice we would have shown up and raised the

9    arguments about 365(h), 363(f), how it couldn't be done anyway,

10   so --

11            THE COURT:  I know, but we all know how it would have

12   worked out.  You would have found a way to get compensated to

13   get off the building if the purchaser was only going to buy it

14   to get you off the building.  That's the way it would have

15   worked out.  But that means somebody has got to pay you now to

16   get off the building.  So that's the way it works.  So I don't

17   know what the number was then, I don't know what the number is

18   now.  I don't want to know.  But I mean that's how it would

19   have worked because if the purchaser said I'm going to buy it

20   but I'm not buying it with it on it, then I suspect something

21   would have happened short of no sale because without the sale

22   there would have been no case.

23            MR. DONOVAN:  From our perspective, we had those

24   conversations with the purchaser before the closing.  We put

25   $25,000 in escrow which we're holding.  That's the money that's

12

1   there.

2           THE COURT:  Yes, but you know what?  They don't have

3   to take that.  There was no notice given.  There's --

4           MR. DONOVAN:  There was an escrow agreement, Your

5   Honor.  They don't have to take it but our agreement with the

6   purchaser is --

7           THE COURT:  No, I understand that, I understand that.

8   That was the debtors walkaway amount and say after this it's no

9   longer our problem.  I understand that.  I don't know why they

10  weren't noticed.  It doesn't really matter.  So if you want to

11  get them off you're going to have to pay them.  You would have

12  had to pay them before.  So do you want a time to talk now or

13  do you want me to just take a few minutes and rule?  It's up to

14  you.

15          MR. ROSENZWEIG:  Your Honor, we --

16          MR. FREEDMAN:  I'm sorry --

17          MR. ROSENZWEIG:  Go ahead.

18          MR. FREEDMAN:  We are presently in a situation where

19  we own the building and we haven't been paid rent now.  And I

20  think in the courts of the State of New York we are entitled to

21  have them evicted for nonpayment of rent.  None of that I think

22  is really before Your Honor.

23          THE COURT:  But if they pay you, they're not going

24  anywhere, right?  So that's obvious, you want them off I

25  thought.  If it's just a matter of payment, I'll direct that he

13

1  pay you in three business days or less.

2          MR. ROSENZWEIG:  Your Honor, we were happy to pay

3  them but there was a lot of confusion.

4          THE COURT:  I didn't think that's what this was

5  about.

6          MR. ROSENZWEIG:  I think it's just sort of being used

7  as --

8          THE COURT:  Well again, you know --

9          MR. ROSENZWEIG:  -- an excuse here.

10          THE COURT:  So here's what I'm going to do.  I'm

11  going to leave the bench for 15 minutes.  I'm going to come

12  back.  If you reach some sort of resolution or you want time to

13  talk, great.  If not, I'm just making a ruling.  So there's

14  problems here on both sides and I'll do the best I can with

15  what I've got.  And you know, it's not pretty what we do

16  sometimes.  We're here to break ties and that's my job.  This

17  doesn't seem to be the right way to do it but I'll do the best

18  I can with what I got.  And so what I would ask is just knock

19  on the door when you're done chatting and I'll come out and if

20  there is no agreement I'll just make a ruling unless there's

21  something, other matter of law that somebody wants.  I realize

22  I've been trying to sort of find an alternative solution.  Is

23  there anything as a legal matter anybody wants to say before I

24  sort of take it under submission and leave the bench?

25          MR. ROSENZWEIG:  No.  I think we put it all in the

14

1  papers.

2          THE COURT:  All right.  Anything from this side?

3          MR. FREEDMAN:  It's all in our papers.

4          THE COURT:  All right.  Anything from the debtor?

5          MR. DONOVAN:  No.

6          THE COURT:  You're in for 25 and after that you're

7  out.  All right.  Just knock on the door when you're done

8  chatting.  Thank you.

9          MR. FREEDMAN:  Thank you, Your Honor.

10  (Off the record at 11:27 a.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Please be seated.  All right.  Unless

13  there's some sort of resolution, I'll read a ruling into the

14  record.  Is there any resolution?

15          MR. ROSENZWEIG:  Your Honor, no, we were not able to

16  reach a resolution.

17          THE COURT:  All right.  Before I do that, I just want

18  to clarify something with debtor's counsel and anybody else can

19  chime in if they disagree or you want to be heard on this

20  issue.

21          I'm understanding the debtor's responsibility is

22  limited to the $25,000 by virtue of the escrow.  That is the

23  only liability the debtor can have in connection with any of

24  this.

25          MR. DONOVAN:  That is correct, Your Honor.  Since we

15

1  weren't a party to the lease, since we never owned the

2  property, we don't believe we have any liability directly with

3  AT&T and we have an escrow agreement with the buyer.

4          THE COURT:  All right.  And the debtor has no claim -

5  -

6          MR. DONOVAN:  And I checked Friday.  We do have the

7  25,000 in a separate escrow account.

8          THE COURT:  All right.  And the debtor has no claim

9  for nonpayment as to any of this meaning in the estate.

10         MR. DONOVAN:  No.  We did have a dispute with Miller

11 and Sprei and that all got settled.  So as to the pre-

12 bankruptcy payments, all that's been resolved.  So we didn't

13 have a claim against anybody else.

14         THE COURT:  So you don't have a claim against AT&T.

15         MR. DONOVAN:  No.

16         THE COURT:  All right.

17         MR. DONOVAN:  Because anything we have they would

18 have by virtue of being the -- of they being the purchaser

19 would have by virtue of being the purchaser.

20         THE COURT:  Right.  All right.

21         So I have a few motions before the Court that deal

22 with the sale of the property that was the centerpiece of this

23 case.  It was sold for some $70 million.  One deals with AT&T

24 that has a tower that it has on the building by virtue of an

25 agreement that predates the debtor.  And the other is a request

16

1   by the debtor, a motion dealing with trying to reject that

2   lease.  And all this centers on notice and things that we've

3   been discussing.  So let me table set first.

4         No one is asking that the sale of the property be

5   rescinded, and that's a good thing because sales in bankruptcy

6   are to be respected and only voided under exceedingly limited

7   circumstances.  See Dishi & Sons v. Bay Condos, 510 BR 696.

8   Bankruptcy, southern -- well, it's not bankruptcy.  (SDNY

9   2014).  And in that case Judge Oetken, the district judge,

10  noted the Second Circuit's view that the debtors can sell

11  property free and clear of leasehold interest pursuant to

12  Section 365(f), something he notes is the minority view

13  actually out there.

14        But with all that said then the only question is the

15  status of AT&T's lease for the cell tower on the roof.

16        Also important in terms of level setting here is the

17  involvement or obligations of the debtor in the current

18  dispute.  The debtor's exposure is limited only to $25,000

19  that's already placed in escrow by virtue of an agreement

20  between the debtor and the purchaser, 45 John NY LLC.  The

21  debtor has no other potential liability nor does the debtor

22  have a claim against AT&T for nonpayment prior to the sale.  So

23  the debtor's involvement is just limited to the $25,000.

24        So based on the record before the Court, the Court

25  concludes that the building was not sold free and clear of this

17

1    lease.  That's because there was no dispute that AT&T was not

2    given notice of the sale motion, was not a noticed party.  And

3    there's plenty of case law about the relevance and importance

4    of notice in this context.

5            The Court notes that there was possibly a

6    constructive notice argument floating around in this case that

7    might exist.  Frankly, I don't know.  The papers imply that

8    AT&T knew of the bankruptcy but that's not the same as saying

9    it knew of sale which is the relevant issue.  In any event, no

10   evidence has presented to me sufficient to make out a

11   constructive notice argument and no law was presented to me to

12   do the same.

13           So as to the motion to reject the lease, the basis

14   for that motion was nonpayment.  Evidence was presented to me,

15   however, that in fact payments were made.  Moreover, the debtor

16   concedes the lease was not and is not with the debtor but with

17   the party that predates Messrs. Miller and Sprei in this case.

18   So it's not all that surprising that debtors may or may not

19   know whether payments had been made.  Indeed, anyone who spent

20   any time in this case knows there was a massive amount of

21   confusion surrounding the affairs of Mr. Miller and Sprei as to

22   this property and other matters in this case and a huge amount

23   of resulting litigation.  We can just add this lease as one

24   more to the body count of that confusion.

25           But given all these facts, the Court does not have a

18

1  basis at the moment to grant the motion to reject the lease and

2  will deny it without prejudice based on what I have.

3         So that leaves one issue which is what appears to be

4  the lack of, undisputed lack of payments by AT&T on the lease

5  since the sale to the purchaser, 45 John NY LLC.  That issue

6  does not concern the debtor's estate given the debtor's lack of

7  any further liability relating to this lease or any claims that

8  the debtors might have arising under this lease.  So what you

9  have is a dispute between two parties that really has nothing

10  to do with this bankruptcy at this juncture.

11         So AT&T, 45 John New York LLC both have whatever

12  rights they have on the issue of nonpayment to deal with

13  outside of the bankruptcy court.  And that's my ruling.

14         I'd ask that the parties work together to submit a

15  proposed order.  The order shouldn't spend too much time

16  explaining the rationale.  You can just say for reasons stated

17  on the record at the hearing today.  And that's my ruling.  So

18  that would deal with both the lease motion as well as AT&T's

19  motion.

20         MR. ROSENZWEIG:  Thank you, Your Honor.

21         MR. FREEDMAN:  Thank you, Your Honor.

22         MR. DONOVAN:  Thank you, Your Honor.

23         THE COURT:  All right.  Thank you.  Sort of a classic

24  split decision.  All I can say is I urge the parties to try to

25  resolve it without engaging in further litigation.  It doesn't

19

1  seem to be worth it but, you know, there may be more going on

2  here than I know of.  And in that case, good luck with your

3  efforts.  Thank you.

4          MR. ROSENZWEIG:  Thank you, Your Honor.

5          MR. FREEDMAN:  Have a good day, Judge, and thank you

6  again for --

7  (Proceedings concluded at 11:35 a.m.)

8                    * * * * * *

20

1    I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _____

6                    Mary Greco

7  Dated:   July 28, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25